## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMED SOLTAN,<br>2907 Bleeker St.<br>Fairfax, VA 22031 | )<br>)<br>)<br>) | Civil Action No.: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT PURSUANT TO TORTURE VICTIM PROTECTION ACT** |
| HAZEM ABDEL AZIZ EL BEBLAWI, | )<br>)<br>) | |
| Defendant. | )<br>) | **JURY TRIAL DEMANDED** |

Plaintiff Mohamed Soltan, for his complaint in the above-captioned matter, states and alleges as follows:

### PRELIMINARY STATEMENT

1.     This is a civil action for compensatory and punitive damages brought by Plaintiff Mohamed Soltan, a citizen of the United States, under the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at, 28 U.S.C. §1350).  Plaintiff is a citizen of the United States who was almost killed, brutally wounded, imprisoned and tortured for nearly two years in Egypt because he dared to expose to the world the Egyptian military government's brutal suppression and massacre of peaceful demonstrators.  That suppression and massacre, as well as Plaintiff's imprisonment, torture and near death, were the direct results of actions taken by the highest levels of the Egyptian government, including, significantly, by Defendant Hazem Abdel Aziz El Beblawi, the former Egyptian Prime Minister.

2.      Defendant Beblawi imprisoned, tortured and approved the targeted assassination of Plaintiff (which failed only by happenstance as described below), acting in conspiracy with un-sued Defendants Abdel Fattah el-Sisi, the current Egyptian President and former Deputy Prime Minister for Security and Defense Minister; Abbas Kamel, el-Sisi's former Chief of Staff and current Director of The General Intelligence Service; Mohamed Ibrahim Mustafa, also known as Mohamed Ibrahim, the former Egyptian Minister of the Interior; Mahmoud Sayed Abdel Hamid Sha'rawi, the former Assistant Minister of Interior and Deputy Director of the National Security Agency and current Minister of Local Development; and, Tamer Al-Fergany, the former Attorney General of State Security Prosecution and current Head of the Anti-Corruption Authority (collectively, "Defendants").  Mr. Soltan now brings this action against Defendant Beblawi for the attempted extrajudicial killing of Plaintiff and for Beblawi's direction of and oversight over acts of torture against him.

3.      el-Sisi, Kamel, Ibrahim, Sha'rawi and Al-Fergany, (collectively, "the Un-sued Defendants") are also directly culpable for their violations of the TVPA, as described herein, but are not named as formal defendants at this time because they are not present in the United States. It is anticipated that one or more of them will visit the United States as many of them have done regularly in the past.  At such time, Plaintiff will add them to the lawsuit as formal defendants and serve them with process.

4.      The attempted extrajudicial killing of Plaintiff and his subsequent inhumane detention and torture were well-publicized and drew worldwide condemnation from the United States, including directly by President Obama, other governments, and international human rights observers, during Plaintiff's near 22-month captivity and eventual release in May of 2015.

5.      As detailed herein, the attempted extrajudicial killing of Plaintiff and his subsequent inhumane detention and torture were ordered and directed by Defendants, who occupied top positions in the Egyptian government.  They occurred as part of Defendants' closely coordinated and widely admitted policy of violent reprisals, mass killing and quashing of dissent through mass incarceration in Egypt's notorious system of torture prisons following the 2013 military coup.  As Prime Minister, Defendant Beblawi directed and monitored Plaintiff's illegal mistreatment, which could not and would not have occurred without his explicit knowledge, approval and direction.  el-Sisi, Kamel, Ibrahim, Sha'rawi and Al-Fergany all worked directly with and under Defendant Beblawi with respect to the torture and inhumane treatment of Plaintiff and acted in accordance with and furtherance of his plan and instructions.

6.      In the aftermath of Egypt's July 2013 military coup d'état that deposed former President Mohamed Morsi, Defendant Beblawi, in conjunction with the Un-sued Defendants, executed a systematic and ruthless crackdown against all political dissent and reporting by journalists on that dissent.  During that period, Plaintiff, a bilingual, dual Egyptian-American national, took an active and public role in facilitating international media coverage of voices opposing Defendants, arranging for a team of English translators to assist the foreign media not conversant in Arabic.  Plaintiff was committed to bringing the truth of what was occurring, including the massacre of innocent civilians, to the attention of the world.  Later, on the day of the infamous Rabaa Square massacre, Plaintiff took on the role of citizen journalist and live tweeted to the outside world gruesome images and reports detailing the brutal events and mass killings.

7.      Defendant Beblawi was fully aware of Plaintiff's high-profile and widely visible efforts to promote free expression and to prevent a cover-up of these atrocities.  Because of Plaintiff's actions and the embarrassment that they caused to the junta that executed the coup and

3

directed the massacre, Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi attempted the extrajudicial killing of Plaintiff, and, after that narrowly failed, worked with Al-Fergany to subject Plaintiff to a brutal orchestrated regime of detention and torture as a prominent political prisoner.

8.    Due to the torture administered under Defendant Beblawi's direction, control and monitoring, aided and abetted by the Un-sued Defendants, Plaintiff endured horrific physical and psychological abuse as described herein.  He continues to suffer the consequence of his abuse until this day.  Plaintiff now seeks justice and accountability through this Court.

## JURISDICTION AND VENUE

9.    Plaintiff alleges that Defendant Beblawi is liable for acts of attempted extrajudicial killing and torture as defined by customary international law and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350).  Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1350.

10.    This Court has personal jurisdiction over Defendant Beblawi based on his numerous, systematic and regular contacts with the District of Columbia.  He is currently employed as an Executive Director with the International Monetary Fund within the District of Columbia.

11.    Venue is proper in the United States District Court for the District of Columbia against the Defendants pursuant to 28 U.S.C. 1391.

## THE PARTIES

**A.**    **Plaintiff**

12.    Plaintiff Mohamed Soltan is a U.S. citizen.  He was a dual U.S.-Egyptian national until May 13, 2015, days before his release from Egyptian prison.  On that date, he was forced by the Egyptian authorities to relinquish his Egyptian citizenship as one of the preconditions to the

U.S. government securing his release.  He is a graduate of The Ohio State University, where he received a bachelor's degree in Economics.  Currently, Plaintiff resides in Virginia and works as a human rights advocate in the District of Columbia, while also pursuing a master's degree at Georgetown University's School of Foreign Service.  At the time of his arrest in Egypt, Plaintiff was 25 years old.  Despite his young age, he had for some time been an active and prominent figure in promoting human rights and freedom of expression in Egypt.

13.    At a hearing before Congress in 2015, Plaintiff was described by then-Assistant Secretary of State and current Representative Tom Malinowski (D-NJ) as "a particularly decent and courageous American, somebody [who] endured extraordinary hardship and pain for the sake of his principles."[1]  The hearing addressed many of the systemic human rights abuses perpetrated in Egypt by Defendants that are at issue in this action.

B.    **Defendants**

14.    Defendant Hazem El Beblawi, an Egyptian national, served as Prime Minister of Egypt from July 9, 2013 to March 1, 2014.  Immediately upon becoming Prime Minister, Defendant Beblawi, along with the Un-sued Defendants, orchestrated and executed a brutal program to suppress dissent and consolidate military rule.  Defendants planned and executed a campaign of indiscriminate killing, mass incarceration, and brutal torture of those who played any role in publicizing the Rabaa Square protests, the peaceful protests that began shortly after the

---

[1] *See* Human Rights In Egypt: Hearing before the Tom Lantos Human Rights Commission House of Representatives, 114th Congress (1st Session), November 3, 2015, (Statement of Tom Malinowski, Assistant Secretary for Democracy, Human Rights and Labor, U.S Department of State), page 11 (*available at* https://humanrightscommission.house.gov/sites/ humanrightscommission.house.gov/files/documents/Human%20Rights%20in%20Egypt%20Final%20Transcript%20to%20upload_0.pdf).

coup.  Defendant Beblawi currently works in Washington, D.C. as an Executive Director of the International Monetary Fund.

15.     Abdel Fattah el-Sisi, an Egyptian national, is an Un-sued Defendant.  As President of Egypt he is entitled by international law to Head of State Immunity for as long as he occupies that office.  At times relevant hereto, President el-Sisi worked in conjunction with and under the supervision of Defendant Beblawi in his capacity as Deputy Prime Minister for Security and is also culpable for the TVPA violations against Plaintiff described herein.  el-Sisi will be named in the event that his Head of State Immunity no longer applies and personal jurisdiction against him can be obtained.

16.     Abbas Kamel, an Egyptian national, is an Un-sued Defendant.  He served as the top aide and Chief of Staff to el-Sisi first in el-Sisi's role as Director of Military Intelligence, then as Minister of Defense, and, finally, as President of Egypt.  As el-Sisi's top advisor, Kamel served as the lynchpin between the various ministries responsible for the TVPA violations against Plaintiff described herein.   As current head of the General Intelligence Directorate, known as the Mukhabarat, Kamel frequently comes to the United States, including to the District of Columbia, to meet with his counterparts in connection with his duties, including the purchase of equipment and technology used in the ongoing mistreatment of prisoners within his official duties.  Kamel will be named in the event that personal jurisdiction against him can be obtained.

17.     Mohamed Ibrahim, an Egyptian national, is an Un-sued Defendant.  He served as the Minister of the Interior of Egypt from January 2013 to March 2015.  In August 2013, he, working along with then-Defense Minister Abdel Fattah el-Sisi, Kamel, Defendant Beblawi and Sha'rawi, ordered the National Security Agency to conduct the Rabaa Square massacre and oversaw the mass killings and woundings on that day.  Later, working closely with Al-Fergany,

Ibrahim oversaw the Prison Authority's widespread campaign of torture of political prisoners and is responsible for the multiple breaches of the TVPA while Plaintiff was held as a prisoner. Ibrahim will be named in the event that personal jurisdiction against him can be obtained.

18.     Mahmoud Sayed Abdel Hamid Sha'rawi, an Egyptian national, is an Un-sued Defendant.  He was a member of the State Security Investigation Service and climbed through the ranks during the Mubarak era, later becoming a high-ranking official in the department that combats extremist activity.  Sha'rawi served as the Deputy Director of Egypt's notorious National Security Agency between 2013 and December 2015 and assisted Defendant Beblawi to orchestrate the TVPA violations against Plaintiff described herein.  In 2015 Sha'rawi was promoted to become the Director of the National Security Agency and Assistant Minister of Interior and is currently serving as a Cabinet Minister of Local Development.  Sha'rawi will be named in the event that personal jurisdiction against him can be obtained.  Tamer Al-Fergany, an Egyptian national, is an un-sued defendant.  He served as Attorney General of State Security Prosecution between 2012 and 2020.  As head of State Security Prosecution, Al-Fergany oversaw the investigation and prosecution of political cases and perceived threats to national security.  In his role, Al-Fergany exercised authority over prisons and political prisoners including Plaintiff, investigating claims of torture or mistreatment, allowing or prohibiting visits from family, and providing prisoners access to lawyers and is responsible for the TVPA violations against Plaintiff described herein.  Al-Fergany is currently the Head of the Anti-Corruption Authority.  Al-Fergany will be named in the event that personal jurisdiction against him can be obtained.

## STATEMENT OF FACTS

## THE 2011 ARAB SPRING UPRISING AND DEMOCRACY IN EGYPT

19.    Plaintiff first began assisting foreign media in Egypt during the 2011 so-called "Arab Spring" uprising that toppled Hosni Mubarak and ended his 30-year rule.  During the 18 days of mass peaceful protests, Plaintiff journeyed from his family home in the suburbs of Columbus, Ohio to Tahrir Square, the site of the most prominent protest.  There he facilitated translations for foreign media covering the historic protests, a task he was well-situated to perform owing to his native fluency in both English and Arabic.

20.    The Arab Spring uprising in Egypt began on January 25, 2011 when mass popular protests spread across the country.  The protestors consisted of a diverse movement of pro-democracy advocates, secularists, socialists, Islamists, Copts, feminists, and others who protested the authoritarian rule of then President Hosni Mubarak.  The issues they protested included Egyptian state corruption, police brutality, widespread torture through the prison system, indefinite use of state-of-emergency laws, a lack of free elections and freedom of speech, high unemployment, food-price inflation and low wages.

21.    The 2011 Tahrir protests took various forms, but largely consisted of peaceful demonstrations, marches and acts of nonviolent civil disobedience.  During this time, crowds of tens of thousands flocked to Tahrir Square unified by their demand for an end to President Mubarak's 30 years of autocratic rule.

22.    According to an Egyptian fact-finding commission, approximately 850 people were killed during the 18-day protests largely at the hands of police that fired live ammunition at the unarmed protestors.  There were also widespread contemporaneous accounts of the deployment of torture against the peaceful protestors by Egyptian police officers during this time

8

23.     On February 11, 2011, after 18 days of protests and in response to heavy domestic and international pressure, President Hosni Mubarak resigned and handed power over to a military junta, the Supreme Council of the Armed Forces.  After Mubarak's resignation, Plaintiff returned home to Columbus, Ohio and re-enrolled at The Ohio State University where he graduated the next year with a degree in Economics.

24.     On June 16 and 17, 2012, after a turbulent period of military supervised transition, Egyptians voted in the country's first-ever open presidential elections.  The two leading candidates were Mohamed Morsi, the candidate representing the Muslim Brotherhood-affiliated Freedom and Justice Party, and Ahmed Shafik, the former Prime Minister under Mubarak.  In a close election, on June 24, 2012, Morsi was declared the victor, winning 51.7% of the vote.

25.     During President Morsi's tumultuous presidency, Egypt grew further polarized, as various factions fought political battles over the meaning, purpose, identity and nature of the Egyptian state in the post-revolution era.

26.     In March 2013, Plaintiff moved back to Egypt to care for his ailing mother, who had been diagnosed with breast cancer.  There, he secured employment as a manager for an oil services company based in Cairo.

27.     On June 30, 2013, the first anniversary of Morsi's assumption of the presidency, massive protests erupted.  The protestors cited a litany of grievances with Morsi's governance and demanded that he step down.  The army soon hijacked these protests to consolidate power, seizing upon the political turmoil and warning that it would take control if national reconciliation could not be achieved.

**THE 2013 MILITARY *COUP D'ETAT* AND ENSUING MILITARY CRACKDOWN**

28.     A few days later, on July 3, 2013, the army, led by el-Sisi, announced in a televised address that it had intervened to remove President Morsi from office and had suspended the 2012 Constitution.  The Army issued arrest warrants and rounded up hundreds of Muslim Brotherhood officials and former Morsi administration members and purported collaborators.  The Army announced that the Supreme Court Chief Justice Adly Mansour would serve as Egypt's interim president, and on July 9, 2013, Defendant Beblawi became the new Prime Minister.

29.     Immediately, Defendant Beblawi, working in close coordination with el-Sisi, Kamel, Ibrahim and Sha'rawi, all of whom were responsible to him as Prime Minister, effected the closure of all broadcast outlets unwilling to promote the newly established government's official narrative.  The news outlets that remained open broadcast military propaganda and sought to stir public sentiment against the ousted Morsi administration and its sympathizers.

30.     A large group of anti-military rule activists launched a major sit-in to protest the coup in Cairo's Rabaa al-Adawiya Square ("Rabaa Square").  The protesters slept, ate, prayed, and lived at the square in hopes that the sit-in would pressure the military to restore democracy.

31.     Plaintiff joined the tens of thousands of civilians in Rabaa Square, seeking to assist in the coverage of the protest by the many non-ideologically driven Egyptians alarmed at the sudden turn of events from democracy and who were once again facing a military takeover,

32.     As one of the few fluent Arabic and English speakers in Rabaa Square and a readily identifiable young American due to his customary attire—baggy shorts, flip-flops and a baseball hat worn sideways—Plaintiff became a valuable asset to the foreign media covering the protests, including journalists he had worked with during the previous Tahrir Square protests.  He volunteered as an interpreter and, later, coordinated a team of interpreters that assisted numerous

Western media outlets including the Washington Post, the New York Times, Time Magazine, the Guardian, CNN, ABC, the BBC, Time Magazine, the Guardian, and Al Jazeera.  Plaintiff was working to promote insight in the midst of the military black-out of all independent media.

33.     An example of Plaintiff's media work during that time occurred on July 8, 2013. On that day, military and police forces opened fire on hundreds of protestors as they demonstrated outside a military facility where Morsi was believed to be held.  At least 66 people were killed and more than 300 were wounded during the attack.  Plaintiff personally witnessed this massacre and assisted international news sources in reporting the events by providing access to witnesses and facilitating the reporting of their first-hand accounts.

34.     Later, on July 27, 2013, at least 72 protestors were shot dead by security officials and many more were injured during a sit-in protest in Rabaa Square.  Ibrahim had publicly claimed that his officers "have never and will never shoot" at Egyptian citizens.[2]  Plaintiff contradicted this false account, sharing videos, photographs, and first-hand testimonials of witnesses with international media.

35.     As a citizen-journalist describing actual events in two languages, Plaintiff became prominent in the Western media and anathema to the Egyptian junta, which was lying to Egypt and to the world about what was happening.  This made Plaintiff a prime target for retaliation.

36.     On July 31, 2013, after careful coordination with el-Sisi and his Chief of Staff Kamel, Defendant Beblawi authorized the Egyptian Cabinet and Ibrahim to violently disperse the protests, stating ominously that he had ordered the military and police to "take all necessary

---

[2] Kareem Fahim and Mayy El Sheikh, *Crackdown in Egypt Kills Islamists as They Protest,* The New York Times (July 27, 2013), https://www.nytimes.com/2013/07/28/world/middleeast/egypt.html.

measures to face these dangers and put an end to them," citing what it called a popular mandate to fight its "war on terror."[3]  By all credible accounts, however, these peaceful protests presented neither a danger nor any risk of terrorism.  As is so often the case with contemporary tyrants, those who dissented and demanded transparency in Rabaa Square were tarred as terrorists to justify the most heinous actions against them.  Upon information and belief, Defendant Beblawi, working in concert with el-Sisi, Kamel, Ibrahim and Sha'rawi, took this action, in part, out of frustration with his inability to fully control the narrative about what was occurring due to the work of Plaintiff and the foreign media.

37.     Defendant Beblawi assured the public that the protests would be cleared peacefully, even posting maps showing "safe exits" by which protesters could leave unharmed.  That assurance was a sham.  Early on the morning of August 14, 2013, security services surrounded the squares and as many protesters, including Plaintiff, slept, and they demanded that the camps be cleared.  The security services did so while simultaneously blocking off the promised "safe exits," bottling up the protesters in the square.  As directed by el-Sisi, Kamel and Defendant Beblawi, Ibrahim and Sha'rawi ordered the police to commence their assault in direct coordination with army forces and immediately began firing tear gas, sending the crowded camps into chaos.  A mere 10 minutes after the announcement, the security forces began firing live ammunition into the captive, non-violent crowd blinded by tear gas, a crowd that included women and children.  As Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi well knew and intended, there was no way that the crowded square could reasonably disperse amid the chaos of tear gas, live fire and massing

---

[3] Human Rights Watch, *All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt,* www.hrw.org, (August 12, 2014), at 99 (*available at* https://www.hrw.org/report/2014/08/12/all-according-plan/raba-massacre-and-mass-killings-protesters-egypt).

soldiers.  The immediate initiation of live fire assured that there would be vast numbers of dead and wounded.

38.     In an operation overseen by el-Sisi, Kamel, Ibrahim and Sha'rawi, in direct coordination with Defendant Beblawi, who as Prime Minister was el-Sisi's direct superior in security matters, Egyptian security forces fired repeatedly into the captive crowd from rooftops and helicopters, emptying many thousands of rounds of live ammunition.  Led by army bulldozers, police slowly advanced from each of the five major entrances to the square, destroying makeshift fences erected by protesters and other structures in their path.  The advancing forces were supported by snipers deployed on top of adjacent government buildings, who, on information and belief, were firing at targets designated by Defendant Beblawi and el-Sisi, Kamel, Ibrahim and Sha'rawi.  Security forces then besieged demonstrators for most of the day, attacking from each of the five main entrances to Rabaa Square leaving no safe exit until the end of the day.  This included trapping thousands of injured protesters in need of medical attention as well as families desperate to escape and, in many cases, firing upon those who sought to escape.  This was Defendant Beblawi's plan, formulated and carefully orchestrated while communicating directly by phone with Ibrahim and other officials from the Interior Ministry, including Sha'rawi, and it was executed with utmost brutality.[4]

39.     By the day's end, the Egyptian government had executed systematic, violent attacks on Rabaa Square, leaving approximately 1000 dead and thousands more wounded by gunshots in one of the worst mass killings of peaceful demonstrators in a single day in history, one which

---

[4] *See* Abdulsattar Hitaita, *Al-Beblawi Uncovers Details of Rab'a Protest Dispersal…and States that Mansour Had Given an Opportunity to Everyone in the Discussion*, Asharq Al-Awsat (2014), (*available at* https://aawsat.com/home/article/172121) (title translated from the original Arabic).

Human Rights Watch has called the "worst mass unlawful killings in [Egypt's] modern history."[5] Security forces also detained over 800 protesters over the course of the day, many of whom were beaten, tortured, and summarily executed.

40.     In the early hours of the military onslaught, Plaintiff witnessed the deliberate targeting of members of the media present reporting events.  He saw indicia of sniper "kill-shots"—gunshot wounds to the head, neck, chest and groin—in over a dozen corpses of reporters that day.

41.     Plaintiff live-tweeted images and reports of the Rabaa Square massacre as they unfolded.  Because Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi enforced a widespread internet blackout, Plaintiff would save several drafts of his reports on his Twitter feed before finding sporadic reception and broadcasting them out.  Upon information and belief, Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi and those reporting directly to them were monitoring that account.  As their later statements and actions demonstrated, they viewed Plaintiff's reporting the truth about this mass killing as treasonous.

42.     One such tweet captured and disseminated by Plaintiff was that of a journalist assassinated by a bullet that had pierced his helmet.  Pieces of his brain and skull were visible, splattered upon a white banner with the word "peace" written upon it in Arabic brought by a protestor in  Rabaa Square.

43.     Plaintiff was deliberately targeted for assassination that day for his work with reporters.  He was first shot at by a bullet that narrowly missed his head and then wounded by another bullet that struck his arm.  Prior to the sniper shots, he had fielded calls from a variety of

---

[5] Human Rights Watch, *Egypt: Security Forces Used Excessive Lethal Force*, (August 19, 2013), https://www.hrw.org/news/2013/08/19/egypt-security-forces-used-excessive-lethal-force.

international media seeking first-hand accounts from Rabaa Square and his phone battery had run low, so he located an electrical outlet to charge his phone. As Plaintiff leaned forward to remove the charging cable from his phone a bullet whizzed by just above his ear, narrowly missing his head in the place where it had been the moment before. Immediately thereafter, a second bullet fired from the opposite direction struck his arm, suggesting a coordinated sniper attack and active targeting of Plaintiff. The second bullet shattered his left humerus and lodged itself deep into the flesh of his upper arm.

44.     In the aftermath of the Rabaa Square massacre, Ibrahim explained his work with Sha'rawi and the high level of planning that was conducted under Defendant Beblawi's watch. He stated, "I started meeting with my assistants, and we laid a plan for the dispersal of the two sit-ins, which we submitted to the cabinet so that there would be political and legal cover for it. We obtained a permit from the public prosecution and submitted the plan to the National Defense Council [of which Beblawi and el-Sisi were members] to which they agreed."[6] Ibrahim formulated the plan for the Rabaa Square massacre that was approved by Defendant Beblawi and a central group of ministers, including el-Sisi, who oversaw its implementation with the assistance of Kamel, who assisted with the coordination efforts. Ibrahim acknowledged that he had "ordered the Special Forces to advance and purify" key buildings at the heart of Rabaa Square.[7]

45.     According to certain Western diplomats, Ibrahim scrapped an initial plan that would have spared bloodshed and instead opted for a plan of "maximum force to get it over with

---

[6] *All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt* at 101.

[7] *Id*. at 15.

15

quickly."[8]  The day after the Rabaa Square massacre, he told the Egyptian daily Al-Masry al-Youm that "the dispersal plan succeeded 100 percent," indicating that the manner in which it was carried out was centrally planned and reflected a clear governmental policy.[9]

46.     Indeed, Defendant Beblawi personally authorized and launched the operation anticipating even more than the 1000 deaths that actually occurred.  In a September 2013 interview, Defendant Beblawi told Al-Masry al-Youm that the death toll from August 14 massacres was "close to 1,000," but that "[w]e expected much more than what actually happened on the ground. The final outcome was less than we expected."[10]  His statement makes clear that he was part of the "we" who planned the massacre and that he had approved a plan that called for far more than 1000 civilian deaths.

47.     el-Sisi also acknowledged in an August 18, 2013 interview the careful planning that went into the Rabaa Square massacre with Defendant Beblawi, Ibrahim, Sha'rawi and Kamel, stating that he spent "very many long days to discuss all the details."[11]  Recognizing Kamel's central role in the planning and coordination, when asked in 2013 about the number of deaths in the Rabaa Square massacre, el-Sisi responded that the reporter should "ask Kamel."[12]

---

[8] David D. Kirkpatrick et al*., How American Hopes for a Deal in Egypt Were Undercut*, New York Times (August 17, 2013)*,* https://www.nytimes.com/2013/08/18/world/middleeast/pressure-by-us-failed-to-sway-egypts-leaders.html.

[9] *All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt,* at 12.

[10] *Id*.

[11] Patrick Kingsley, *Egypt Massacre was Premeditated, says Human Rights Watch*, The Guardian, (August 12, 2014 4:01 PM), https://www.theguardian.com/world/2014/aug/12/egypt-massacre-rabaa-intentional-human-rights-watch); *See also All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt* at 15.

[12] EgyptWatch, *General Abbas Kamel: The Strongman in Al-Sisi's Regime*, (August 19, 2019), (*available at* https://egyptwatch.net/2019/08/19/general-abbas-kamel-the-strongman-in-al-sisis-regime).

48.     As Prime Minister, Defendant Beblawi personally reviewed and approved Ibrahim and Sha'rawi's plan and strongly endorsed the operations publicly.  Defendant Beblawi described the killings as being "needed to move the country forward," even though "it was also clear that there would be victims."[13]

49.     A Human Rights Watch report concluded that Egyptian police were shooting to kill rather than to injure or apprehend.[14]  It also stated that the premeditated violence was ordered at the highest levels of government, which includes, on information and belief, Sha'rawi, Ibrahim and Defendant Beblawi, to whom current President el-Sisi, working as Deputy Prime Minister for Security at the time, reported.

## PLAINTIFF'S ARREST AND BRUTAL ABUSE AT BASATEEN POLICE STATION AND THE STATE SECURITY PROSECUTION BUILDING

50.     In the wake of the Rabaa Square massacre, Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi unleashed the full violent power of Egyptian security forces to continue their campaign of repression, arbitrary imprisonment, and torture.  The campaign was designed to suppress any remaining dissenting voices and punish the individuals responsible for airing their stories, including Plaintiff who had gone into hiding.

51.     Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi succeeded in executing a near total suppression of all domestic coverage of the crackdown that questioned their actions. International audiences, however, were provided with images and reports of the events unfolding in Egypt due in large part to the efforts of Plaintiff and similar individuals fluent in English who could work with the international media.  Those images and reports made their way not only

---

[13] *All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt* at 147.

[14] *See id.*

around the world, but also back into Egypt through encryption, smuggled foreign news and word of mouth.  This defeated the attempt of the new military junta to hide its campaign of violence and repression and enraged Defendant Beblawi and the Un-sued Defendants, who responded with further violence and repression.

52.     Days after the Rabaa Square massacre, Plaintiff had surgery on his shattered arm at a small community clinic and opted for an internal fixture rather than a visible cast to avoid detection by the Egyptian authorities.  Despite the excruciating pain and in contravention of his Doctor's order to rest, he, along with three journalists who also had covered the events—Samhy Mostafa, Abdullah Fakharany and Mohamed Al-Adly—continued to move from apartment to apartment, finally returning to Plaintiff's parents' home in the Al-Maadi suburb of Cairo on August 23, 2013.

53.     On August 25, 2013, shortly after Plaintiff conducted an interview with Jared Malsin of Time Magazine, Egyptian security forces stormed the house and arrested Plaintiff and the three journalists.

54.     Approximately 30–40 civilian-clothed state security officers under, on information and belief, Defendant Beblawi's authority and direction, took part in the capture operation.  Upon storming the apartment, approximately six officers forced Plaintiff and his journalist companions onto their knees and proceeded to brutally beat them, slapping and punching their faces and upper bodies repeatedly.  Some officers taunted Plaintiff as they beat him with shouts of "don't think that your American citizenship is going to save you."

55.     The officers then ordered the arrestees to lie directly on their stomachs.  Plaintiff was still recovering from the gunshot wound in his arm and was wearing a sling, so he could not

follow the officers' orders to lie on his stomach.  Seeing this, the officer in charge repeatedly struck Plaintiff in the back of his head causing him to black out.

56.     At no time during Plaintiff's arrest did the armed, plain-clothed state security officers identify themselves nor did they inform him of any charge or provide him with a warrant or other basis for the arrest.  Their actions caused Plaintiff to fear that he and his journalist companions were being "disappeared" as so many had at Defendants' direction during those perilous days.

57.     Following his arrest, Plaintiff was taken to the Basateen Police Station.  There, he was thrown into a crowded holding cell and handcuffed to other prisoners while forced to squat on the floor with no space to lie down.  This caused Plaintiff further excruciating pain due to the injuries to his arm as well as a previous injury to his right knee.  The officers were aware of Plaintiff's easily visible injuries and would inform each new shift of police to specifically target the injuries to cause maximum pain.

58.     Plaintiff was held in Basateen Police Station for between 36-48 hours.  During this time, Plaintiff was held incommunicado and prohibited from contacting anyone outside the prison, including family members, counsel, or the U.S. embassy.

59.     On August 26, 2013, Plaintiff was taken to his first interrogation where he was questioned for approximately two hours by senior officers of the National Security Agency reporting to el-Sisi and Defendant Beblawi.  Plaintiff was blindfolded in the common holding cell and then handcuffed to another individual who did not identify himself, but who Plaintiff understood worked with the National Security Agency.  Plaintiff was taken by two guards into a separate room where he was interrogated, remaining blindfolded.  Depending on the nature of his

responses, a guard would jerk Plaintiff's injured arm downward, slapping and punching him with a closed fist, often targeting his injured arm. Another officer beat him repeatedly with his baton.

60.     During the August 26, 2013 interrogation, Plaintiff was asked repeatedly about his activities in Rabaa Square assisting the foreign media, his American citizenship, his political viewpoints, as well as his father's whereabouts. Plaintiff's father had been a Deputy Minister in the overthrown government and was in hiding. At one point during the blindfolded interrogation, Plaintiff felt a painful, burning sensation on his neck. A cigarette had been put out directly on his skin by the interrogators. The officers resumed their vicious physical attacks while also berating him for working with foreign media to broadcast anti-military views that would "embarrass Egypt before the world."

61.     Plaintiff was not provided food or drink until nearly two days after his arrest. During this time, Plaintiff lived under constant fear and threat of physical abuse and death. The guards, officers, and State security prosecutors would routinely boast to Plaintiff and the other prisoners that they could kill anyone at any moment, and that there would be no repercussions because it all occurred in complete secrecy, beyond the view of the outside world. Given the history of disappearances and torture in Egyptian prisons, Plaintiff viewed these threats of murder as entirely credible.

62.     During the entirety of his detention at Basateen Police Station, Plaintiff was kept in an unventilated approximate 5-meter by 5-meter cell along with 45–50 other prisoners. This was in August, when the average ambient temperature in Cairo reaches upwards of 95 degrees Fahrenheit. Because there was not enough room on the ground for the prisoners to sleep, Plaintiff and the others were required to sleep in shifts.

63.     On August 27, 2013, nearly two days after Plaintiff's arrest and detention in Basateen Police Station, security forces finally issued an arrest warrant.  Plaintiff was taken to the State Security Prosecutor's office headed by Al-Fergany.  There, assistant prosecutors operating under Al-Fergany's command and control, Elyas Imam, Mohamed Khatir and Mohammad Al-Taweela interrogated him.  The prosecutor's office then sent Plaintiff to a new police station in Manshiyat Nasir where, in his first recorded official interrogation, Plaintiff detailed his health condition to the interrogator and requested medical assistance.  Plaintiff's requests for medical attention were ignored by Al-Fergany and his assistants, and Plaintiff's condition worsened due to further beatings.

64.     That same day, Plaintiff was interrogated around the clock concerning his political views.  Plaintiff was falsely accused of an assortment of imagined crimes, including membership in a terrorist organization, forming a gang, plotting to overthrow the regime, and spreading false information internationally with the intention of "shaking the grandeur of the state."  Because Defendants had been condemned internationally for arresting journalists, Defendants made allegations of terrorism and extremism and tried to extract confessions to change the narrative from a crackdown on truth telling to a crackdown on extremism.

65.     The charges against Plaintiff were the same ones levelled against Al-Jazeera journalists, which had already garnered heavy international criticism.  Upon realizing that such charges were viewed as illegitimate on the international stage, members of Al-Fergany's prosecution team, working in concert with Defendants Beblawi, Ibrahim and Sha'rawi, sought to obscure the fact that Plaintiff was being targeted due to his role in spotlighting Defendant Beblawi's brutal crackdown for the world to see.  They settled upon a plan to add leaders of the

Muslim Brotherhood as well as other prominent political and media figures to Plaintiff's case even though Plaintiff was never a member of the Muslim Brotherhood, as they well knew.

66.     Al-Fergany, with the approval of Defendant Beblawi, charged Plaintiff and other journalists with an assortment of knowingly false charges, to criminalize assistance of journalists by falsely alleging terrorism.   The false charges also included charges relating to their media activities: intentionally broadcasting false news, information, and rumors about the domestic situation of the country; transmitting videos, photos and false news to damage the prestige of the state and harm the national interest of the country; deliberately broadcasting false news, information and rumors to disturb public security and spread terror among the general public and harm the public interest; and, utilizing wireless communication devices without permit for the purpose of undermining national security.

## PLAINTIFF'S ABUSE AT MANSHIYAT NASIR POLICE STATION

67.     After the interrogation at the State Prosecutor's office, Plaintiff was transferred to the Manshiyat Nasir Police Station.   During the transfer from Basateen Station to Manshiyat Nasir Police Station, the head of the investigative unit at Basateen warned the head investigative officer at Manshiyat Station to beware of protests outside the station.   The Manshiyat officer responded by pulling out his gun and pointing it at Plaintiff and the other prisoners, threatening that "if anything happens, we'll release them and shoot them one-by-one like chickens."

68.     At Manshiyat, Plaintiff was subjected to the same type of orchestrated humiliating treatment and violent abuse that he faced in Basateen.   Upon their arrival at Manshiyat, the guards there promised Plaintiff and his fellow arrestees that they "would never leave these prisons alive." When they arrived, all detainees were forced to strip to their underwear.   Plaintiff was chained to his fellow arrestee and journalist Mohamed Al-Adly.   He pleaded for medical attention for his arm

injury, which had since worsened due to the beatings and lack of medical care. Plaintiff asked to change the bloodied and putrefied bandage on his arm and in response, the head investigative officer working under Sha'rawi, under the orders of Al-Fergany, drew his gun and marched directly to Plaintiff, aiming the weapon at Plaintiff's head. He shouted at Plaintiff, "What kind of medical attention would you need once you have a bullet in your head?" Seeing the gun pointed at his head caused Plaintiff extreme terror as he expected to be shot at any moment. Eventually, another officer succeeded in calming the officer down by stating that Plaintiff would be "his" soon enough.

69.     The detainees were then taken to a holding cell that was empty except for a concrete bench, which all the detainees took turns sitting and laying down on, using plastic water bottles as pillows. Desperate to cover the open wound on his arm and to prevent it from infection and further aggravation, Plaintiff was forced to utilize the only items available: several pieces of discarded dirty bloody cotton shards that rested on the ground. The wound remained untreated and painful. Plaintiff's condition was ruthlessly exploited by his captors during subsequent beatings, in which they would target his arm with their blows.

70.     Initially, the Manshiyat prison authorities, upon information and belief acting upon orders from Defendants, instituted a total ban on food and drink for Plaintiff, as well as a ban on visitors. Finally, on August 29, 2013, Plaintiff was allowed a brief two-minute monitored visit from a family friend. During the visit he and other detainees received some food and money from their families to pay the guards the necessary bribes to obtain food and water to survive. At night, the guards would come into the holding cell, take a few of the prisoners out, and beat them outside where the other detainees could still hear.

71.     During this time, Plaintiff continued to struggle with his injuries, shuttling between one prison/police station and another.  He suffered from constant beatings, threats of beatings and death, humiliation, isolation and starvation.

## ABUSE AT BASATEEN AND WADI NATROUN 440 PRISON

72.     On August 29, 2013, Plaintiff was sent back to Basateen where he was to await transfer to another prison.  At Basateen, officers beat Plaintiff and numerous other detainees mercilessly, with one prisoner tied to a tree in front of the prisoners as he was kicked and beaten with wooden sticks and belts.  Plaintiff learned two days later that the man had died from the blows.

73.     After the beatings, Plaintiff and some 50 other detainees were selected for transfer to Wadi Natroun Prison.  They were told to squat outside until they were herded into two closed transport vehicles built for 12 individuals each.  Some forty-three prisoners, including Plaintiff, were forced into one wagon while only seven were placed in the second.  During this ride, Plaintiff was handcuffed to another detainee and nearly suffocated from the lack of air circulation in the stifling Cairo heat.

74.     Plaintiff spent five hours in transit in the overcrowded transport vehicle, never informed where he was being taken.  When the wagon finally reached Wadi Natroun Prison, the guards kept the detainees waiting in the vehicles in the extreme heat, without air circulation.

75.     Finally, Plaintiff and the other prisoners were released from the wagon and forced to run through a gauntlet of two rows of guards who brutally beat them with batons, whips, belts, and fists as they passed.  Plaintiff was still handcuffed to a fellow prisoner, and his broken arm was made a target by the guards as they beat him.  As he ran through the gauntlet, Plaintiff dropped the bag of painkillers he had secretly been carrying with him in his sling.  When he tried to turn

back, the prisoner he was handcuffed to dragged him forward to escape the beatings.  Plaintiff was

not allowed to retrieve the necessary medicines.  He was told by officers at the time that the

beatings would continue to come and that they were meant to send the detainees a "clear message."

76.     After the beatings, the prisoners, including Plaintiff, were forcibly shaven, stripped

down, and told to squat in groups of four.  Plaintiff could not squat due to his injuries and suffered

another beating for failure to comply with the impossible demand.

77.     The detainees were then instructed to line up against and face a wall, with no

explanation.  An officer came up behind Plaintiff and three fellow journalist arrestees and claimed

that they were "the bastards who killed my friends at Rabaa."  Then Plaintiff and his three fellow

journalist arrestees were singled out for additional beatings.  For two hours, eight officers and

guards beat them with whips, belts, batons, punches and kicks.  The officers took turns when they

grew tired to ensure the beatings did not stop.

78.     At this point, the approximately 50 prisoners were moved to a single individual

cell.  Plaintiff lost consciousness during this period on multiple occasions due to the pain from the

beatings and the injuries to his body and arm.

79.     On September 7, 2013 Plaintiff was brought to a meeting with Abdulaleem Farouq,

a state prosecutor working under Al-Fergany.  During the meeting Plaintiff informed Farouq of

his need for medical treatment as well as his beatings at the hands of the prison authorities.  At that

meeting, Plaintiff made clear the severity and duration of the beatings, showing Farouq the metal

nails that held his bones together that had begun to tear out of his elbow and through his skin.

Plaintiff also informed Farouq that he suffered from severe asthma that put him at risk of

pulmonary embolisms and that the confined and overcrowded cells exacerbated these conditions.

Plaintiff requested medical assistance and one day later was seen by a doctor who reported his

medical conditions to the prison and security authorities.  The report, later seen by Plaintiff, stated that he urgently needed medical attention; however, he never received any care.

## ABUSE AT TORA PRISON

80.     Plaintiff was then transferred to the notorious Tora prison complex where he was held for the remainder of his detention.  Tora occupies 1.3 square kilometers (332 acres) in southern Cairo and houses at least six detention facilities administered by the Interior Ministry.

81.     All prisons in Egypt fall under the control of the Interior Ministry's Prisons Authority Sector.  In practice, however, Tora is overseen by the internal security service, the National Security Agency under Sha'rawi who reported to Ibrahim as Interior Minister, and in turn to Defendant Beblawi as Prime Minister.  The National Security Agency maintains almost total control over decisions about access to the prison and the treatment and movement of its inmates. Tora houses the bulk of high-profile political prisoners, whose treatment is closely monitored.

82.     In a 2012 television interview, a former Tora warden, Ibrahim Abd al-Ghaffar, stated "[i]t was designed so that those who go in don't come out again unless dead.  It was designed for political prisoners."[15]

83.     Human Rights Watch described the severe conditions in the Tora prison complex including "the beating of inmates, confinement in their cells for months at a time, bans on visits by relatives and lawyers, a prohibition on all written materials, and interference in medical care."[16] Plaintiff received all that and more.

---

[15] Human Rights Watch, *We Are in Tombs: Abuse in Egypt's Scorpion Prison*, www.hrw.org, (September 28, 2016), https://www.hrw.org/report/2016/09/28/we-are-tombs/abuses-egypts-scorpion-prison.
[16] *Id.*

84.     On September 12, 2013, en route to Tora, the condition of Plaintiff's arm badly deteriorated.  During the course of his beatings, the screws in his arms had shifted, one coming close to his elbow and ulnar nerve; the other moved close to his shoulder.  The slightest movement caused him excruciating pain.  After many pleas for help, authorities finally agreed to take him to a medical clinic and have his arm examined.  There, however, Plaintiff only received a quick change of his putrescent dressing and no examination of the injuries caused by his repeated beatings.

85.     Unlike other political prisoners whose visits were monitored by lower ranking prison officials, visits to Plaintiff were monitored at the highest levels.  During all visits to Plaintiff by family members, Egyptian counsel, U.S. consular affairs and even his U.S. counsel, high-level prison and Interior Ministry officials reporting to Defendants would sit in the same room, listening to the discussions.  This included the Prison Warden and the National Security Agency's representative stationed in the prison.  On information and belief, the details of these meetings were reported directly to Defendant Beblawi and thereafter to the Un-sued Defendants.

86.     Weeks after his incarceration began, the authorities arrested Plaintiff's father—a former deputy minister in the Morsi government—and utilized him in their torture of Plaintiff. Guards operating under Defendants' direct supervision and control would routinely delight in recounting to Plaintiff the intimate details of the indignities to which his father—who suffered from a host of ailments including diabetes, high blood pressure, Hepatitis  and two bulging disks in his back—was subjected.  These included a range of physical and emotional abuse.  In addition, on several occasions the guards would beat his father within earshot of Plaintiff so that he could hear the cries as the blows rained down upon him.

87.     When transferred to the Tora prison complex, Plaintiff was only allowed to keep one pair of undergarments; everything else was burned before his eyes.  He was not given any replacements.

88.     Plaintiff's prison cell window did not allow any direct sunlight into the cell and cut off almost all airflow.  Because of this arrangement, he suffered heat exhaustion due to the extreme heat of the Egyptian summer when the temperature inside his cell rose to well in excess of 100 degrees Fahrenheit.

89.     The cell lacked all necessities of basics of living conditions; no blanket, pillow or even food was provided.  Nothing was provided aside from one box of water bottles that Plaintiff later used as pillows.  No mattress was provided by the authorities and so he flattened the cardboard boxes that had held the water bottles to provide some cushioning between his body and the hard concrete.

90.     Plaintiff was not allowed access to exercise or to go outside for fresh air and was only allowed into the prison hallway for short durations at a time.

91.     Plaintiff's cell contained no toilet, just a hole in the ground over which he was forced to squat—a difficult endeavor given his medical condition.  He only had intermittent access to unsanitary dirty water to clean himself and to wash his festering wound.  The denial of these basic necessities for hygiene caused and exacerbated Plaintiffs' skin eruptions and infections.  Plaintiff was informed by prison authorities on numerous occasions that their denial of basic items of comfort and hygiene was purposely designed to degrade and humiliate him.

92.     Plaintiff's cell was also infested with cockroaches and spiders.  His cell was underground and so water regularly leaked into it when it rained.

93.     Plaintiff and his fellow prisoners were held incommunicado for a total of eleven days upon their arrival at Tora, after which time they were allowed sporadic contact with family members and brief visits.  In October 2013, Plaintiff and his fellow prisoners threatened a hunger strike and began to protest the terrible conditions in Tora.  The prison authorities, operating under Defendants' express authority and control, responded by deploying tear gas against the prisoners, including Plaintiff, in their cells.

94.     Plaintiff was interrogated in Tora by Al-Fergany's Assistant Prosecutors Elyas Imam, Mohamed Khatir and Mohammed Al-Taweela, where, as in prior interrogations, he was blindfolded, handcuffed, physically assaulted, and berated.  During the interrogations, Plaintiff repeatedly requested medical attention.  These requests were consistently denied by the prison authorities.  When they finally responded, they gave him an X-ray but no actual treatment.

95.     In November 2013, Plaintiff was repeatedly refused medical attention despite his need for prompt surgery.  Finally, two of his cellmates, both of whom were doctors, operated on his arm without anesthetics or sterilization.  The doctor performed the surgery inside Plaintiff's cell using pliers and a straight razor in lieu of a scalpel.  Plaintiff's cellmates held him down as he writhed from the pain of undergoing surgery without anesthetic.  They performed the surgery to prevent further permanent damage to Plaintiff's arm.  Two hours later, when the guards could no longer bear the screams of Plaintiff and his cellmates calling for help, the guards gave him two aspirins.

96.     In Egyptian prisons, detained members of the same family are routinely provided the option to be held together.  When Plaintiff made a request to be held with his father, however, he was denied that request by an officer who showed Plaintiff an order issued by Al-Fergany explicitly barring that from happening.

29

97.     Finally, approximately 150 days after the date of his arrest, Plaintiff was informed that he would be brought before a judge for the first time.  The judge immediately ordered his imprisonment for another forty-five days without a hearing.  In protest, that same day, January 26, 2014, Plaintiff initiated a hunger strike to protest both his unjust arrest and the brutal conditions of his confinement.

98.     While on hunger strike, Plaintiff refused to consume solid foods and drank only liquids.  This was the first such hunger strike recorded in Egypt and brought with it intense international media coverage.  The Egyptian authorities operating under Defendants' command and control at first treated the strike with cruel amusement, stating that it would relieve their burden if Plaintiff were to kill himself, and refused to provide Plaintiff medical care.

99.     As a result of the conditions of his confinement as directed by Defendants, Plaintiff suffered a pulmonary embolism and over twelve hypoglycemic comas in prison.  After sixteen months on hunger strike, Plaintiff shed 160 of his original 270 pounds of body weight, dropping to a sickly 110 pounds.  He risked organ failure and was near death.

100.    Throughout the course of his hunger strike, Plaintiff was very weak, unable to walk, and used a wheelchair.  Even then the prison authorities operating under Defendants' command and control showed him no mercy.  On multiple occasions they handcuffed him to his wheelchair and beat him with punches, slaps, and kicks to the face and stomach.  After they were done, they called the doctors to take his vital signs but directed that the doctors could not attend to Plaintiff in any other way.

101.    In retaliation for the international attention mounting with regards to Plaintiff's mistreatment, from December 18, 2014, through the date of his release, Egyptian officials operating under the Un-sued Defendants' command and control placed Plaintiff in a windowless

room measuring 2.5 meters by 3 meters in complete isolation in a building in the furthest corner of the Tora prison complex.  Plaintiff had been held in solitary confinement for the 8 months prior, but this confinement was in its own separate building.  There, he was kept in utter isolation and had no human contact; no window for sunlight, no sound of anything living, no exercise, and no exposure to the sun.  After some days of silence, Plaintiff broke down and started banging his head against the metal door until he bled enough to need a bandage.

102.    To assist in Plaintiff's torture, Defendants also deployed an Interior Ministry official reporting directly to Ibrahim named Mohammed Ali.  Ali was the third ranking official in the Prison Authority and was notorious for his torture of political detainees.  Among other things, Ali would let loose a purposefully starved attack dog on the political detainees to intimidate them. On one occasion, the attack dog viciously bit a fellow prisoner in front of Plaintiff.

103.    On December 18, 2014, Ali, along with Mohamed Khaleesi, the second ranking official in the Prison Authority who also reported to Ibrahim, and a group of guards operating under Defendants' command and control filed into Plaintiff's cell and began to beat Plaintiff relentlessly, knocking the wind out of him, kicking him, and breaking his ribcage.  Plaintiff retreated to a cell wall and attempted to protect himself from the blows, but the guards persisted in kicking his head, arms, legs, and stomach.  Then, the officers grabbed Plaintiff by his arms and legs and stripped him down, taking all his clothes, as well as his books and other belongings in the cell, and burned them.

104.    During this time, the prison authorities operating under Defendants' command and control actively encouraged Plaintiff to take his own life.  The guards slipped razor blades under the door of Plaintiff's cell.  Medical officer doctors later came in to talk to Plaintiff about suicide and instructed him to slit his wrist vertically to ensure death.  After that, prison officials operating

31

under Defendants' command and control entered Plaintiff's cell telling him to relieve them and relieve himself from the ordeal by committing suicide.  When this tactic did not work, the officials entered Plaintiff's cell the next day under the pretense of maintenance and exposed the electrical wires.  They then instructed Plaintiff on how to hold the wires to electrocute himself and unscrewed the plug to make it readily available for Plaintiff to grab.  "Make sure you grab it with two hands," they told Plaintiff, explaining that "you're never going to see anybody again, might as well make it easy on all of us."  Senior prison official, Mohammed Ali, told Plaintiff to "relieve us and yourself of this headache."

105.    The prison authorities operating under Defendants' command and control also deployed the familiar tool of the torturer: sleep deprivation.  They kept Plaintiff awake by having guards loudly come to his cell door at random hours of the night with keys as if they were about to come in.  They later positioned other inmates who would scream in agony outside his door preventing any sleep or rest.  The inmates, each suffering from their own assortment of serious conditions, were brought in at nighttime and were left to scream in pain within earshot of Plaintiff the whole night.  When they stopped, the officers returned and hit them to reinitiate the screaming.

106.    During one period, seeking to ratchet up the pressure against Plaintiff and make him break the hunger strike, the prison authorities operating under the Defendants' command and control took another page from the torturer's playbook, placing Plaintiff under an intense 72-hour spotlight.  In another episode, a blinking strobe light was placed in his room, causing Plaintiff to suffer a seizure.  Wielding one of the sole powers left to him and in retaliation against these abuses, Plaintiff protested by refusing to allow the prison doctors to take his vital signs.  In response, the guards, under orders of senior officials, handcuffed him to his wheelchair and over the course of several minutes physically battered the already bed-ridden Plaintiff into submission.

107.    One evening a few weeks after that beating, a guard and a nurse carried a prison hospital patient named Rida into Plaintiff's cell and demanded that he "take care of Rida," stating that this prisoner was now Plaintiff's responsibility.  Immediately after the prison employees left, Rida began screaming in agony and Plaintiff banged on the door for help to no avail, even though the guards assigned to Plaintiff were stationed directly outside.  Plaintiff crawled to Rida and attempted to perform CPR on him and then crawled to the door of the cell to bang on it again and screamed for help.  Nobody answered and Rida died in Plaintiff's cell that night.

108.    The prison guards did not open the door to Plaintiff's cell until the next day, leaving Plaintiff alone with Rida's decomposing corpse for over 15 hours.  When they entered, they continued their persistent efforts designed to break Plaintiff's spirits, blaming him and claiming that he "did not knock hard enough!"  This charade was repeated by first the guards, then by the prison doctors, and later by the senior prison officers who told Plaintiff, "you let this man die? How could you do this?!"

109.    A prison doctor later informed Plaintiff that Rida had been terminally ill with cancer and that it was known that he was going to die.  The doctor revealed that the guards wanted to scare Plaintiff and use Rida's death to apply pressure on him.  Plaintiff was overwhelmed with guilt and continues to have nightmares about that night.

110.    Beyond the near total neglect of Plaintiff's medical care, Interior Ministry officials under the authority of the Defendants also regularly actively interfered with Plaintiff's limited medical treatment.  During periods when visits were banned, they forbade relatives from delivering medicine unavailable in the prison pharmacy.  Even when visits were allowed, guards often arbitrarily seized the much-needed medication to preclude its delivery to Plaintiff.

33

111.   Plaintiff's dire medical condition during the hunger strike was exacerbated by pre-existing conditions that had been reported to and purposefully ignored by the prison authorities and the judge presiding over his case.  Plaintiff suffered from auto immune disorder—blood lupus—that, in combination with the malnutrition, caused his blood levels to fluctuate dangerously.  This put Plaintiff at increased risk for both internal bleeding and blood clots, the latter of which occurred throughout his detention, causing him numerous life-threatening medical episodes that could have been avoided had he received due care.

112.   Moreover, decisions pertaining to Plaintiff's medical care were also often overruled or ignored entirely by non-medical prison staff.  Non-medical Interior Ministry officials operating under Ibrahim's direct control and Defendant Beblawi's ultimate control would actively interfere with Plaintiff's medical treatment by arbitrarily seizing medicine, delaying or denying treatment, and in two cases, administering powerful sedatives to Plaintiff for no apparent medical purpose and without his consent.  Again, treatment of such a high-profile political prisoner was orchestrated from the top and any decency shown by medical staff was overruled by Defendant Beblawi's Interior Ministry minions.

113.   During the pendency of Plaintiff's inhumane detention, doctors took about 45-50 urine samples from Plaintiff and found ketone bodies in each one of them, indicating acute starvation and malnutrition.  The prison authorities, however, doctored Plaintiff's medical reports, altering the figures to hide Plaintiff's rapidly deteriorating health condition to thereby deny claims of his mistreatment to the outside world.

114.   From the earliest days of his arrest and throughout his detention, Interior Ministry officials operating under Ibrahim's direct control and Defendant Beblawi's ultimate control would

routinely mock Plaintiff's American citizenship, claiming that American values and ideals would not save him.

115.    At no time was any evidence presented, or was a legitimate investigation conducted into Plaintiff's case in Egypt.  Despite the absence of anything that would be recognized as evidence, on April 11, 2015, Plaintiff was found guilty as part of a mass trial of the bogus charges presented against him and sentenced to life in prison.  He was 27 years old.

116.    The United States government and human rights organizations sharply condemned the verdict as part of the continued miscarriage of justice against Plaintiff.  White House spokesman Josh Earnest stated that "the United States condemns the life sentence issued ... in Egypt against American citizen Mohamed Soltan," and called "for Mr. Soltan's immediate release from prison."[17]

117.    The State Department also responded in sharp terms to Egypt's continued miscarriage of justice against Plaintiff, stating "[t]he U.S. government is deeply disappointed in the Egyptian court's decision in the case of U.S. citizen Mohamed Soltan.  We understand from reports that Mr. Soltan has been sentenced to life in prison.  We remain deeply concerned about Mr. Soltan's health and detention.  The United States reiterates our call for the release of Mr. Soltan on humanitarian grounds, and we urge the Government of Egypt to redress this verdict."[18]

---

[17] AFP, *US Condemns Life Sentence Against American in Egypt*, AhramOnline (April 12, 2015), http://english.ahram.org.eg/NewsContent/1/64/127444/Egypt/Politics-/US-condemns-life-sentence-against-American-in-Egyp.aspx.

[18] Marie Harf, *The Conviction of Mr. Mohamed Soltan*, Press Statement Prepared for Bureau of Public Affairs, Under Secretary for Public Diplomacy and Public Affairs, (2015), (*available at* https://2009-2017.state.gov/r/pa/prs/ps/2015/04/240592.htm).

118.    Plaintiff was finally released on May 30, 2015, after being compelled as a condition of his release to relinquish his Egyptian citizenship.  He was then allowed to leave Egypt and he returned to his family in Virginia, where he has since received medical treatment and sought to recover from his deep physical and mental trauma.

119.    Not only was nearly two years taken from Plaintiff's life, he has suffered from severe health complications and every aspect of his life has been irredeemably affected.  To this day, Plaintiff undergoes therapy for the post-traumatic stress disorder caused by Defendants' conduct and the conduct of those who implemented their directives.  Plaintiff is unable to sleep properly and suffers from recurring nightmares.  In addition, a range of seemingly mundane activities including the shaking of keys, the slamming of doors and hearing Fourth of July fireworks causes Plaintiff severe emotional distress.

## **GENERAL ALLEGATIONS**

120.    The acts described herein were carried out under actual or apparent authority or color of law of the government of Egypt.  The acts of torture and attempted extrajudicial killing inflicted upon Plaintiff are part of a pattern and practice of widespread or systematic human rights violations committed against the civilian population for which Defendant Beblawi, acting as Prime Minister of Egypt, bears responsibility.

121.    The Ministry of Interior, where Ibrahim and Sha'rawi worked under Defendant Beblawi's oversight, is responsible for the numerous public security, law enforcement, and emergency management abuses at issue in this complaint.  This Ministry is directly responsible for all detention centers and prisons in Egypt where the brutal torture of Plaintiff took place.  Two important entities report to the Interior Ministry, which in turn reports to the Prime Minister: (1) The Prison Authority Sector, including the Director of Prisons and (2) the National Security

Agency.  The Interior Ministry also is responsible for allowing or banning visits to prisons and has the authority to conduct prison and prisoner inspections.

122.     On information and belief, the actions taken with respect to Plaintiff were approved by Defendant Beblawi during the time that he served as Prime Minister.  At the end of July 2013, acting President Adly Mansour gave Defendant Beblawi, as Prime Minister, authority over armed forces and security forces (collectively, "the NSA Forces") and the power to pardon or reduce criminal charges.  After this time, the NSA Forces were no longer reporting [only] to the Interior Ministry, but also to Defendant Beblawi.[19]

123.     The NSA Forces, under the Interior Ministry and Defendant Beblawi's direction, were integral actors at the Rabaa Square massacre.

124.     At all relevant time between July 2013 and his resignation in March 2014, Defendant Beblawi, as Prime Minister, possessed and exercised command and control over the NSA forces responsible for the Rabaa Square massacre and the subsequent crackdown in Egypt implemented by el-Sisi, Kamel, Ibrahim, Sha'rawi and Al-Fergany.  Defendant Beblawi also authorized, directed and permitted persons or groups acting in coordination with the NSA Forces, or under their control, to commit human rights abuses.

125.     At all relevant times between July 2013 and March 2014, Defendant Beblawi, as Prime Minister of Egypt, had the legal authority and practical ability to exert control over subordinates in the NSA Forces, or person or groups acting in coordination with the NSA Forces

---

[19] *See* About Hazem El-Beblawy, the resigned Prime Minister of Egypt, BBC, (February 24, 2014) https://www.bbc.com/arabic/middleeast/2013/07/130709_hazem_beblawi_profile (title translated from the original Arabic).

or under their control, who participated in the attempted extrajudicial killing and torture of Plaintiff.

126. The acts of torture and attempted extrajudicial killing inflicted upon Plaintiff between July 2013 and March 2014 were part of a pattern and practice of widespread systemic human right violations, inhumane treatment and torture against the civilian population of Egypt that were authorized and approved by Defendant Beblawi. At all relevant times, Defendant Beblawi knew of and approved the pattern of practice of gross human rights abuses perpetrated against the civilian population by subordinates under his command, including the abuses committed against Plaintiff.

127. Defendant Beblawi knew and approved of and/or failed and/or knowingly failed prevent these abuses, or to punish personnel under his command for committing such abuses. These abuses were an integral part of the system and an integral part of the punishment of Plaintiff for his role in informing the world of the Rabaa Square massacre.

128. Al-Fergany's Office of Public Prosecution and Sha'rawi's National Security Agency ("NSA") were key tools wielded by Defendant Beblawi in his brutal crackdown on Plaintiff as they directly oversaw his confinement and orchestrated his torture. Al-Fergany oversaw the inspection of Plaintiff's prison and detention centers, for which the Interior Ministry is directly responsible and was specifically empowered to investigate and halt the abuses by the Interior Ministry under Defendant Beblawi's control. As detailed herein, these abuses were known and not halted in this case despite ample evidence of Plaintiff's mistreatment, reflecting a clear conspiracy on the part of Defendant Beblawi, Sha'rawi and Al-Fergany to continue the torture of Plaintiff and lie about it to the world.

129.     Defendant Beblawi, as Prime Minister, instructed, authorized, conspired with, and/or aided and abetted subordinates in the NSA Forces or persons or groups acting in coordination with the NSA Forces or under their control to commit acts of torture and attempted extrajudicial killing and to cover up these abuses.

130.     The shooting of Plaintiff as well as the other journalists at Rabaa Square was part of a deliberate campaign orchestrated by Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi to target for death journalists and to intimidate and silence the dissenting voices present there and to cover-up the atrocities that were unfolding.

131.     The numerous government statements and accounts from government meetings, as described herein, make clear that the Rabaa Square massacre and attacks on peaceful demonstrators were ordered at the highest levels of the Egyptian government and that those in charge, which included Defendant Beblawi, el-Sisi, Kamel, Ibrahim and Sha'rawi intended, anticipated and planned for the deaths of more than one thousand peaceful protesters.

132.     Defendant Beblawi as Prime Minister was integral in the planning of the massacre and the crackdown on surviving participants, especially those whom the regime viewed as "embarrassing Egypt" before the world.  He had the most significant decision-making authority in ordering the massacre and its aftermath.

133.     As described herein, Defendant Beblawi's statements in the wake of the Rabaa Square massacre are an admission of his involvement in mass murder of innocent civilians as well as in both random live fire and targeted sniper shootings resulting in numerous actual and intended casualties, including Plaintiff.

134.    Defendant Beblawi and Ibrahim's statements, as detailed herein, are admissions of complicity in the mass slaughter, attempted extrajudicial killing and wounding of innocent persons including Plaintiff and subsequent torture of innocent protesters and journalists, including Plaintiff.

135.    The government actions that followed the Rabaa Square massacre further make clear that the brutal crackdown was fully intended and planned by Defendants and those reporting to them.  There have been no arrests, meaningful investigations, or prosecutions of a single officer, much less a senior official, for these killings.   The police and government have refused to acknowledge any wrongdoing on the part of security services in the violent massacre of the sit-ins or other attacks on protesters.  To the contrary, days after the massacre, the Interior Ministry, overseen by Defendant Beblawi, provided all officers that participated with a bonus for their homicidal conduct.[20]

136.    The active failure to provide Plaintiff with necessary healthcare by Defendants and those reporting directly to them was purposeful.  Defendants were fully aware of the brutality of Plaintiff's confinement, but still the torture continued despite consistent pleas made by Plaintiff, his local counsel, the U.S. Consul General and Ambassador and his international legal team. Throughout the course of his detention, the Egyptian authorities denied Plaintiff proper healthcare and used the lack of treatment as a tool of torture and coercion.

137.    Plaintiff's mistreatment was a matter of deliberate government policy set by Defendant Beblawi, in conjunction with other senior officials named herein and was not the random brutality of sadistic prison guards.  The regular interference in Plaintiff's medical care amounted to cruel and inhuman treatment and was deployed as a torture tactic against Plaintiff.

---

[20] *All According to Plan: The Rab'a Massacre and Mass Killings of Protesters in Egypt*, at 16.

From the outset of his inhumane detention and throughout its duration, the clinical decisions pertaining to his care were taken by the Ministry of Interior and implemented by their physicians, not by responsible, independent health-care professionals whose duty would have been to Plaintiff's health and safety. This allowed Plaintiff's care to be politicized and weaponized by the prison physician's employer—the Interior Ministry—that reports directly to Defendant Beblawi and whose primary obligations were to the institutional goals of Defendant, including the suppression of allegations of torture and mistreatment.

138.    On information and belief, such a campaign seeking to coerce a high-profile prisoner with consular visiting rights as a U.S. citizen to take his own life would have been put in place, monitored and directed by high Egyptian officials, including Ibrahim, who had full authority over the Interior Ministry and who worked closely with el-Sisi and Kamel during this time. To similar effect, other measures, such as putting a dying man in Plaintiff's cell, bringing Plaintiff's father nearby to hear him tortured, sleep deprivation and the like would all have been approved by high Egyptian officials, including el-Sisi and Kamel, as well as Defendant Beblawi during the time that he served as Prime Minister.

## **EXHAUSTION OF REMEDIES**

139.    Plaintiff does not have access to an independent or functioning legal system within Egypt to raise his TVPA complaint and any efforts to seek redress there would be futile.

140.    The Egyptian judicial system no longer attempts to uphold the rule of law or administer justice in cases deemed political. Complaints of torture and attempted extrajudicial killing by Plaintiff, who assisted foreign media broadcast the mass atrocities of the military regime and who is the son of a currently detained former Morsi administration official, would of course be deemed political in Egypt and any suit would be viewed as a treasonous attempt to embarrass

41

the regime by the Egyptian courts.  Plaintiff himself gained significant notoriety in Egypt during his detention and hunger strike and has been the subject of numerous pronouncements by senior Egyptian government officials as well as the subject of personal contentious conversations between President Obama and el-Sisi over concerns arising from his torture in Egyptian prisons and lack of meaningful process.

141.   Since the 2013 military coup, the Egyptian judiciary has become coopted into becoming an active and reliable participant in the repression by providing blanket protection to the state, handing down harsh sentences, including death sentences at mass show trials,  and refusing to hear complaints from anyone perceived as a threat to the ruling military regime.  This includes all political opposition, human rights advocates, civil society workers, journalists, trade unionists, students and others.  The Egyptian judiciary's deep sense of servility to the military regime rather than to the rule of law precludes Plaintiff from obtaining a fair hearing of any complaint over his mistreatment in Egypt.  Any judge who does not bow to the instructions of the regime would be removed, or worse.

142.   Plaintiff has previously lodged a complaint over his torture with the presiding judge in his mass trial, Judge Nagy Shehata, Egypt's most notorious judge who has rightfully earned the moniker of the "Hangman Judge" for his April 2014 simultaneous sentencing to death of 529 caged defendants after a 15 minute hearing conducted without a single lawyer present for the defense. Unsurprisingly, there is no evidence that at any time this Hangman Judge ever considered the claims relating to Plaintiff's torture.

143.   Problems with Egypt's judiciary are not confined to a single judge – they are much more pervasive as the entire structure of the judiciary has been coopted by the military state.  This assures that any attempts for redress in Egyptian courts against Defendant would be futile.

President el-Sisi's has granted himself wide powers over the judicial branch through constitutional amendments, which provide broad scope for abuse.  Judges who have expressed opposition to el-Sisi's legal decrees or weaponization of the law to crush dissent  are often the targets of trumped up internal disciplinary investigations and charges.  In Egypt, there is a high price to pay for any judge who does not conform his rulings to el-Sisi's regime.  In one instance, one judge, Yehya al-Dakroury, was purged from the judiciary where his impartial ruling was deemed as contrary to the interests of the security-military apparatus.[21]

144.    As such, Plaintiff has clearly met his burden of articulating that he has no local remedies in Egypt and that any efforts made there to hear the misconduct at issue in this complaint would be futile.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(*Committing Acts of Torture in Violation Of
The Law of Nations Under 28 U.S.C. §1350*)**

145.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

146.    The acts described herein constitute torture as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat.73 (1992) (codified at 28 U.S.C. §1350 note).

---

[21] Mohamed Soltan, *Egypt's Sissi is Arriving in the White House More Authoritarian Than Ever*, The Washington Post (April 8, 2019 3:33 PM), https://www.washingtonpost.com/opinions/2019/04/08/egypts-sissi-is-arriving-white-house-more-authoritarian-than-ever

147.    Defendants tortured Plaintiff through a regime of physical beatings, psychological torture, and a purposeful deprivation of medical treatment.  This torture was carried out or ordered by Defendants and those acting in concert with them.

148.    The illegal detention and systematic torture of Plaintiff by Defendants was a clear violation of the law of nations and international law.

149.    The acts described herein were inflicted deliberately and intentionally upon Plaintiff for purposes that included suppressing Plaintiff's broadcasting of the military's crimes to international viewers, deterring dissent among critics of the military coup, obtaining information from Plaintiff as to who else was assisting to broadcast details of the military crackdown.

150.    The torture of Plaintiff did not arise from, and was not inherent in or incidental to, lawful sanctions.

151.    Defendant Beblawi and the Un-sued Defendants exercised command responsibility over, conspired with, or aided and abetted subordinates in the prison authorities, or persons or groups acting in coordination with the Prison authorities or under their control, to torture Plaintiff. Furthermore, Defendant knew that their subordinates had committed, were committing, or were about to commit human rights abuses, and he authorized or knowingly failed to exercise his authority to prevent the abuses or to punish those responsible.  Furthermore, Defendants knew that human rights abuses were being committed by their subordinates and he authorized or knowingly failed to prevent the abuses or to punish those responsible.

152.    Plaintiff has exhausted all available remedies for obtaining justice and further efforts to obtain justice in Egypt are futile.

153.    Defendant's acts and omissions described above, and the acts committed by their subordinates against Plaintiff were committed under actual or apparent authority, or color of law, of the government of Egypt.

154.    Defendant's acts and omissions described above, and the acts committed by their subordinates, caused the torture of Plaintiff and caused him to suffer, and continue to suffer from, severe physical and mental pain and suffering.

155.    As a result of his torture, Plaintiff is entitled to recover the full extent of his damages, in an amount to be determined by the jury at trial.

156.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (*Attempted Extrajudicial Killing*)

157.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 144 of this Complaint as if fully set forth herein.

158.    The attempted extrajudicial killing of Plaintiff described herein constitute attempt to commit extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C §1350 note).

159.    The attempted extrajudicial killing of Plaintiff was not authorized by a judgment pronounced by a regular constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

160.    Defendant Beblawi and Un-sued Defendants Ibrahim and Sha'rawi exercised command responsibility over, conspired with, or aided and abetted subordinates in the National

Security Agency, or persons or groups acting in coordination with the National Security Agency or under their control, in their attempt to extrajudicially kill Plaintiff.  Furthermore, Defendant Beblawi, and Un-sued Defendants el-Sisi, Kamel, Ibrahim and Sha'rawi knew that their subordinates had committed, were committing, or were about to commit human rights abuses, and authorized and/or knowingly failed to prevent the abuses or to punish those responsible. Furthermore, Defendant Beblawi and Un-sued Defendants el-Sisi, Kamel, Ibrahim and Sha'rawi knew of and/or authorized the targeting of Plaintiff by snipers for extrajudicial killing.

161.    Defendant Beblawi and Un-sued Defendants el-Sisi, Kamel, Ibrahim and Sha'rawi's acts and omissions described above, and the acts committed by their subordinates against Plaintiff were committed under actual or apparent authority, or color of law, of the government of Egypt.

162.    Defendant Beblawi and Un-sued Defendants el-Sisi, Kamel, Ibrahim and Sha'rawi's acts and omissions described above, and the acts committed by their subordinates, caused the attempted extrajudicial killing of Plaintiff and caused him to suffer, and continue to suffer from, severe physical and mental pain and suffering.

163.    As a result of the attempted extrajudicial killing, Plaintiff is entitled to damages in an amount to be determined at trial.

164.    Defendant Beblawi and Un-sued Defendants el-Sisi, Kamel, Ibrahim and Sha'rawi's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff pray for judgment against Defendant as follows:

(a)     For compensatory damages according to proof;

(b)     For punitive and exemplary damages, according to proof;

(c)     For prejudgment interest as allowed by law;

(d)     For reasonable attorneys' fees and costs of suit, according to proof; and

(e)     For any such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

The plaintiff hereby demands a trial by jury.

Respectfully submitted,

/s/ Eric L. Lewis
_____
ERIC L. LEWIS (D.C. Bar #394643)
WALEED NASSAR (D.C. Bar #992659)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan