**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MOHAMED SOLTAN, | ) | Civil Action No.: 20-cv-1437 (CKK) |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAZEM ABDEL AZIZ EL BEBLAWI | ) | |
|     Defendant. | ) | |

**PLAINTIFF MOHAMED SOLTAN'S REPLY TO DEFENDANT'S
<u>OPPOSITION TO MOTION FOR EMERGENCY STATUS CONFERENCE</u>**

Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan

i

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ..................................................................................................................1

ARGUMENT........................................................................................................................4

A.    There is no current prohibition against the Defendant's appearance before this Court because, as Defendant concedes, he has no immunity right now. ......................................4

    1.    Defendant does not have diplomatic immunity because of his position at the IMF and visa status. ...................................................................................................5

    2.    Defendant does not have foreign official immunity. ............................................7

B.    Courts have the inherent power to control the Defendant's conduct even while jurisdictional issues are being considered. ........................................................................8

CONCLUSION...................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Dunn*,
  6 Wheat. 204, 5 L.Ed. 242 (1821) ........................................................................................ 8

*Arcaya v. Paez*,
  145 F. Supp. 464 (S.D.N.Y. 1956), aff'd, 244 F.2d 958 (2d Cir. 1957) ................................ 4

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ........................................................................................................ 8, 10

*Diallo v. Strauss-Kahn,*
  No. 307065/11, 2012 WL 1533179 (N.Y. Sup. Ct. May 01, 2012) ...................................... 6

*Earle v. De Besa*,
  109 Cal. App. 619 (Cal. Dist. Ct. App. 1930) ...................................................................... 5

*Firemen's Ins. Co. of Washington D.C. v. Onwualia*,
  No. 94 CIV. 0095 (PKL), 1994 WL 706994 (S.D.N.Y. Dec. 19, 1994) ............................... 5

*Land v. Dollar*,
  330 U.S. 731 (1947) ............................................................................................................. 9

*Lewis v. Mutond*,
  918 F.3d 142 (D.C. Cir. 2019) ......................................................................................... 3, 7

*Link v. Wabash R. Co.*,
  370 U.S. 626 (1962) ............................................................................................................. 8

*Moran v. Kingdom of Saudi Arabia*,
  27 F.3d 169 (5th Cir. 1994) .................................................................................................. 9

*NAACP, Jefferson Cty. Branch v. Brock*,
  619 F. Supp. 846 (D.D.C. 1985) ........................................................................................ 10

*Roadway Exp., Inc. v. Piper*,
  447 U.S. 752 (1980) ........................................................................................................ 8, 9

*Samanter v. Yousuf*,
  560 U.S. 305 (2010) ............................................................................................................. 4

*Tel–Oren v. Libyan Arab Republic*,

726 F.2d 774 (D.C. Cir.1984) ............................................................................................. 7

*U. S. ex rel. Casanova v. Fitzpatrick*,
    214 F. Supp. 425 (S.D.N.Y. 1963) ............................................................................... 5

*United States v. Denedo,*
    556 U.S. 904 (2009) .................................................................................................. 10

*United States v. Ruiz*,
    536 U.S. 622 (2002) .................................................................................................... 9

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) .................................................................................................... 9

*White v. United States*,
    791 F. Supp. 2d 156 (D.D.C. 2011) ............................................................................ 9

*Yousuf v. Samantar*,
    699 F.3d 763 (4th Cir. 2012) ....................................................................................... 8

**Statutes**

International Organizations Immunity Act, 22 USC §288d(b) ......................................... 6

Torture Victim Protection Act,
    Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at, 28 U.S.C. §1350) .............. 3-4


**Treaties**

Vienna Convention on the Law of Treaties,
        Article 53, May 23, 1969, 1155 U.N.T.S 331 (1969) .......................................... 7

**Other Authorities**

*Restatement (Third) of Foreign Relations Law* § 702 ..................................................... 7

**INTRODUCTION**

Plaintiff Mohamed Soltan ("Plaintiff" or "Mr. Soltan") hereby replies to Defendant Hazem Abdel Aziz El Beblawi's ("Defendant's" or "Defendant Beblawi's") Opposition to Plaintiff's Motion for Emergency Status Hearing ("Motion"). ECF#19. Plaintiff seeks a hearing so that the Court can ascertain whether Defendant has taken actions, including communicating with Egyptian officials about this lawsuit, that resulted in multiple retaliatory actions against Plaintiff and his family.

As detailed in Plaintiff's memorandum in support of the motion for an emergency status conference, days after the service of the Complaint, a series of troubling events occurred in Egypt designed to intimidate Plaintiff and obstruct justice in this case. The situation remains perilous. As of the date of this submission, Mr. Soltan's father has "been disappeared" after reports of an interrogation where he was questioned concerning the lawsuit and his son, Mr. Soltan. *See* Third Declaration of Mohamed Soltan at 1-2 (attached hereto at Exhibit A). In addition, Mr. Soltan's five cousins have now been produced in court in Egypt and charged, without basis, with membership in a terrorist organization and spreading false news – the precise crimes that were levied against Mr. Soltan and for which he was sentenced to life in prison. *Id.* at 2-3. All of these actions were taken in an attempt to intimidate Plaintiff into dropping this action. The actions are clearly an attempt to obstruct justice; the only questions are whether Defendant is involved and, if so, what remedial actions can and should be taken with respect to Defendant.

Tellingly, Defendant does not deny in his opposition that he communicated with high Egyptian officials about this case after he was served. Rather, he throws out a laundry list of potentially applicable immunity doctrines which he claims preclude the status conference from

going forward because, he asserts, the Court may ultimately conclude that it has no jurisdiction over him to adjudicate the claims that he was responsible for Plaintiff's torture.

Defendant wants to have it both ways. He claims that he needs two-plus months to organize and present a possible immunity defense while, in the meantime, the Court is precluded from protecting the integrity of its proceedings by determining whether Defendant has been complicit in the ongoing effort to use the full coercive power of the Egyptian state against Plaintiff's innocent relatives to convince Plaintiff to drop this case. As Defendant's own pleadings make clear, he does not currently have any immunity; he just wants time to try to get it. But in any event, the Court's ability to protect its authority is not proscribed as Defendant maintains.

Defendant claims that he has both diplomatic and foreign official immunity. He claims that he needs time to get the Egyptian government, the US Government and the IMF to agree to assert diplomatic immunity based on his status as a G-1 Visa holder in a senior position at the IMF nominated by his government. He concedes, as he must, that he has no immunity now; he only argues that he may meet the requirements down the road when and if the US Government and the IMF may take action to immunize torture claims in the US court. He claims that the Court is powerless over him during the interim even though the IMF's own foundational documents make clear that an IMF employee, at whatever level, only has immunity for official acts undertaken on behalf of the IMF. In sum, Defendant does not have diplomatic immunity now; while Plaintiff contends he will never be able to obtain it, the Court does not need to resolve that question now because he is not presently immune.

Defendant also suggests that he enjoys foreign-official immunity because he was directing torture under official authority of the Government of Egypt. He suggests that this fact raises "complex questions" under the TVPA. It does not. Indeed, the Torture Victim Protection Act

2

("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at, 28 U.S.C. §1350), requires by its terms that torture be administered under color of law of a foreign state and that is what Plaintiff has alleged. Defendant concedes (Opp. at 3, n.7), again as he must, that in *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), the Court of Appeals unanimously "held that (1) a categorical exception to foreign-official immunity applies when officials are sued only in their personal capacities, and (2) the Torture Victim Protection Act implicitly abrogated conduct-based foreign-official immunity." That is unambiguously the law that governs the issue here. Yet Defendant suggests that this Court should ignore that precedent because the defendant in that case filed a petition for certiorari and the Justice Department submitted a brief in support of restricting the TVPA. The small possibility that the Supreme Court might hear a case on this question and issue an opinion next year does not prevent this Court from exercising its authority now over ongoing retaliation and extortionate acts seeking to force Plaintiff to drop this case.

Finally, in response to the Court's Minute Order, Plaintiff wants to make clear that it views the Court as having power over Defendant Beblawi only. Any communications he may have had with respect to pressuring Plaintiff to drop this case through coercive action are not "diplomatic communications;" they are obstructions of justice. Any order that the Court may issue for Defendant to cease communicating about this case with officials in Egypt does not implicate the Vienna Conventions. They have nothing to do with his job at the IMF. Plaintiff does not seek to compel evidence or issue orders with respect to anyone who is in Egypt or otherwise beyond the power of this Court.

## **ARGUMENT**

A.   There is no current prohibition against the Defendant's appearance before this Court because, as Defendant concedes, he has no immunity right now.

Defendant Beblawi argues that this Court should deny Plaintiff's request for an emergency status conference because this case purportedly "raises a number of legally complex questions concerning personal and subject matter jurisdiction, diplomatic and foreign official immunity, and the separation of powers doctrine in international relations." Opp. at 2. While Plaintiff does not seek now to now litigate all the issues of immunity that Defendant Beblawi may potentially raise, it is clear from the Opposition itself that, as shown below, Defendant does not have immunity now and he has raised no prima facie valid immunity defenses that currently proscribe the Court's jurisdiction over Defendant Beblawi. Opp. at 3-5.

Accordingly, Defendant's assertion that "[u]pon a showing of [immunity], the Court must dismiss this lawsuit for lack of jurisdiction," *see* Opp. at 3, misses the mark, because there has been no such showing by in this case. A "showing of immunity" must go beyond unsubstantiated claims. As noted in *Samantar v. Yousuf*, a case that Defendant relies upon, Opp. at 3, until the Defendant's claims of immunity are substantiated by the U.S. government, this court retains its jurisdiction, as well as its inherent powers. *See Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (noting that "in the absence of recognition of the immunity by the Department of State, a district court had authority to decide for itself whether all the requisites for such immunity existed" and noting that the district court "surrendered its jurisdiction" only after the State Department recognizes immunity) (internal citations omitted). *See also* discussion of inherent powers *infra* at pp. 9-10. As recognized in *Arcaya v. Paez*, even subsequent acquisition of diplomatic immunity will not retroactively nullify actions undertaken previously, because "valid jurisdiction…obtained at the commencement of the action…was not destroyed by a subsequent change of the status of

4

the defendant." 145 F. Supp. 464, 469 (S.D.N.Y. 1956), aff'd, 244 F.2d 958 (2d Cir. 1957) (discussing and applying the holding of *Earle v. De Besa*, 109 Cal. App. 619, 621 (Cal. Dist. Ct. App. 1930).

> 1. <u>Defendant does not have diplomatic immunity because of his position at the IMF and visa status.</u>

Defendant contends that his mere status as a G-1 Visa holder is the "primary source" of his diplomatic immunity, Opp. at 2; however, his holding of a G-1 Visa does not provide him with blanket immunity for his prior misconduct in Egypt. As the court made clear in *U. S. ex rel. Casanova v. Fitzpatrick*, possession of a G-1 Visa by itself does not confer full diplomatic immunity. 214 F. Supp. 425, 440 (S.D.N.Y. 1963). In that case, a Cuban national appointed by his government and who had entered the U.S. with both a diplomatic passport and a G-1 Visa was arrested for conspiracy to commit sabotage within the United States. In response to the assertion of a number of immunity defenses, including immunity based on his G-1 Visa status, the court rejected these contentions, refusing to "transmute the G-1 visa issued by the State Department into an agreement by the United States of diplomatic immunity." *Id*. Defendant ignores this decision and points to no law in support of the proposition that his G-1 Visa, standing alone, shields him from suit.

Diplomatic immunity is only conferred "if agreed upon by the secretary-general of the United Nations, the government of the United States, and the government of the member nation" which has appointed the claimant. *Firemen's Ins. Co. of Washington D.C. v. Onwualia*, No. 94 CIV. 0095 (PKL), 1994 WL 706994, at *2 (S.D.N.Y. Dec. 19, 1994) (citing *Casanova*, 214 F. Supp. at 440). Defendant has not provided proof of any such agreement between both governments and the sub-agency of the UN by which he is employed and indeed he has conceded he does not have it. In addition, his claims run contrary to the statutes of the IMF and relevant law

5

and practice, which provide that IMF employees, including Executive Directors, are only entitled to limited immunity for their official acts.  The Opposition later asserts, that "counsel for Mr. Beblawi is acting judiciously to arrange for consultations among the appropriate agencies within the Egyptian and United States governments," but, "bureaucratic coordination takes time." *Id.* At 5.  It goes on to state that "[t]he administrative process for invoking intervention by the United States government requires additional communications with the Egyptian Embassy and its representatives." *Id.*  In other words, the Defendant needs more time to drum up support for his claim of immunity based on his status as a G-1 Visa holder; currently, he has no such immunity.

Defendant Beblawi's current position as an Executive Director with the IMF, moreover, is irrelevant to whether he has diplomatic immunity.  Immunity for employees of international organizations like the IMF apply *only* to official acts undertaken in their official capacity under the International Organizations Immunity Act, 22 USC §288d(b) ("IOIA").  With respect to senior international civil servants, like Mr. Beblawi,  "the United States made a decision to bestow limited "official acts" immunity, as evidenced by the enactment of the IOIA (see United States Department of State, Diplomatic Consular Immunity Guidance for Law Enforcement and Judicial Authorities at 8)  and to announce to the diplomatic community that specialized agency employees will be accorded a lower level of immunity than a diplomatic envoy." (internal citations omitted).

Even the former Managing Director of the IMF – Dominique Strauss-Kahn – did not enjoy absolute immunity even for acts committed while actually employed at the IMF, much less the blanket immunity for all acts prior to his employment that Defendant Beblawi seeks here.  *See Diallo v. Strauss-Kahn,* No. 307065/11, 2012 WL 1533179, at *2 (N.Y. Sup. Ct. May 01, 2012).  Here too, Defendant Beblawi does not enjoy such a blanket privilege.

### 2. Defendant does not have foreign official immunity.

Defendant's claim to foreign official immunity also fails. By enacting the TVPA, Congress created an express private right of action, specifically against foreign officials acting under color of law of a foreign country, for individuals victimized by a variety of acts constituting violations of *jus cogens* norms, including torture and extrajudicial killing. A *jus cogens* norm is "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Vienna Convention on the Law of Treaties art. 53, opened for signature May 23, 1969, 1155 U.N.T.S. 331. Torture and extrajudicial killing are paradigm examples of *jus cogens* norms. *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n. 20 (D.C. Cir.1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, summary execution, genocide and slavery"); *Restatement (Third) of Foreign Relations Law* § 702 and cmt. N (identifying murder, torture and "prolonged arbitrary detention" as jus cogens violations).

In *Lewis v. Mutond,* 918 F.3d 142 (D.C. Cir. 2019) the D.C. Circuit held, as Defendant Beblawi acknowledges, that a categorical exception to foreign-official immunity applies when officials are sued only in their personal capacities and that the Torture Victim Protection Act implicitly abrogated conduct-based foreign official immunity. Defendant appears to concede that this case is directly on point and dispositive of Defendant's official immunity claim. *See* Opp. at n.7. The pending petition for a writ of certiorari before the Supreme Court and Defendant

Beblawi's hopes for future reversal do not alter the fact that the *Lewis* holding is binding on this Court unless and until the unlikely event that it is overruled.

Defendant, while citing the *Yousuf v. Samantar* decision of the Supreme Court for the proposition that it is up to the lower courts to define the scope of common law immunity, ignores the subsequent decision in which the Fourth Circuit, on remand from the Supreme Court, examined a similar claim of common law immunity in the context of a TVPA claim against a former Prime Minister, and held that because *jus cogens* violations are *never* legitimate official acts they therefore cannot be subject to foreign official immunity. *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012).

### B. Courts have the inherent power to control the Defendant's conduct even while jurisdictional issues are being considered.

"Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates ….These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (*quoting Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962) and *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)). Indeed, the court's ability to exercise its inherent powers to control the conduct of its litigants, and if necessary, punish bad conduct, is "the most prominent" of its "inherent powers." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). If the court becomes aware that a litigant's conduct threatens the dignity of the court or the orderly administration of the judicial process, the court has wide "discretion… to fashion an appropriate sanction." *Chambers*, 501 U.S. 32, 44–45.

Defendant appears to argue that a court's inherent powers to control the conduct of the parties before it begin only *after* the resolution of a party's claim of immunity from suit. *See* Opp.

8

At 3, n. 6.[1]  That position is, in a word, untenable.  When a litigant alleges that she is immune from suit, the court is presented with a question of whether it has jurisdiction over the litigant, or whether immunity shields the party from the court's reach.  *See, e.g.*, *White v. United States*, 791 F. Supp. 2d 156, 161 (D.D.C. 2011) ("Sovereign immunity is a jurisdictional issue.").  A court of law possesses the inherent power to determine whether or not its jurisdiction extends to a case or to the litigants before it.  *United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction.").  While the jurisdictional decision is pending, the court retains its inherent powers including the powers to punish parties for misconduct.  There are no free passes for contemptuous conduct simply because jurisdiction has not yet finally been determined.  *See, e.g., United States v. United Mine Workers,* 330 U.S. 258, 291-92 (1947) (holding that "[p]ending a decision on a doubtful question of jurisdiction, the District Court was held to have power to maintain the status quo and punish violations as contempt" because ***"[u]ntil its judgment declining jurisdiction should be announced, it had authority, from the necessity of the case***, to make orders to preserve the existing conditions [at the time the suit was filed] and the subject of the petition . . . .") (emphasis added)).

Alleging the applicability of a form of immunity does not strip a court of its ability to use its inherent powers.  *See, e.g., Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) (citing *Land v. Dollar*, 330 U.S. 731, 735 and n. 4 (1947)) (when resolving a claim of immunity, the court is still "given the authority to resolve factual disputes" and may in the course of making

---

[1] Plaintiff does not assert, as Defendant claims, that the Court's inherent authority "create[s] jurisdiction over a person where none exits" or that the cases relied upon in Plaintiff's moving papers "allow a court to ignore jurisdictional requirements by simply invoking its inherent authority." Opp. at 3, n.6.  To the contrary, Plaintiff's position is that a litigant's challenge to a court's jurisdiction, whether based on immunity or otherwise, does not strip the court of its inherent powers to control the conduct of litigants. *Roadway Exp.,* 447 U.S. at 764.

the determination "consider[] affidavits, allow[] further discovery, hear[] oral testimony" and "devise a procedure" as needed). To hold otherwise would permit litigants who dispute jurisdiction to shield themselves from the court's reach, leaving the court powerless to defend its own integrity. That is not the law and the cases cited by Defendant do not hold otherwise. In *NAACP, Jefferson Cty. Branch v. Brock*, 619 F. Supp. 846, 851–52 (D.D.C. 1985), the court held that jurisdiction must be determined before injunctions can be issued against *nonparties* to the case. Plaintiff seeks to have this Court exercise its powers with respect to a party before it. Similarly, *United States v. Denedo* holds that the court's ability to issue writs cannot, by itself, be the basis for jurisdiction if no other basis for subject matter jurisdiction exists. 556 U.S. 904, 914 (2009). That is not the situation here. Moreover, *Denedo*, speaks to the limits of the court's powers under the All Writs Act; it says nothing about the court's inherent powers that are not governed by statute or rule, but are part of the "the control necessarily vested in courts to manage their own affairs." *Chambers*, 501 U.S. at 43.

## CONCLUSION

In sum, Defendant does not have immunity now. He merely raises its future dubious prospect based on his hope of future action by the United States Government (acting against its own policies), the government of Egypt and the IMF (acting against its own statutory framework and precedents) and/or a decision by the Supreme Court to overturn binding circuit precedent. At the same time, he wants a multiple month extension of his obligation to respond to the Complaint in this action, months during which the efforts to intimidate Plaintiff and obstruct justice could continue and his role in them remain unexamined. Defendant's requests should be denied. There is no obstacle to this Court exercise of its inherent authority to inquire into whether Defendant is trying to obstruct justice and to order relief to make him stop. In the most unlikely event that he

is found to have immunity as a matter of law in the future, Defendant will suffer no prejudice from being asked about his role in efforts to intimidate Plaintiff in to abandoning this action or being ordered to cease any such actions in the future and this Court will have utilized its power to consider and prevent potential obstruction of justice in this case.

DATED:	June 23, 2020	Respectfully submitted,

/s/ Eric L. Lewis_____
Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan