# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

MOHAMED SOLTAN,

        Plaintiff,

    v.

HAZEM ABDEL AZIZ EL BEBLAWI,

        Defendant.

Case No. 1:20-cv-01437-CKK

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Robert H. Bunzel
Louise Ann Fernandez
John J. Bartko
BARTKO, ZANKEL, BUNZEL & MILLER
A Professional Corporation
One Embarcadero Center Suite 800
San Francisco, CA 94111
Tel: (415) 956-1900
rbunzel@bzbm.com
lfernandez@bzbm.com

Timothy Broas
Rachel A. Beck
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW Suite 700
Washington, D.C. 20004
Tel.: (202) 508-6000
timothy.broas@bclplaw.com
rachel.beck@bclplaw.com

*Attorneys for Defendant Hazem Abdel Aziz El Beblawi*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT .................................................................................................................... 14

    **I.**    Motion to Dismiss Standard ........................................................... 14

    **II.**    Mr. Beblawi Is Immune to Suit Due to His Diplomatic Status ............................ 15

        **A.**    Mr. Beblawi Is Not Subject to Service of Process................................... 15

        **B.**    Mr. Beblawi Has Diplomatic Immunity .................................................. 16

    **III.**    There Is No Personal Jurisdiction Over Mr. Beblawi for the Conduct Alleged ........................................................................................... 19

    **IV.**    Mr. Beblawi Is Immune From Suit Due to Common Law Official Immunity ...................................................................................... 22

        **A.**    Common Law Foreign Official Immunity ............................................... 22

        **B.**    The Acts Complained of Were Official Acts on Behalf of Egypt ............ 24

    **V.**    The Act of State Doctrine Bars This Suit ............................................. 27

    **VI.**    This Case Presents a Non-Justiciable Political Question .................................... 29

        **A.**    Political Questions Are Not Justiciable .................................................. 29

        **B.**    Plaintiff's Suit Impermissibly Raises Political Questions ....................... 30

    **VII.**    The Complaint Fails to State a Claim Upon Which Relief Can be Granted ........ 33

        **A.**    There Is No Secondary Liability Under the TVPA in This Case ............. 33

        **B.**    The TVPA's Structure and Legislative History Do Not Evidence Congressional Intent to Create Secondary Liability ............................... 34

        **C.**    An "Attempted" Extrajudicial Killing Is Not Recognized Under the TVPA ................................................................................................... 36

CONCLUSION ................................................................................................................. 36

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Aidi v. Yaron*,
    672 F. Supp. 516 (D.D.C. 1987) ...................................................................... 15

*Aktepe v. United States*,
    105 F.3d 1400 (11th Cir. 1997) ...................................................................... 32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 14

*Baker v. Carr*,
    369 U.S. 186 (1962) .......................................................................... 28, 29, 30, 32

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ................................................................................ 26, 27

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ...................................................................... 29

*Belhas* v. *Ya'alon*,
    515 F.3d 1279 (D.C. Cir. 2008); ................................................................ 23, 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 15

*Bostock v. Clayton Cty., Georgia*,
    No. 17-1618, 2020 WL 3146686 (2020) .................................................... 33, 35

*Bourassa v. Desrochers*,
    938 F.2d 1056 (9th Cir.1991) ........................................................................ 20

*Bristol-Myers Squibb Co. v. Sup. Ct. of California, San Francisco County*,
    137 S. Ct. 1773 (2017) ...................................................................... 14, 19, 20

*Broidy Capital Mgmt. LLC v. Benomar*,
    944 F.3d 436 (2d Cir. 2019) ...................................................................... 15, 16

*Cabello v. Fernandez–Larios*,
    402 F.3d 1148 (11th Cir.2005) ...................................................................... 34

*Carrera v. Carrera*,
    174 F.2d 496 (D.C. Cir. 1949) .................................................................... 15, 16

*U.S. ex rel. Casanova v. Fitzpatrick*,
   214 F. Supp. 425 (S.D.N.Y. 1963) ....................................................................................... 18

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ........................................................................................................... 33

*Collingsworth v. Drummond Co. Inc.*,
   2020 WL 2800612 (D.D.C. May 29, 2020) ..................................................................... 21, 22

*Corrie v. Caterpillar, Inc.*,
   403 F. Supp. 2d 1019 (W.D. Wash. 2005) ........................................................................... 30

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ....................................................................................................... 20, 21

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ........................................................................................................... 28

*Desert Palace v. Costa*,
   539 U.S. 90 (1983) ............................................................................................................. 35

*Devi v. Silva*,
   861 F. Supp. 2d 135 (S.D.N.Y. 2012) ................................................................................. 17

*Diallo v. Strauss-Kahn*,
   No. 307065/11, 2012 WL 1533179 (N.Y. Sup. Ct. May 01, 2012) ..................................... 18

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
   135 F.3d 837 (2d Cir. 1988) ......................................................................................... 33, 34

*Doe 1 v. Buratai*,
   318 F. Supp. 3d 218 (D.D.C. 2018), *aff'd. sub nom Doe v. Buratai*, 792 F.
   App'x 6 (D.C. Cir. 2019) ..................................................................................................... 23

*Doe I v. Qi*,
   349 F.Supp.2d 1258 (N.D.Cal.2004) ........................................................................ 24, 27, 28

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) ................................................................... 27, 30, 31, 32

*Dogan v. Barak*,
   932 F.3d 888, 895 (9th Cir. 2019) ........................................................................... 22, 24, 25

*Eisel v. Sec. of the Army*,
   477 F.2d 1251 (D.C. Cir. 1973) ......................................................................................... 20

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ..................................................................................... 29, 30

*Filarsky v. Delia*,
566 U.S. 377 (2012) ........................................................................................22

*First American Corporation v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir.1998) ..............................................................................20

*First Chicago Int'l v. United Exch. Co.*,
836 F.2d 1375 (D.C. Cir. 1988) ......................................................................14

*Forras v. Rauf,*
812 F.3d 1102 (D.C. Cir. 2016) ......................................................................22

*Gilligan v. Morgan*,
413 U.S. 1 (1973) ............................................................................................32

*Giraldo v. Drummond Co.*,
2012 WL 2358306 (N.D. Ala. June 20, 2012), *aff'd sub nom. Doe v.
Drummond Co.*, 782 F.3d 576 (11th Cir. 2015) ..............................................21

*Gonzalez Paredes v. Vila*,
479 F. Supp. 2d 187 (D.D.C. 2007) ................................................................15

*Goode v. Billington*,
932 F. Supp. 2d 75 (D.D.C. 2013) ..................................................................11

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011)..............................................................................19, 20, 21

*Grand Lodge of the FOP v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ....................................................................14

*Hellenic Lines, Ltd. v. Moore*,
345 F.2d 978 (D.C. Cir. 1965) ........................................................................15

*Hilao v. Estate of Marcos*,
103 F.3d 767 (9th Cir.1996) ............................................................................34

*Hilao v. Estate of Marcos*,
25 F.3d 1467 (9th Cir.1994) ......................................................................24, 27

*Hourani v. Mirtchev*,
796 F.3d 1 (D.C. Cir. 2015)............................................................................26

*International Shoe Co. v. Washington*,
326 U.S. 310 (1945)........................................................................................19

*Jones v. Horne*,
634 F.3d 588 (D.C. Cir. 2009) ........................................................................14

*Jungquist v. Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ...........................................................................14, 17, 24

*Jungquist v. Nahyan*,
    940 F. Supp. 312 (D.D.C. 1996) ...................................................................................17

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir.1995) ...........................................................................................20

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
    Amministrazione Straordinaria*,
    937 F.2d 44 (2d Cir. 1991) ...........................................................................................20

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001) ...........................................................................10

*Lewis v. Mutond*,
    918 F.3d 142 (2019)........................................................................................23, 25, 26

*Livnat v. Palestinian Auth.*,
    82 F. Supp. 3d 19 (D.D.C. 2015) aff'd, 851 F.3d 45 (D.C. Cir. 2017) ........................ 19, 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................14

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .........................................................................................8

*Matar v. Dichter*,
    563 F.3d 9 (2d Cir. 2009) ............................................................................................ 22

*Matar v. Dichter*,
    500 F. Supp. 2d 284 (S.D.N.Y. 2007) ...................................................................30, 31, 32

*Florida* ex rel. *McCollum v. United States Dept. of Health & Human Servs.*,
    716 F. Supp. 2d 1120 (N.D. Fla. 2010) ..........................................................................11

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449, 132 S. Ct. 1702 (2012) ..............................................................................34

*Mutond v. Lewis*,
    No. 19-185 (2020) ...............................................................................................25, 26

*Nuevos Destinos, LLC v. Peck*,
    2019 WL 78780 (D.D.C. Jan. 2, 2019)......................................................................21, 22

*Oetjen v. Central Leather Co.*,
    246 U.S. 297 (1918).....................................................................................................29

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ..................................................................................23

*Republic of Mexico v. Hoffman,*
    324 U.S. 30 (1945) ....................................................................................24

*Ex parte Republic of Peru,*
    318 U.S. 578 (1943) ...........................................................................10, 23

*Richmond & D.R. Co. v. Gorman,*
    7 App. D.C. 91 (D.C. App. 1895) ............................................................20

*Samantar v. Yousef,*
    560 U.S. 305 (2010) .......................................................................*passim*

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993) ..................................................................................24

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) ................................................................29

*Second Amendment Found. v. U.S. Conference of Mayors,*
    274 F.3d 521 (D.C. Cir. 2001) ................................................................19

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ..................................................................................29

*Singh v. G.k.,*
    2016 WL 3181149 (S.D.N.Y. June 2, 2016) ..........................................21

*Tabion v. Mufti,*
    877 F. Supp. 285 (Ed. Va. 1995) ............................................................13

*Tachiona v. United States,*
    386 F.3d 205 (2d Cir. 2004) ....................................................................16

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013) ....................................................................21

*The Schooner Exchange v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812) ..........................................................20, 23

*Underhill v. Hernandez,*
    168 U.S. 250 (1897) ..................................................................................26

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) ...........................................................................10, 31

*United States v. Venturella*,
   391 F.3d 120 (2d Cir. 2004) ............................................................... 20

*United States v. Williams*,
   825 F. Supp. 2d 117 (D.D.C. 2011) ..................................................... 20

*Verlinden B.V. v. Central Bank of Nigeria*,
   461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ......................... 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................. 28

*Zdravkovich v. Consul Gen. of Yugoslavia*,
   No. 98-7034, 1998 WL 389086 (D.C. Cir. June 23, 1998) .................. 16

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ........................................................................... 29, 30

**Statutes**

8 U.S.C.A. § 1101 ....................................................................................... 17

18 U.S.C. § 2340A(c) .................................................................................. 35

18 U.S.C. § 2340B ....................................................................................... 35

22 U.S.C. § 254d .................................................................. 15, 16, 17, 18

28 U.S.C. § 1350, Note ....................................................................*passim*

23 U.S.T. § 3227 ................................................................................ 15, 18

D.C. Code § 13–423(a)(1) ........................................................................... 22

**Rules**

Fed. R. Civ. Proc. 12(a) ............................................................................... 1

Fed. R. Civ. Proc. 12(b)(1) ................................................................... 1, 14

Fed. R. Civ. Proc. 12(b)(2) ................................................................... 1, 14

Fed. R. Civ. Proc. 12(b)(6) ................................................................... 2, 14

**Other Authorities**

22 C.F.R. § 41.12 ....................................................................................... 17

22 C.F.R. § 41.26(c)(1) ................................................................................. 8

H.R. Rep. No. 102-367, pt. 1 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 84.............................34

S.Rep. No.102-249 102d Cong., 1st Sess. at 9 (1991)................................................................34

*Fact Sheet: President Donald J. Trump Remains Committed to Egypt and Middle East Stability – Foreign Policy* (April 9, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-remains-committed-egypt-middle-east-stability/.......................................................10, 11, 13

*Motund v. Lewis*, No. 19-185 (2020), Brief Amicus Curiae of United States ......................24, 25

*Matar* v. *Dichter*, 2007 WL 6931924, Brief Amicus Curiae of United States ............................34

Jeremy M. Sharp, *Egypt: Background and U.S. Relations*, Congressional Research Service Report RL33003 at Summary (May 27, 2020), available at https://www.everycrsreport.com/reports/RL33003.html ................................................11, 12

## PRELIMINARY STATEMENT

Defendant Hazem Abdel Aziz El Beblawi ("Defendant" or "Mr. Beblawi") is an Egyptian diplomat domiciled in Cairo and residing temporarily in Washington, D.C., who has been afforded the highest diplomatic designation by the United States. He is also a former Prime Minister of the Arab Republic of Egypt ("Egypt"), serving in that official capacity during the period alleged in this action, which concerns events that occurred five to seven years ago in Egypt. Virtually all of the allegations against Mr. Beblawi, a distinguished public servant and economist currently serving as an Executive Director of the International Monetary Fund, are made solely on information and belief. And there is no factual nexus between the acts complained of and this judicial district.

Plaintiff filed an affidavit of service on June 8, 2020, averring that service of summons occurred on June 3, 2020. Dkt. 9. Defendant, upon retention of counsel, sought a customary extension of time to respond to the Complaint, and Plaintiff denied the request. Dkt. 13. This brief is filed within the 21-day period for responding to a civil complaint, assuming that legally effective service occurred on June 3, 2020, which is denied. Fed. R. Civ. Proc. Rule 12(a). Mr. Beblawi intends to supplement the arguments below sufficiently in advance of the due date for Plaintiff's opposition to this motion, including so that the formal positions of the Egyptian and United States governments can be considered and placed before the Court.

There is no personal general or specific jurisdiction over Mr. Beblawi for the acts alleged in the Complaint, inasmuch as Washington, D.C. is not his domicile and the acts alleged did not occur in or relate to this jurisdiction. Fed. R. Civ. P. 12(b)(2). *See*, Argument, § III, below.

This Court lacks subject matter jurisdiction in this case because (i) Mr. Beblawi is immune from process and from suit due to diplomatic immunity, *see*, Argument, § II.A, B below;[1] (ii) he is immune from suit under the doctrine of foreign official immunity, *id*., § IV; (iii) the Act of State doctrine bars this suit, *id*., § V; and (vi) this case presents non-justiciable political questions, *id*., § VI. Fed. R. Civ. P. 12(b)(1).

---

[1] Mr. Beblawi is concurrently filing a motion to quash service of process. Mr. Beblawi files both of these motions in an abundance of caution as, at the time of filing, the Court had not yet ruled on his motion for extension of time to file responsive pleading. *See* Dkt. 12.

In addition, under Rule 12(b)(6), the Complaint's second claim for relief fails to state a claim because "attempted" extrajudicial killing is not an action redressable by the Torture Victims Protection Act ("TVPA").[2] *See*, Argument, § VII.A. And the elements of both claims for relief as to Mr. Beblawi, as summarized at ¶ 151 of the Complaint, fail to state a claim because secondary liability for the alleged wrongs is not subject to redress by the TVPA. *Id.*, § VII.B.

## BACKGROUND

### Defendant Hazem El Beblawi

Hazem El Beblawi is a respected international public servant who served as interim Prime Minister of Egypt from July 9, 2013 until March 1, 2014. He currently serves as an Executive Director of the IMF and is responsible for the votes cast by Bahrain, Egypt, Iraq, Jordan, Kuwait, Lebanon, Maldives, Oman, Qatar, United Arab Emirates, and Yemen in that international organization.[3] He has been honored as a Chevalier de la Légion d'honneur by France, a Commandeur Léopold II by Belgium, and Grand Officier Cèdre du Liban by Lebanon.

Mr. Beblawi was born in Cairo on October 17, 1936. A liberal economist, he holds a PhD in economics from the University of Paris 1 Pantheon-Sorbonne. He worked at the United Nations Economic and Social Commission for Western Asia (ESCWA) as Executive Secretary from 1995 to 2000 and served as an advisor to the Arab Monetary Fund from 2001 to 2011.[4] During the 'Arab spring,' Mr. Beblawi became a founding member of the Egyptian Social Democratic Party. He was appointed as Deputy Prime Minister for Economic Affairs and Minister of Finance on July 17, 2011. In October 2011, he resigned from office in protest at the Maspero massacre in which up to twenty-eight Coptic protesters were killed.

Following the revolution against former President Mohamed Morsi on July 3, 2013, Mr. Beblawi was appointed as the consensus candidate by all parties to be interim Prime Minister on

---

[2]   The TVPA is codified as a note to 28 U.S.C. § 1350, the Alien Tort Claims Act ("ATCA").

[3]   *See*, IMF Executive Directors and Voting Power (last updated 24 June 2020) (here).

[4]   *See*, Profile of Hazem El Beblawi on Economic Research Forum (ERF) website (here).

July 9, 2013 and held that office until March 1, 2014.[5]

## Relevant Events in Egypt Including August 2013 in Rabaa Square

Between 2011 and 2015, the Republic of Egypt underwent three revolutions and endured a turbulent period of political and social change. The first revolution, in January 2011, happened because the Egyptian people rebelled against the politics of the era of President Mubarak. However, by June 2012 the military Generals who replaced Mubarak proved themselves to be so incompetent that the people in the elections voted for the Muslim Brotherhood's Mohamed Morsi to be President over a former Mubarak-era General (the second revolution). Once he became President, Morsi proved more interested in consolidating the Muslim Brotherhood's grip on power than governing, culminating in millions of people taking to the streets on June 30, 2013 "virtually begg[ing] the military to oust Morsi."[6] This was to become the third revolution in which a broad coalition comprising leading figures and representatives from across political, social, and religious spectra combined with the military to remove Morsi once it became apparent that it would be impossible for political factions to reach consensus and there was the possibility of civil war. Then U.S. Secretary of State John Kerry supported the army's action, stating that Egypt's army was "restoring democracy." He stated during a visit to Pakistan, "The military did not take over….The military was asked to intervene by millions and millions of people."[7]

An emergency meeting on July 3, 2013 resulted in the appointment of Adly Mansour as temporary President on July 4. The interim government communicated messages of inclusivity and integration and in this context, Mr. Beblawi was appointed Prime Minister on July 9. Mr. Beblawi and President Mansour made overtures to the Muslim Brotherhood. The Muslim Brotherhood rejected the offer and committed themselves to bringing about Morsi's return, a strategy which became increasingly more desperate and violent. Pro-Morsi protests culminated in mass sit-ins held

---

[5]   Profile: Hazem el-Beblawi, Egypt's Interim Prime Minister, Atlantic Council, 10 July 2013 (here).

[6]   Friedman, I. L., "Egypt's Three Revolutions," The New York Times, July 23, 2013 (here).

[7]   *See* Weymouth, L., "Rare interview with Egyptian Gen. Abdel Fatah al-Sissi," The Washington Post, August 3, 2013 (here).

at al-Nadha Square and Rabaa al-Adawiya Square (hereinafter "Rabaa Square").  The protests caused the center of Cairo city to be blocked and commercial life in the capital was brought to a standstill. Residents of the city were living in fear for their safety. By July 26, it was estimated that violent confrontations between the Muslim Brotherhood and the security forces had resulted in an estimated 250 deaths and 2800 injuries.[8]  Lasting over forty days, the mass sit-ins at the two camps became a threat to the security of Egypt.

Muslim Brotherhood calls for violence continued throughout July and until August 14. These calls coincided with clashes between protestors and attacks against military and police personnel and infrastructure in which the military and police were targeted by live ammunition and resulted in the loss of life.[9]  Allegations of torture and killing of suspected "agents" or "security personnel" emerged from within the camps,[10] and protestors at Rabaa Square barricaded themselves inside and

---

[8]     *See* "Factbox: 189 killed in post-30 June violence", Egypt Independent, July 23, 2013 (here).

[9]     Booth, W. *et al.*, "Egypt's Muslim Brotherhood calls for 'uprising' after troops shoot protesters", Washington Post, July 8, 2013 (here). Chulov, M. & Kingsley, P., "Egypt prepares for backlash as Morsi allies reject new regime," The Guardian, July 4, 2013 (here). Kingsley, P. and Chulov, M., "Morsi supporters prepare to defend themselves as tide turns in Egypt" The Guardian, July 4, 2013 (here). "Thousands call for Morsi's return to power in Beni Suef, Beheira", Ahram Online, July 4, 2013 (here). Stack, L. & el-Naggar, M., "Latest Updates on Egypt's Transition", New York Times, July 4, 2013 (here). Hubbard, B., "Mayhem in Cairo as Morsi Backers Fight for Return", The New York Times, July 5, 2013 (here). Owen, P. and McCarthy, T., "Egypt: 51 Morsi supporters killed in shooting at Republican Guard compound – as it happened", The Guardian, July 8, 2013 (here). "At Least 51 Killed in Egypt as Tensions Soar", VOA News, July 8, 2013 (here). "Pro and anti-Mursi clashes leave 17 injured in Ismailiya", Aswat Masriya, July 30, 2013 (here). "More Bodies Found Near Raba'a al-Adaweya | Leaders of Wasat Party Arrested", Tahrir Institute for Middle East Policy, July 29, 2013 (here). "Egyptian general calls for millions to protest against 'terrorism'", The Guardian, July 24,2013 (here).  Siddique, H. and Quinn, B., "Egypt: Deaths as rival rallies clash— As it happened", The Guardian, July 26, 2013 (here). "Clashes, helicopters, tear gas as tens of thousands take to streets of Egypt", RT, July 26, 2013 (here). el-Deeb, S., "Two killed in Egypt as supporters and opponents of ousted president clash in Alexandria", National Post, July 26, 2013 (here).  NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Al Nasr Road Events" (here).

[10]    "Report on the events at Rabaa and Nadha", Egyptian Ministry of Interior, available at Albawabh News, August 14, 2014 (here). "Eleven tortured bodies found near Islamists sit-in – source", Aswat Masriya, July 29, 2013 (here). "More Bodies Found Near Raba'a al-Adaweya | Leaders of Wasat Party Arrested", Tahrir Institute for Middle East Policy, July 29, 2013 (here). "Fresh allegations of torture at pro-Morsy rallies", Egypt Independent, 3 August 2013 (here). NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Nadha Sit-in Events" (here). See also Guirguis, D., "Brotherhood Violence, Overshadowed", Middle East Institute, August 8, 2013 (here).  "Fresh allegations of torture at pro-Morsy rallies", Egypt Independent, August 3, 2013 (here).

fortified the camp.[11]   As the authorities exercised all efforts to secure a peaceful resolution, it became clear that the security forces would need to disperse the camps which had now caused significant local and national disruption to public order.[12]

Given the alarming nature of the situation, the interim government had from the outset attempted to engage in negotiations with various political factions, including the Muslim Brotherhood.[13]   On July 27, the Minister of Interior issued a press statement announcing "the police and the army were working in coordination to discuss a suitable day for dispersing the two pro-Morsi sit-ins, which hold tens of thousands of protesters."[14] The Minister urged the Muslim Brotherhood to stop its incitement of violence, to reopen blocked roads, and to stop the killing and torture of "suspected spies."[15] The Minister of Interior convened a meeting with various civil society actors with a view to discuss methods of peacefully ending the protests in the knowledge that some protesters were armed.[16]

On July 31, 2013, the Office of the Public Prosecutor issued a decision which called for the police to take all legally required action to disperse crowds at the camps and to investigate

---

[11]   "Pro-Morsy protesters place barriers on Nasr road", Egypt Independent, July 28, 2013 (here).

[12]   Klein, G., "Cairo Islamist camp angers residents", Your Middle East, July 21, 2013 (here). NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Republican Guard House Events" (here). Kingsley, P., "Egypt's Rabaa massacre: one year on", The Guardian, August 16, 2014 (here). Fahim, K. and Gladstone, R., "Egypt Vows to End Sit-Ins by Supporters of Deposed President", New York Times, July 31, 2013 (here). See also Statement of the reported incidents that occurred in Rab'a, Public Prosecution – East Cairo Plenary Prosecution – First Nasr City Area Prosecution, 2013 (here), English translation to be provided when obtained. Official Facebook page for SOS Organization Rabaa (here).

[13]   Awad, M. and Kingsley, P., "Egypt's Muslim Brotherhood admits it has been negotiating with army", The Guardian, July 14, 2013 (here). "Cairo crackdown follows failed negotiation", Al Jazeera, August 14, 2013 (here).

[14]   "Pro-Morsi rallies no longer acceptable: Egyptian cabinet", Ahram Online, July 31, 2013 (here).

[15]   NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Statement of National Defence Council, 24 July 2013," (here).

[16]   "Pro-Morsi rallies no longer acceptable: Egyptian cabinet", Ahram Online, 31 July 2013 (here). NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Statement of National Defence Council, 24 July 2013" (here). "Army throws flyers at pro-Mursi protesters", Aswat Masriya, July 30, 2013 (here).

perpetrators of crimes alleged to have been committed in the camps.[17] Between July 31 and August 13, the Minister of Interior made requests to the protestors to leave voluntarily.[18] Leaflets were dropped warning pro-Morsi supporters to clear the camps.[19] The Minister of Interior exhausted all reasonable efforts to encourage the protesters to return home.

By August 13, 2013, it became clear that security forces would need to enter the camps to secure clearance and restore order and peace to the city of Cairo. On August 14, 2013, it was widely reported that at 6:30 a.m., security services arrived at the Rabaa Square camp using loudspeakers to call on protesters to leave the camps via clearly designated routes.[20] Security forces noted that the dispersal was taking place under the law by decree and in full view of the media and international observers and thereby warned against use of violence.  Implementation orders provided to the security forces, as well as the numbers of those participating in the dispersal, were also published to ensure transparency of the operation.[21]

The protestors ignored the warnings to disperse and the security forces employed tear gas, water cannons and fire engines to disperse the crowds.[22] It is at this point that gunfire is reported to have broken out from within the camp and, reportedly, from a building nearby where 60 snipers

---

[17]   NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Statement of National Defence Council, 24 July 2013" (here).

[18]   Al-Atrush, S., "Egypt offers safe passage to Mursi supporters", Arab News, August 1, 2013 (here). NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, annex entitled "Statement of National Defence Council, 24 July 2013" (here).

[19]   "Army throws flyers at pro-Mursi protesters", Aswat Masriya, July 30, 2013 (here). NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30 2013, March 11, 2014, page 10 (here).

[20]   "Report on events at Rabaa and Nadha", Egyptian Ministry of Interior, available at AlBawabh News, August 14, 2014 (here).

[21]   Id.

[22]   NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014 page 10 (here). See also Case No. 15899/2013, Report of the Nasr City First Police Station entitled "Dispersal of Rab'a Square and relevant reports", 2013 (here), and "Report on events of Rabaa and Nadha", Egyptian Ministry of Interior, available at AlBawabh News, August 14, 2014 (here).

were subsequently arrested.[23]   Within 30 minutes of their arrival, police reported that two police officers had been shot resulting in one fatality as unarmed protestors were caught in the crossfire between the police and snipers. Subsequently, matters quickly escalated at the camp with police and pro-Morsi supporters both engaging in violent clashes.[24]   With any major operation between armed protesters and security forces, where causalities are inevitable, investigations into the cause of casualties is standard.

On December 21, 2013, interim President Mansour issued a decree for the establishment of an independent fact-finding mission to be headed by Dr. Fouad Abdel-Moneim Riad, a former judge at the International Criminal Tribunal for the Former Yugoslavia. As part of its mandate, the Independent National Commission was tasked with investigating events, which occurred in connection with the ousting of former President Morsi. The mission published its findings on March 11, 2014.[25]

Mr. Beblawi carries no responsibility for any alleged acts caused to the Plaintiff either while Plaintiff was at Rabaa Square or subsequently.

### The Allegations Against Mr. Beblawi are Based on Limited Assumptions

The Complaint seeks to hold Mr. Beblawi liable under the TVPA as an "An individual who, under actual or apparent authority, or color of law, of any foreign nation – (1) subjects an individual to torture…or (2) subjects an individual to an extrajudicial killing."

Although Plaintiff's Complaint provides a great deal of factual detail about his background, arrest and imprisonment in Egypt, the facts are relatively spare with respect to the alleged conduct of

---

[23]   Recordings of special forces during Rabaa sit-in dispersal, Al-Watan, 14 August 2013, uploaded on YouTube on August 18, 2013 (here).

[24]   NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014, page 10 (here). See also, "Report on events of Rabaa and Nadha", Egyptian Ministry of Interior, available at AlBawabh News, August 14, 2014 (here). El-Rashidi, Y., "Scenes from a Crackdown: What Really Happened in Cairo?", New York Review of Books Daily, September 11, 2013 (here). For a list of injuries sustained by security forces see "Report on events of Rabaa and Nadha", Egyptian Ministry of Interior, available at AlBawabh News, August 14, 2014 (here).

[25]   NCHR, Findings of Fact-finding Report issued by the Independent National Commission on Events Concurrent with June 30, 2013, March 11, 2014 (here).

the Defendant *as an individual*.   Instead, the Complaint relies on conclusory "would haves" based on Mr. Beblawi's position as Prime Minister of Egypt from July 2013 to March 2014, and a number of critical allegations are based solely on "*information and belief*".

Allegations Related to Attempted Extrajudicial Killing

Plaintiff alleges that he was acting as a translator and tweeter during the 2013 demonstration in Rabaa Square. Complaint, ¶¶ 32, 41.   Plaintiff claims based on *information and belief* that Defendant was monitoring his twitter feed. *Id*. ¶¶ 41  On August 14, 2013 during the course of the demonstrations Plaintiff was shot in the arm.  *Id*. ¶¶ 43.

Plaintiff asserts that Mr. Beblawi authorized the Egyptian Cabinet and the Minister of Interior to "violently" disperse protesters (*id*. ¶ 36), and that he was responsible for planning the shooting and attack of the protesters. *Id*. ¶¶ 38, 46.   Any connection to Plaintiff is limited to *information and belief* that Defendant took these actions "in part out of frustration with his inability to fully control the narrative about what was occurring due to the work of Plaintiff and the foreign media."*Id*. ¶ 36.

Allegations Related to Torture

Eleven days after the Rabaa Square demonstrations, Plaintiff was arrested. (Comp. ¶ 53). He alleges after his arrest that he was interrogated, beaten, threatened, insulted, denied medical attention, encouraged to commit suicide and confined at various police stations and prisons under inhumane conditions. *Id*. ¶ 62.  On January 24, 2014, Plaintiff commenced a hunger strike. *Id*. ¶ 97.

On August 27, 2013, Plaintiff, along with leaders of the Muslim Brotherhood, was charged with a variety of crimes including membership in a terrorist organization, forming a gang, plotting to overthrow the regime and spreading false information. *Id*. ¶¶ 64, 65.  Mr. Beblawi resigned as Prime Minister of Egypt in March 2014.  *Id*. ¶ 14.

Plaintiff alleges on *information and belief* that his treatment following arrest was approved by Mr. Beblawi during the time he served as Prime Minister and that he had authority over the armed and security forces as well as the Interior Ministry which controlled the prisons. (*Id*. ¶¶ 121, 122) Plaintiff also asserts on *information and belief* that Defendant had the power to pardon or reduce

8

criminal charges and failed to punish personnel for committing such abuses. *Id*.   ¶¶ 122, 127. Similarly,  Plaintiff argues on *information and belief* that "such a campaign seeking to coerce a high-profile prisoner" and other measures of torture "*would all have been approved*" by high Egyptian officials including el-Sisi and Kamel as well as Mr.  Beblawi.  Plaintiff argues that the fact that the abuses were "known and not halted" evidences a "clear conspiracy" on the part of the Defendant and other named but unserved defendants to continue the torture of Plaintiff and lie about it to the world. *Id*. ¶ 128.

<u>Plaintiff's  Criminal  Conviction</u>

A year after Mr. Beblawi ceased being Prime Minister, Plaintiff was convicted of a number of the criminal charges levied against him and sentenced to life in prison. (Comp. 115). He was ultimately released following renouncement of his Egyptian citizenship and returned to the United States on May 30, 2015.  *Id*.  ¶ 118.

**Implicated Policy Interests of the United States**

Plaintiff's Complaint levels charges not only against Mr. Beblawi for actions in his official capacity as Egypt's Prime Minister, but makes allegations against five current high-level Egyptian Government officials. These officials—which the Complaint brands as "*Un-Sued Defendants*"—are President Abdel Fattah el-Sisi,; Abbas Kamel, the Director of Egypt's General Intelligence Service; Mohamed Ibrahim Mustafa, the former Egyptian Minister of Interior; Mahmoud Sayed Abdel Hamid Sha'rawi, Egypt's Minister of Local Development; and Tamer Al-Fergany, Egypt's former Attorney General and current Head of the Anti-Corruption Authority. Complaint ¶ 2 (emphasis added). Plaintiff alleges that these "Un--Sued Defendants" are "not named as formal defendants" only "because they are not present in the United States." *Id*. ¶ 3. The Complaint explicitly threatens that if "one or more of them . . . visit the United States" Plaintiff will attempt "to serve them with process" and if successful, "will add them to the lawsuit as formal defendants." *Id*.

Such allegations both sensationalize and politicize this case, and given the concession of no jurisdiction verge on propaganda. Allowing Plaintiff's suit to proceed in light of the  explicit threat to serve President el-Sisi or any other "unsued Defendant[]" who visits the U.S. for diplomatic or

other purposes, would compromise the United States' sensitive relationship with Egypt and pose a threat to significant long-standing policy interests recognized by both the Executive and Legislative Branches.

"The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (quoting Statement of Rep. John Marshall, 10 Annals of Cong. 613 (Mar. 7, 1800 .[26] Accordingly, for most of our nation's history, the courts recognized that high-ranking foreign officials are immune from suits targeting their official acts whenever the Executive Branch determines that allowing such actions to proceed might "interfere[] with the proper conduct of our foreign relations." *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943). The Egyptian government notified Defendant's counsel that it intends to issue a Diplomatic Note to the State Department requesting a Suggestion of Immunity.[27] Dkt. 19-1, Ex. B. The Diplomatic Note from Egypt to the State Department issued on June 24, 2020. Dkt. 22-1, Ex. B.

The President has explicitly declared that Egypt is "an important strategic partner in the Middle East" and to that end the administration is "working with Egypt on many different fronts, including military and trade"[28] The administration has made "strengthening [the U.S.'s] partnership with Egypt and promoting regional stability across the Middle East" a critical U.S. national security policy.[29] The administration has made clear that it views Egypt as "an anchor of stability in the Middle East" with whom it "is working . . . on issues impacting regional stability including conflicts

---

[26]   Less than a year after giving this speech, Representative Marshall became Chief Justice; an office he held for more than 33 years. *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 282 n.5 (11th Cir. 1993).

[27]       A Suggestion of Immunity is a letter issued by the State Department informing the Court that the government believes the defendant should "should be immune from suit in courts of the United States" and asking the Court to refrain from adjudicating the case. *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001).

[28]   *Fact Sheet: President Donald J. Trump Remains Committed to Egypt and Middle East Stability – Foreign Policy*, Whitehouse.gov (April 9, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-remains-committed-egypt-middle-east-stability/ ("*Fact Sheet*").
[29]       *Id.*

in Libya, Syria, and Yemen and progress on the Middle East Strategic Alliance."[30] Specifically, the administration "is working with Egypt to combat terrorism" and to that end "is providing Egypt with military training and equipment to support counterterrorism efforts."[31]

The Congressional Research Service[32] recognizes that Congress agrees with the Executive Branch's assessment.[33] Congress views Egypt as "an important country for U.S. national security interests based on its geography, demography, and diplomatic posture."[34] Congress has recognized that "the stability of Egypt" is "key to the stability of the Middle East" including the resolution of the ongoing West Bank crisis.[35] Accordingly, the U.S. is striving to maintain its "decades-long security partnership to strengthen Egypt's armed forces and its ability to combat terrorism."[36]

Congress views preservation of friendly relations with Egypt as critical to U.S. foreign policy for several reasons. "Egypt's population of more than 100 million people makes it by far the most populous Arabic-speaking country."[37] It "controls the Suez Canal, which is one of the world's most well-known maritime chokepoints, linking the Mediterranean and Red Seas."[38] Egypt is also a strategic ally in efforts to end extremism. "Egypt is opposed to Islamist groups wielding political power across the Middle East, and opposes Turkish and Qatari support for Hamas."[39]

Egypt's 41-year old peace treaty with Israel is "one of the single most significant diplomatic

---

[30]  *Id.*

[31]  *Id.*

[32]  The Congressional Research Service is "a nonpartisan legal 'think tank' that works exclusively for Congress." *Florida ex rel. McCollum v. United States Dep't. of Health & Human Servs.*, 716 F. Supp. 2d 1120, 1136 (N.D. Fla. 2010). It "is a unit within the Library of Congress that provides research and analysis in response to requests from Congressional committees and individual members of Congress." *Goode v. Billington*, 932 F. Supp. 2d 75, 80 (D.D.C. 2013).

[33]  Jeremy M. Sharp, *Egypt: Background and U.S. Relations*, Congressional Research Service Report    RL33003    at    Summary    (May    27,    2020),    available    at https://crsreports.congress.gov/search/#/?termsToSearch=33003&orderBy=Relevance.

[34]  *Id.*

[35]  *Id.* at 19.

[36]  *Id.*

[37]  *Id.* at Egypt: Background and U.S. Relations.

[38]  *Id.*

[39]  *Id.* at 14.

achievements for the promotion of Arab-Israeli peace."[40] "Congress has long been concerned with the preservation of the peace treaty and has appropriated foreign assistance and exercised oversight to ensure that both parties maintain it."[41] Congress views such continued goodwill between Egypt and Israel as critical to U.S. foreign policy.[42] Since 2013, Egypt has worked with Israel to stop terrorist activity by Hamas in the Gaza Strip and has unilaterally worked to "thwart arms tunnel smuggling into Gaza."[43] Egypt has also used its status as the world's largest Arabic-speaking country "to play the role of mediator between Israel and Hamas" seeking "to broker[] . . . a long-term Israel-Hamas truce."[44]

Additionally, Egypt's agreement to allow the U.S. Navy "expedited naval access through the Suez Canal" is a critical aspect of the U.S. Government's relationship with Egypt.[45] In May 2019, "amidst rising U.S.-Iranian tension around the Strait of Hormuz," the Egyptian Navy facilitated the "expedited transit" of "the aircraft carrier *USS Abraham Lincoln* and its strike group through the Suez Canal" enabling it to promptly respond to a sudden crisis.[46]

Indeed, Congress regards these long-standing concerns as even more pressing now because Egypt, like the rest of the Middle East, "faces an uncertain future" because of the COVID-19 pandemic.[47]

Adjudication of Plaintiff's lawsuit threatens to undermine the strategic relationship between the U.S. and Egypt recognized by both the President and Congress. The suit calls upon American courts to judge the actions of Egypt's highest officials, which could have a chilling effect on their willingness to work with the U.S. or take steps to further American foreign policy objectives. These implications are significantly magnified by the Complaint's explicit threat "to serve . . . process"

---

[40] *Id.* at 13.

[41] *Id.*

[42] *Id.*

[43] *Id.* at 14.

[44] *Id.*

[45] *Id.* at 20.

[46] *Id.*

[47] *Id.* at 1.

upon any of the five high-ranking foreign officials it characterizes as "Un-Sued Defendants"—including President el-Sisi—if any "of them . . . visit the United States" for diplomatic purposes. Complaint ¶ 3. This threat could deter important diplomatic visits by key Egyptian officials, including President el-Sisi, whom the President has invited to Washington on multiple occasions.[48]

Allowing this action to proceed would also have collateral reciprocal effects. It is well settled that "diplomatic immunity is a valuable and integral feature of our relations with foreign nations." *Tabion v. Mufti*, 877 F. Supp. 285, 292 (E.D. Va. 1995), *aff'd*, 73 F.3d 535. This immunity "protect[s] United States diplomats from criminal and civil prosecution in foreign lands with differing cultural and legal norms as well as fluctuating political climates." *Id.* at 293. And, "reciprocity is the price paid for that immunity." *Id.* If U.S. courts allow suits against high-ranking foreign officials to proceed that conflict with policy concerns expressed by the political branches, other sovereigns may be less willing to offer such protection to high-ranking U.S. officials. This could particularly undermine American efforts in nations with "fluctuating political climates." *Id.*

### Egypt Has Requested a Suggestion of Immunity From the United States

On June 21, 2020, the Egyptian government, through its Embassy in Washington, D.C. wrote to the undersigned counsel for the Defendant advising: "Mr. El Beblawi has immunity from suit, not only by virtue of his current diplomatic status, but also personal immunity due to his official position of Prime Minister of Egypt at the time of the events cited. Please inform the court that we require time to draft the Diplomatic Note and we are in support of your application for extension of time in order to prepare the necessary documentation." Decl. Timothy M. Broas, Dkt. 19-1, Ex. B. Thereafter, on June 23, 2020, via Diplomatic Note 0077-2020 from the Egyptian Embassy to the United States State Department, Egypt introduced the undersigned counsel and advised that "A detailed diplomatic note will soon be dispatched to the State Department respectfully requesting the United States of America to recognize the immunities from suit in respect to Mr El Beblawi." Decl. Timothy M. Broas, Dkt. 22-1, Ex. A. And then on June 24, 2020, a copy of Diplomatic Note 0078-2020 was issued by the Egyptian Embassy to the United States State Department, officially

---

[48] Fact Sheet.

requesting a suggestion of immunity from the United States. *Id.*, Ex. B.

As noted in Argument, § II.B below, the process for our government to act on the request may take some time, and Mr. Beblawi respectfully requests that decision on this motion await the position of the United States, which may be dispositive.

## ARGUMENT

## I.    Motion to Dismiss Standard

Mr. Beblawi brings this motion pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6). Upon a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, Plaintiff bears the burden of establishing that the court has jurisdiction over the case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A Rule 12(b)(1) motion "imposes on the Court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority" and "[f]or this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny [than] in resolving a [Rule] 12(b)(6) motion.'" *Grand Lodge of the FOP v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (citation omitted). To determine whether it has subject matter jurisdiction, the Court may consider materials outside the pleadings. *Jungquist v. Al Nahyan*, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997).

When a defendant makes a timely objection to the Court's exercise of personal jurisdiction under Rule 12(b)(2), the "plaintiff must make a *prima facie* showing of the pertinent jurisdictional facts." *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). There are two types of personal jurisdiction: (1) general, or all-purpose jurisdiction; and (2) specific, or suit-related jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). If the court has neither, it must dismiss the lawsuit. *See Id.*

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the pleadings must suggest a plausible scenario that shows that the pleader is entitled to relief." *Jones v. Horne*, 634 F.3d 588, 595 (D.C. Cir. 2011) (quotations and citations omitted); "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion, a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II.   **Mr. Beblawi Is Immune to Suit Due to His Diplomatic Status**

### A.   **Mr. Beblawi Is Not Subject to Service of Process**

By virtue of his diplomatic status, Mr. Beblawi is immune from service of process under the Diplomatic Relations Act of 1978 ("DRA") and the Vienna Convention on Diplomatic Relations ("VCDR"). *See* VCDR art. 31(1), Dec. 13, 1972, 23 U.S.T. 3227; 22 U.S.C. § 254d.

The DRA incorporated the VCDR into federal law and repealed contradictory legislation. *See Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436, 442–43 (2d Cir. 2019). Under the VCDR, diplomatic agents are immune from a receiving state's civil and administrative jurisdiction, including service of process. VCDR art. 31(1), Dec. 13, 1972, 23 U.S.T. 3227; *see also Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) (affirming dismissal and holding that joining a diplomatic agent as a defendant would violate diplomatic immunity); *Hellenic Lines, Ltd. v. Moore*, 345 F.2d 978, 980–81 (D.C. Cir. 1965) (affirming dismissal and "conclude[ing] that the purposes of diplomatic immunity forbid service" on a foreign diplomat); *Aidi v. Yaron*, 672 F. Supp. 516, 518 (D.D.C. 1987) ("this case merely declares the rather obvious point that if a diplomat is immune from suit he or she is equally immune from service of process").

As a diplomatic agent, Mr. Beblawi is thus immune from service, and the Court should dismiss Plaintiff's Complaint with prejudice and grant the concurrently-filed motion to quash. *Id.* at 519 (granting motion to quash service of process on a diplomatic agent); *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 195 (D.D.C. 2007) (granting motions to quash service and dismiss action against defendants entitled to diplomatic immunity under the VCDR).

B.      **Mr. Beblawi Has Diplomatic Immunity**

Mr. Beblawi's diplomatic immunity compels dismissal of this action for lack of subject matter jurisdiction. *See* 22 U.S.C. § 254d ("Any action . . . brought against an individual who is entitled to immunity with respect to such action . . . under the [VCDR] . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed"); *Broidy Capital Mgmt. LLC*, 944 F.3d at 443, 446 (affirming dismissal and recognizing that "[d]iplomatic immunity is a matter of subject matter jurisdiction"); *Tachiona v. United States*, 386 F.3d 205, 220 (2d Cir. 2004) (affirming dismissal of TVPA claims based on diplomatic immunity).

The DRA "establishes the privileges and immunities provisions of the [VCDR] as the essential United States law on the subject." H.R. 7819 – 95th Congress: Diplomatic relations Act (statement of President Carter signing into law on Sept. 30, 1978); *see also* Diplomatic Relations Act, Pub. L. No. 95-393, 92 Stat. 808. While the DRA neither alters nor augments the VCDR, it does clarify available procedures for establishing and asserting diplomatic immunity: "immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure." 22 U.S.C. § 254d.

A common and conclusive mechanism to establish diplomatic immunity under the DRA is through a suggestion of immunity submitted by the State Department. *See Zdravkovich v. Consul Gen. of Yugoslavia*, No. 98-7034, 1998 WL 389086, at *1 (D.C. Cir. June 23, 1998) ("The courts are required to accept the State Department's determination that a foreign official possesses diplomatic immunity from suit"); *Carrera*, 174 F.2d at 497 ("The courts are disposed to accept as conclusive of the fact of the diplomatic status of an individual claiming an exemption, the views thereon of the political department of their government").

Here, Mr. Beblawi is proceeding through the appropriate diplomatic channels to have his diplomatic status communicated to the Court through a statement of immunity issued by the State Department. *See* Dkt. 19-1, Ex. B. To that end, counsel has received written confirmation from the Egyptian Ministry of Foreign Affairs that the Egyptian government has sent a Diplomatic Note to the United States government respectfully requesting that the latter file with this Court a suggestion of

immunity from suit. Dkt. 22-1, Ex. B. Upon issuance of a statement of immunity by the State
Department, the Court must dismiss this lawsuit. *Carrera*, 174 F.2d at 497; *Zdravkovich*, 1998 WL
389086, at *1.

The Court need not wait for the State Department to respond, however, as a formal
suggestion of immunity is not the *sole* way to establish diplomatic immunity. *See* 22 U.S.C. § 254d.
Indeed, Section 254d explicitly allows an individual to establish diplomatic immunity by filing a
motion or suggestion of immunity on his own behalf, or "as otherwise permitted by law or applicable
rules of procedure." *Id*. Accordingly, federal courts have found that "there is no rule requiring a
filing in the case by the United States Government," and that "where the basis for diplomatic
immunity is clearly established, there is no need for a formal suggestion of immunity by the United
States." *Devi v. Silva*, 861 F. Supp. 2d 135, 140–41 (S.D.N.Y. 2012).[49]

Mr. Beblawi has submitted into evidence his G-1 Diplomatic Visa along with three items of
official correspondence from the Ambassador of the Arab Republic of Egypt to the United States of
America confirming Mr. Beblawi's status as a diplomatic agent, and indicating that the Egyptian
government is requesting that the United States government confirm his status to this Court. *See*
Dkt. 19-1, Ex. A, B. Mr. Beblawi's G-1 Diplomatic Visa supports his diplomatic immunity claim
because it corroborates his status as a diplomat while within the United States. *See* 8 U.S.C.A.
§ 1101(a)(11) (West 2014) (defining "diplomatic visa" to mean a "nonimmigrant visa bearing that
title and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may
prescribe"); 22 C.F.R. § 41.12 (confirming "G-1" designation reflects status as "designated principal
resident representative of a foreign government"). To issue the diplomatic visa, which is reflected by

---

[49]  Plaintiff may cite to the now-reversed opinion of *Jungquist v. Nahyan*, 940 F. Supp. 312, 321-22
(D.D.C. 1996) to suggest that dismissal under § 254d requires evidence from the State Department.
In *Jungquist*, the District Court denied a motion to dismiss an action against two defendants, finding
that immunity under the Foreign Sovereign Immunities Act ("FSIA") did not apply and that the
Court lacked evidence that the State Department considered the defendants diplomatic agents. *Id*.
The D.C. Circuit reversed, finding that the defendants were entitled to FSIA immunity and that it
therefore need not reach the diplomatic immunity claim. *See Jungquist v. Al Nahyan*, 115 F.3d 1020,
1026 (D.C. Cir. 1997). Had the Circuit Court reached the diplomatic immunity claim, it would have
confronted the plain language of § 254d, which expressly allows an individual to establish
diplomatic immunity on his own.

a "D," the United States government had to confirm that Mr. Beblawi not only had a diplomatic passport, but also that he fell within an enumerated class eligible for receipt of a diplomatic G-1 visa, as opposed to a regular (or, "R") type visa. *See* 22 C.F.R. § 41.26(c)(1).[50] The diplomatic visa therefore supports Mr. Beblawi's immunity claim.

The Egyptian Ambassador's June 21, 2020 letter provides further evidence of Mr. Beblawi's diplomatic status because the Ambassador expressly confirms that Mr. Beblawi is "a diplomat of the Arab Republic of Egypt" and that he holds "immunity from suit, not only by virtue of his current diplomatic status, but also personal immunity due to his official position of Prime Minister of Egypt at the time of the events cited." Dkt 19-1, Ex. B. This designation provides additional evidence of Mr. Beblawi's diplomatic status.

On June 23, 2020, the Egyptian Embassy issued Diplomatic Note 0077-2020 to the United States State Department, introducing the undersigned counsel and advising that "A detailed diplomatic note will soon be dispatched to the State Department respectfully requesting the United States of America to recognize the immunities from suit in respect to Mr El Beblawi." Dkt. 22-1, Ex. A. On June 24, 2020, the Egyptian Embassy issued Diplomatic Note 0078-2020 to the State Department, in which the Egyptian government officially requested a suggestion of immunity from the United States be issued to this Court. Dkt 22-1, Ex. B.

As the weight of the evidence before the Court therefore demonstrates that Mr. Beblawi is a diplomatic agent entitled to immunity from suit, the Court should dismiss Plaintiff's lawsuit for lack of subject matter jurisdiction. *See* 22 U.S.C. § 254d; VCDR art. 31(1), Dec. 13, 1972, 23 U.S.T.

---

[50]     Plaintiff will likely cite to the inapposite cases of *United States ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425 (S.D.N.Y. 1963) and *Diallo v. Strauss-Kahn*, No. 307065/11, 2012 WL 1533179 (N.Y. Sup. Ct. May 01, 2012)that he previously relied on to argue that a G-1 visa does not confer diplomatic immunity. The Court need not labor long to distinguish such cases. In *Fitzpatrick*, the United States government actively *opposed* the diplomatic immunity claim, which was premised on Section 15(2) of the Headquarters Agreement. 214 F. Supp. at 432. Here, the United States government has not disputed Mr. Beblawi's claim of immunity; it has not even had the chance to weigh in. And Section 15(2) of the Headquarters Agreement is not presently at issue. Similarly in *Diallo*, IMF Managing Director Dominic Strauss-Kahn, asserted immunity under the Convention on the Privileges and Immunities of the Specialized Agencies, to which the United States is not a signatory. 2012 WL 1533179 at *3. Mr. Beblawi is not asserting immunity under that framework.

3227. Should the Court require additional evidence of Mr. Beblawi's diplomatic status, Mr. Beblawi respectfully requests that the Court grant his request for extension to respond to Plaintiff's Complaint. *See* Dkt. 13.

### III.   There Is No Personal Jurisdiction Over Mr. Beblawi for the Conduct Alleged

"The primary focus of [the Constitution's] personal jurisdiction inquiry is the defendant's relationship to the forum." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1779.   Plaintiff's Complaint asserts that "[t]his Court has personal jurisdiction over Defendant Beblawi based on his numerous, systematic and regular contacts with the District of Columbia" in that "[h]e is currently employed as an Executive Director with the International Monetary Fund within the District of Columbia." Complaint ¶ 10.   This is insufficient for  the Court to exercise general or specific personal jurisdiction over Mr. Beblawi as an individual.

When personal jurisdiction is challenged, "the plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant." *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 24 (D.D.C. 2015) (Kollar-Kotelly, J.), *aff'd*, 851 F.3d 45 (D.C. Cir. 2017). To satisfy this burden, "the plaintiff cannot rest on bare allegations or conclusory statements but 'must allege specific acts connecting [the] defendant with the forum.'" *Id.* (quoting *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).

Since its landmark decision in *International Shoe Co. v. Washington*, 326 U.S. 310, (1945), the Supreme Court has "recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.  "A court with general jurisdiction may hear *any* claim against the defendant, even if all the incidents underlying the claim occurred in a different State." *Id.* (emphasis in original).

"Specific jurisdiction is very different." *Id.* For such jurisdiction to exist, "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum.*'" *Id.* (citation omitted, alterations and emphasis in original). This requires "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum... and

is therefore subject to the [forum's] regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("*Goodyear*") (quotations and citations omitted). Thus, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (quotations and citations omitted).

Mr. Beblawi maintains a residence in this district for the purpose of engaging in IMF-related work.[51]   The mere fact that the Defendant maintains a residence in the forum does not establish domicile for general jurisdiction to attach.   It is now settled law that "general" or "all-purpose jurisdiction" over an individual is limited to "the individual's domicile." *Goodyear*, 564 U.S. at 924; *accord Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).[52]   Mr. Beblawi's domicile is Cairo, Egypt.   Indeed, our courts have recognized from the outset that "[t]he household of an ambassador is supposed to be within the territorial jurisdiction of his sovereign." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 127 (1812).

"[R]esidence is '[t]he act or fact of living in a given place for some time, which [Mr. Beblawi is temporarily doing in Washington, D.C.,] while domicile is a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere.'" *See United States v. Williams*, 825 F. Supp. 2d 117, 124 (D.D.C. 2011) (quoting *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir. 2004)).   "The word domicile means the place where a person has his fixed habitation without any present intention of removing therefrom, and necessarily, therefore, a person can have only one domicile at the same time." *Richmond & Danville*

---

[51]   Historically, governmental contacts of an official nature by a foreign defendant are generally not considered in assessing personal jurisdiction.   "[B]asing jurisdiction on the PLO's participation in UN-related activities would put an undue burden on the ability of foreign organizations to participate in the UN's affairs." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51 (2d Cir. 1991).

[52]   While so-called "tag" jurisdiction has been recognized over physically present foreign defendants in a jurisdiction at the time of service—*e.g.*, *Kadic v. Karadzic,* 70 F.3d 232, 247 (2d Cir.1995) (service of process on Bosnian Serb in New York while present as an invitee of the United Nations); *First Am. Corp. v. Price Waterhouse LLP,* 154 F.3d 16, 19 (2d Cir. 1998) (service of process on partner of a British company while in New York); *Bourassa v. Desrochers,* 938 F.2d 1056, 1057–58 (9th Cir.1991) (service of process on Canadian citizen while in Florida)—*Goodyear, Daimler* and *Bristol-Meyers Squibb* have since narrowed personal jurisdiction substantially.

*R.R. Co. v. Gorman*, 7 App. D.C. 91, 98 (D.C. 1895).  As such, "[a]n individual consequently may have several residences, but only one domicile." *Williams*, 825 F. Supp. 2d at 124-125 (citation omitted); *accord e.g.*, *Eisel v. Secretary of the Army*, 477 F.2d 1251, 1265 (D.C. Cir. 1973)("a person has been able to have only one domicile.")

As this Court has recognized, principles of general jurisdiction apply where, as here, a U.S. plaintiff asks a federal court to exercise jurisdiction over a foreign defendant for conduct that occurred outside the forum state. *Livnat*, 82 F. Supp. 3d at 25. "Regarding general or all-purpose jurisdiction, a court may assert jurisdiction over a foreign defendant 'to hear any and all claims against [the defendant]' only when the [defendant's] affiliations with the State in which suit is brought are so constant and pervasive 'as to render [the defendant] essentially at home in the forum state.'" *Id.* (quoting *Goodyear*, 564 U.S. at 919). Here, as *Goodyear* made clear, for an individual defendant this means "the individual's domicile." *Livnat*, 82 F. Supp. 3d. at 29.

Judge Sullivan recently ordered the dismissal of a suit against several individual Peruvian defendants which asserted "general jurisdiction," on the basis of their "various connections to [the] jurisdiction." *Nuevos Destinos, LLC v. Peck*, Case No. 15-cv-1846 (EGS), 2019 WL 78780, at *6 (D.D.C. Jan. 2, 2019). *Nuevos Destinos, LLC* noted that "various connections to a jurisdiction" are insufficient if the foreign defendant is not "*at home* in the United States." *Id.* (emphasis in original) (citing *Livnat*, 82 F. Supp. 3d at 30).

TVPA cases recognize the domicile limitation for asserting personal jurisdiction over foreign individual defendants. "*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile…" *Daimler*, 571 U.S. at 137 (quotations and citations omitted); *E.g., Singh v. G.K.*, 1, 2016 WL 3181149, at *3 (S.D.N.Y. June 2, 2016) (court lacked general jurisdiction in TVPA claim against president of Indian political party because he was only temporarily present in U.S. and not domiciled there); *Giraldo v. Drummond Co.*, , 2012 WL 2358306, at *7 (N.D. Ala. June 20, 2012), *aff'd sub nom. Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015) (court lacked general jurisdiction in TVPA case against former

Central American CIA-based CIA chief who "traveled to the forum repeatedly" because he was not domiciled in the forum); *Collingsworth v. Drummond Co.,* , 2020 WL 2800612, at *6 (D.D.C. May 29, 2020) (court lacked general jurisdiction in TVPA claims against members of Columbian paramilitary group because they were not "at home" in the forum); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (court lacked general jurisdiction in TVPA claims against Sudanese and Liechtenstein defendants allegedly financed terrorists involved in September 11 attacks because they were not "at home" in the forum).

Nor does specific jurisdiction apply here, since specific jurisdiction requires an "affiliation between the forum and the underlying controversy." *Livnat*, 851 F.3d at 56. "Where a forum seeks to assert specific jurisdiction over [a foreign] defendant who has not consented to suit there, [the] fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum," and "***the litigation results from alleged injuries that arise out of or relate to those activities***." *Nuevos Destinos*, 2019 WL 78780 at *7 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)) (emphasis added).

There are no allegations in the Complaint concerning activities in this forum, other than the non-domicile temporary employment of the Defendant (Compl. ¶ 10.)—which is insufficient.[53]

## IV.    Mr. Beblawi Is Immune From Suit Due to Common Law Official Immunity

### A.    Common Law Foreign Official Immunity

Mr. Beblawi cannot be sued in this Court given his official immunity.  The conduct complained of was all undertaken in the Defendant's official capacity on behalf of the government of Egypt. *See*, Background, pp. 13-14 above, and Argument § IV.B, below.  In *Samantar v. Yousuf*, 560

---

[53]   Even if Plaintiff were to allege that he suffers harm in this district due to conduct that occurred abroad—which he does not allege—that would be insufficient to establish specific jurisdiction. "The fact that plaintiff Collingsworth suffered the effects of the alleged injury within the District is insufficient by itself to confer personal jurisdiction over defendants.  *See Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (section 13-423(a)(1) of the D.C. long-arm statute "focuses on where the defendant undertook the challenged ... actions, not where the plaintiff felt the injury"). Plaintiffs make no effort whatsoever to satisfy the plain terms of the only statutory provision upon which they rely: there has been no showing that the complaint arises out of the Drummond defendants' 'transacting any business in the District.' D.C. Code § 13–423(a)(1)." *Collingsworth v. Drummond Co.*, *supra*, 2020 WL 2800612, at *8.

U.S. 305 (2010), the Court held that the Foreign Sovereign Immunities Act of 1976 ("FSIA") did not govern immunity determinations concerning foreign officials. *Id*. at 312-323. Instead, the Court explained that when a plaintiff sues a foreign official "in his personal capacity and seek[s] damages from his own pockets, [the suit] is properly governed by the common law" of foreign official immunity that predated the statute. *Id*. at 325.

Principles of immunity "'were incorporated' into the TVPA," *Dogan v. Barak,* 932 F.3d 888, 895 (9th Cir. 2019) (quoting *Filarsky v. Delia*, 566 U.S. 377, 389 (2012)), and the TVPA is the sole basis for Plaintiff's two claims for relief here. In *Matar* v. *Dichter*, 563 F.3d 9, 15 (2d Cir. 2009), the Second Circuit rejected the argument that "any immunity [the foreign official defendant] might enjoy is overridden by his alleged violations of the TVPA."

Immunity exists in the present case because the suit against Mr. Beblawi for his conduct in an official capacity would "enforce a rule of law against the sovereign state." *Dogan*, 932 F.3d at 894.[54] Courts evaluating individual immunity consider whether the defendant's acts were "performed on behalf of the foreign state and thus attributable to the state." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 231 (D.D.C. 2018) (quoting *Samantar*, 560 U.S. at 321), *aff'd sub nom. Doe v. Buratai*, 792 F. App'x 6 (D.C. Cir. 2019),. And when a foreign state ratifies its official's conduct—as has been formalized here, *see* Dkt. 19-1 Ex. B; Dkt. 22-1, Exs. A, B—the suit against the official is effectively one against the foreign state. *Belhas* v. *Ya'alon*, 515 F.3d 1279, 1283-84; (D.C. Cir. 2008); *Matar*, 563 F.3d at 14.[55]

In *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), Chief Justice Marshall explained that "as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases...." *Republic of Austria v. Altmann,* 541 U.S. 677, 688, (2004). Because such cases typically

---

[54] Mr. Beblawi is aware of the holding in *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), and notes that the decision is the subject of a pending petition for *certiorari* supported by the United States as *Amicus Curiae*. No. 19-185. *See*, discussion in Argument, § II.B, below

[55] As the Court explained in *Samantar*, the common law doctrine of foreign official immunity is distinct from the now-statutory doctrine of foreign sovereign immunity under the FSIA. *See,* 560 U.S. at 321-322. Indeed, the Executive has "sometimes suggested immunity under the common law for individual officials even when the foreign state did not qualify." *Id.*

raised "questions of policy [rather] than of law," Marshall suggested they were "for diplomatic, rather than legal discussion." *Schooner Exchange,* 11 U.S. at 146. Courts have thus generally "deferred to the decisions of the political branches—in particular, those of the Executive Branch— on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

Under this framework of deference, courts have followed "a two-step procedure" for resolving questions of immunity. *Samantar*, 560 U.S. at 311-312.   If the State Department determined that immunity should be recognized, then "the district court surrendered its jurisdiction." *Id*. at 311. If the State Department did not file a suggestion of immunity, then the court "had authority to decide for itself whether all the requisites for such immunity existed," by considering "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Id*. at 311-12 (quoting *Ex parte Republic of Peru*,  318 U.S. at 587); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945).

To discharge this two-step process here, the Court should await finalization of the Diplomatic Note from the government of Egypt and any resulting suggestion of immunity or related position of the United States. *See*, Dkt. 19-1, Ex. B.

## B.   The Acts Complained of Were Official Acts on Behalf of Egypt

Plaintiff's allegations as to Mr. Beblawi concern executive, prosecutorial and police power decisions that are "peculiarly sovereign in nature." *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993).  The United States has consistently maintained that the immunity analysis "turns on whether the acts in question were performed on the state's behalf, such that they are attributable to the state itself."  *See Matar* v. *Dichter*, 2007 WL 6931924, Brief Amicus Curiae of United States, p. 21.

Part of that analysis is whether a suit challenges "core aspects of the foreign state's sovereignty." *Id*. at 24.  There is no doubt that the Complaint here meets this standard.

Ratification from the foreign state that the alleged conduct was official in nature is central to the immunity analysis. "In cases involving foreign sovereign immunity, it is also appropriate to look to statements of the foreign state that either authorize or ratify the acts at issue to determine whether

the defendant committed the alleged acts in an official capacity." *Belhas*, 515 F.3d at 1283; *Jungquist v. Al Nahyan,* 115 F.3d 1020, 1025 (D.C.Cir.1997) [affidavits submitted to the district court to help determine whether the defendant was entitled to foreign sovereign immunity]; *Hilao v. Estate of Marcos,* 25 F.3d 1467, 1472 (9th Cir.1994);[56] *Doe I v. Qi,* 349 F.Supp.2d 1258, 1285–87 (N.D.Cal.2004).[57]   The record here establishes that:

> The Arab Republic of Egypt respectfully requests the Department of State to recognize and allow the immunities of Mr. El Beblawi concerning the Complaint at all material times as its Head of Government, with entitlement to functional immunity, and as its current diplomatic agent, being his current personal immunity. The effect of the District Court of the District of Columbia exercising jurisdiction in this case would be to seek to enforce a rule of law against the Egyptian state and is contrary to the principles of international law.
>
> The Arab Republic of Egypt respectfully requests the United States Government to submit to the court a Suggestion of Immunity on behalf of Mr. El Beblawi. The basis for the Suggestion of Immunity is twofold, namely (1) that all of the actions alleged against Mr. El Beblawi at issue in this suit relate to his official capacity as Egypt's Prime Minister, and (2) that Mr. El Beblawi is inviolable and immune from civil suit on account of his current diplomatic status.
>
> .

Dkt. 22-1, Ex. B, Diplomatic Note 0078-2020.

Even where the United States does not suggest immunity, ratification by the foreign state may be sufficient for immunity and dismissal given the second stage of the immunity analysis, provided that foreign official immunity is consistent with "the established policy" of the State Department. *Samantar*, 560 U.S. at 312.  Indeed, when "actions were taken in an official capacity, [ ] it is the policy of the Executive to recognize immunity." *Motund v. Lewis*, No. 19-185 (2020), Brief Amicus Curiae of United States, p. 17. [58]

---

[56]   The Republic of the Philippines' statement in *Hilao* that the acts complained of were not official acts distinguishes the present case.  *See Dogan,* 932 F.3d at 895-96.

[57]   Despite the inflammatory allegations of the Complaint here, there is no *jus cogens* exception to such immunity.  *Belhas,* 515 F.3d at 1286; *Dogan*, 932 F.3d at 896; *Matar*, 563 F.3d at 14.

[58]   "[T]he Executive's articulation of foreign immunity principles historically has been adhered to in judicial proceedings, including in cases in which the Executive Branch expresses no view about a particular defendant's immunity."  *Id*. at 11-12.

While not required to establish immunity, the position of the United States should be dispositive. Mr. Beblawi respectfully requests that the Court not decide this motion until an immunity position from the United States government issues in response to the request from the Egyptian government, since "[i]f the request was granted, the district court surrender[s] its jurisdiction." *Samantar,* 560 U.S. at 311.

Plaintiff will rely on *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019) to argue that foreign official immunity is inapplicable. In *Lewis*, the Court of Appeals held that (i) a categorical exception to foreign official immunity applies when officials are sued only in their personal capacities, and (ii) the TVPA implicitly abrogated conduct-based foreign official immunity. The decision is contrary to the circuit decisions in *Dogan* and *Matar*. Defendant's petition for writ of certiorari asking that the Supreme Court review and reverse the *Lewis* decision is calendared for consideration by the Supreme Court on June 24, 2020. The United States has urged the Court to grant certiorari, anticipating lawsuits like the present, and warning of their consequences:

> If left undisturbed, the decision below could open the District Court for the District of Columbia to suits challenging a variety of foreign military or policy decisions, could invite similar treatment of this Nation's officials by other states, and could seriously interfere with the Executive Branch's conduct of foreign relations.[59]

In any event, *Lewis* is not dispositive in this case because foreign official immunity is not the sole basis for dismissing this matter: (i) there is no personal jurisdiction over Mr. Beblawi here, *see* § III, above; (ii) there is no subject matter jurisdiction as Mr. Beblawi has diplomatic immunity (*see*, § II.A,B above), (iii) in the event the United States issues a Suggestion of Immunity in this case— not present in *Lewis*—then this will be dispositive of the jurisdiction question as the Supreme Court has held (*Samantar,* 560 U.S. at 311), (iv) the Act of State doctrine bars this suit, *see* § V, below; and (v) the case presents non-justiciable political questions, see § VI, below. In any event, the Court may wish to defer any decision on this motion until the status of the D.C. Circuit's *Lewis* decision is made clear.

---

[59] *Lewis v. Motund*, No. 19-185 (2020), Brief Amicus Curiae of United States p. 8.

## V.      The Act of State Doctrine Bars This Suit

Even if this Court had jurisdiction to hear this case, Plaintiff's lawsuit runs afoul of the Act of State doctrine and should be dismissed on that basis.

The Act of State doctrine precludes courts in the United States from inquiring into the validity of the acts committed by a foreign sovereign within its own territory. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964). As the Supreme Court explained in *Underhill v. Hernandez*, 168 U.S. 250 (1897). "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Id.* at 252. The function of the Act of State doctrine is to promote "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Hourani v. Mirtchev*, 796 F.3d 1, 15-16 (D.C. Cir. 2015) (applying the Act of State doctrine in affirming dismissal of defamation claims) (citations omitted).

If a case cannot be decided without adjudicating the lawfulness of the foreign party's conduct, the court should dismiss the action. *See Underhill,* 168 U.S. at 254 (affirming dismissal as "the acts of the defendant were the acts of the government . . . and as such are not properly the subject of adjudication in the courts of another government"); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005) ("*Doe I*") (applying the Act of State doctrine in dismissing tort actions against Israel and foreign officials). In deciding whether to invoke the doctrine, courts assess three factors: (1) the degree of consensus concerning a particular area of international law, (2) the implications of the issue for the United States' foreign relations, and (3) whether the government that perpetrated the act or acts at issue is still in existence. *See Sabbatino,* 376 U.S. at 427-28; *Doe I*, 400 F. Supp. 2d at 113.

An assessment of these three factors confirms that this Court should dismiss Plaintiff's lawsuit in accordance with the Act of State doctrine. As to the first factor, there is no definitive, international consensus surrounding the turbulent period of political and social change occurring in

Egypt as it endured three revolutions from 2011 to 2015.[60] Indeed, much like the Israeli-Palestinian conflict at issue in *Doe I*, here, perhaps the only consensus surrounding harm endured during this period is that such circumstances are "regrettable." *See Doe I*, 400 F. Supp. 2d at 113 ("The first factor requires little attention, as it is undeniable that the Israeli–Palestinian conflict has sharply divided the world—the only consensus is that the situation is regrettable"). The third factor is also easily disposed of: Egypt has not, since the time that Mr. Beblawi served as Prime Minister, experienced a regime change. Indeed, a number of the "Un-Sued Defendants" who are named in Plaintiff's Complaint and who served as Egyptian governmental officials with Mr. Beblawi continue to serve their country as governmental officials.

The second factor—the potential for interference with the foreign relations of the United States—however, warrants the Court's close assessment and weighs heavily in favor of dismissal pursuant to the Act of State doctrine. This Court's opinion in *Doe I* is once again instructive given the factual overlap. In *Doe I*, Judge John D. Bates recognized the nature of the allegations against Israel and Israeli officials and the effect of adjudicating such allegations in a United States court:

> The actions challenged by plaintiffs are classic acts of state. [cite] Tort challenges brought against foreign military officials *for such alleged harms as unlawful detention during a political revolution* implore the courts to "'declare invalid' and deny 'legal effect to acts of a military commander representing the ... government.'" [cite]. Plaintiffs do not challenge the actions of third-parties in procuring the alleged unlawful acts, [cite]; rather, *they ask this Court directly to declare that they were treated illegally by Israeli defendants on Israeli soil*. Such a determination would offend notions of

---

[60] Mr. Beblawi suspects Plaintiff will attempt to analogize to cases such as *Hilao* in which the Ninth Circuit found that alleged acts of torture or extrajudicial killings by a former dictator did not constitute acts of state. 25 F.3d at 1472. In *Hilao*, however, the defendant had been exiled, and the Filipino government confirmed that his conduct was not ratified and had not been performed in an official capacity. *Id*. Here, by contrast, all acts attributed to Mr. Beblawi are indisputably intertwined with and premised on his capacity as interim Prime Minister in 2013 and 2014 and are presently ratified by the Egyptian government. E.g. Dkt. 22-1, Ex. B. Accordingly, attaching liability under the TVPA would be akin to finding unlawful various acts taken by the Egyptian government as it endured and emerged from revolution.

> international comity and sovereignty. [cite] Indeed, " '[t]o permit the validity of the acts of [Israel] to be reexamined and perhaps condemned by the courts of [the United States] would very certainly imperil the amicable relations between [those] governments and vex the peace of nations.' "

*Doe I*, 400 F. Supp. 2d at 113–14 (citations omitted) (emphasis added).

Here, as in *Doe I*, the acts attributed to Mr. Beblawi, primarily upon information and belief, and the other named current and former Egyptian officials, constitute tort challenges for alleged harms sustained during a political revolution. *Id. See also,* Compl. ¶ 25. Adjudicating Plaintiff's claim would therefore necessitate an examination of the validity of acts by the Egyptian government, which could imperil the amicable relations between the Egyptian and United States governments. *Id.* The Court should therefore dismiss this action pursuant to the Act of State doctrine.

## VI.     This Case Presents a Non-Justiciable Political Question

### A.     Political Questions Are Not Justiciable

It is axiomatic that "the Framers 'did not make the judiciary the overseer of our government.' " *Dames & Moore v. Regan*, 453 U.S. 654, 660 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring)). Rather, the separation of powers between branches dictates that "[q]uestions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in [the courts]." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

*Baker v. Carr*, 369 U.S. 186 (1962) prescribes the modern "authoritative taxonomy" that courts must use to identify such non-justiciable political questions. *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006). *Baker* explained that a claim is non-justiciable if it implicates:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> [2] a lack of judicially discoverable and manageable standards for resolving it; or
>
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
>
> [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of

government; or

[5] an unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

These proscriptions are so strong that a court must abstain if even "one factor is present." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006). Moreover, suits implicating these factors remain non-justiciable even when a statute purports to "provid[e] for judicial review." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (en banc). This is so because "Congress may not confer jurisdiction on Art. III federal courts . . . to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III." *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972) (citations omitted). Here, Plaintiff's claim implicates multiple *Baker* factors and thus is not justiciable.

**B.     Plaintiff's Suit Impermissibly Raises Political Questions**

"The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918); *accord Zivotofsky v. Kerry*, 576 U.S. 1, 5 (2015) ("In our constitutional system" any "difficulty and complex" questions regarding "international affairs . . . . are committed to the Legislature and the Executive, not the Judiciary.") This textual commitment requires dismissal of any suit that threatens to interpose the judiciary into "[d]isputes involving foreign relations" between the United States and other nations. *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 841.

Any suit that asks a court to decide questions implicating the U.S.'s relationships with foreign powers necessarily "implicates the third, fourth, and sixth *Baker* categories," because a decision in conflict with the positions adopted by political branches would give foreign powers the impression that the United States spoke with multiple voices and would potentially impede the

Executive's diplomatic efforts. *Doe I*, 400 F. Supp. 2d at 112. This is the very "sort of intragovernmental dissonance and embarrassment that gives rise a to political question." *Matar v. Dichter*, 500 F. Supp. 2d 284, 295 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009).

These principles bar the adjudication of any suit, such as this one, that "challenges the official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great." *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005), *aff'd*, 503 F.3d 974 (9th Cir. 2007). When a court is asked to render a decision posing such ramifications, it "must do no more than note the existence of international debate." *Zivotofsky*, 576 U.S. at 5. This is so because "[t]hose matters are for Congress and the President to discuss and consider as they seek to shape the Nation's foreign policies." *Id.*

*Doe I* is instructive. There, the plaintiffs, U.S. citizens residing in the West Bank who were allegedly targeted by Israeli forces, sued the Prime Minister of Israel under the TVPA asserting, inter alia, they or their next-of-kin were victims of "intentional [extrajudicial] killing, torture," and "inhumane treatment." *Doe I*, 400 F. Supp. 2d at 97. The *Doe* court dismissed the claim as nonjusticiable under *Baker*, concluding that the legality of Israel's use of force presented a "peculiarly volatile" and "undeniably political" issue for which any judicial determination "would draw the Court into the foreign affairs of the United States." *Id.* at 112. The court found that any judgment regarding the legality of Israel's conduct "is a foreign relations determination" to be made by the President and Congress "and the Court would usurp the roles of those coordinate branches if it were to intrude." *Id.*

Similarly, in *Matar*, the court dismissed TVPA claims against the Director of Israel's' General Security Service brought on behalf of alleged civilian victims of drone strikes. *Matar*, 500 F. Supp. 2d at 286. Recognizing the complexities of the "uniquely volatile region," the court concluded that "the potential impact of th[e] litigation on the Middle East's delicate diplomacy" mandated dismissal. *Id.* at 295. This was so because the suit put at issue the "policy of a strategic United States ally in a region where diplomacy is vital." *Id.* at 296. Enmeshing the judiciary in such questions threatened "the sort of intragovernmental dissonance and embarrassment," which might

"undermine the Executive's ability to manage the conflict at issue, through diplomatic means, or to avoid becoming entangled in it at all." *Id.* at 295.

*Matar* likewise recognized that the political question doctrine is at its apex when a lawsuit compromises U.S. relations with a sovereign that the Executive Branch has identified as an important strategic ally. *Id.* at 296. This is so because the Executive Branch—not the courts or even Congress—"has the better opportunity of knowing the conditions which prevail in foreign countries" because the State Department has "confidential sources of information." *See Curtiss-Wright Exp. Corp.*, 299 U.S. at 320. And judicial or legislative attempts to conduct discovery into the intelligence critical to these determinations is constitutionally forbidden because maintaining the secrecy of such information "may be highly necessary, and the premature disclosure of it productive of harmful results." *Id.* This is so because the disclosure of such information "might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers." *Id.* at 321.

Here, these considerations demonstrate that Plaintiff's suit must be dismissed. The Complaint calls upon American courts to judge the legality of Egypt's domestic use of force. Resolution of this question threatens to "undermine the Executive's ability to manage the conflict at issue, through diplomatic means, or to avoid becoming entangled in it at all." *See Matar*, 500 F. Supp. 2d at 295. *See*, Background pp. 3-14, above, describing the critical U.S. policy interests in Egypt.

Adjudication of Plaintiff's claims would impermissibly require the court to judge the "policy of a strategic United States ally in a region where diplomacy is vital." *See Matar*, 500 F. Supp. 2d at 296. It would also call into question the policy goals of both Congress and the President—and would particularly undermine the Executive Branch's proclamations regarding the integrity of the Egyptian government. This "is a foreign relations determination" entrusted to the political branches, and "the Court would usurp the roles of those coordinate branches if it were to intrude." *See Doe I*, 400 F. Supp. 2d at 112. Moreover, such intrusion could "impede the Executive's diplomatic efforts." *See Matar*, 500 F. Supp. 2d at 295. . This is the very "sort of intragovernmental dissonance and embarrassment that gives rise to a political question." *See id.* "A ruling on . . . these issues would

draw the Court into the foreign affairs of the United States, thereby interfering with the sole province of the Executive Branch." *See Doe I*, 400 F. Supp. 2d at 112.

Indeed, the risks posed by this suit are significantly magnified by the Complaint's explicit threat "to serve . . . process" upon the "Un-Sued Defendants"—including President el-Sisi—if any of them "visit the United States" for diplomatic purposes. Complaint ¶ 3. Accordingly, "the potential impact of th[e] litigation on the Middle East's delicate diplomacy" mandates that this case must be dismissed.[61] *See Matar*, 500 F. Supp. 2d at 295.

## VII. The Complaint Fails to State a Claim Upon Which Relief Can be Granted

### A. There Is No Secondary Liability Under the TVPA in This Case

Each of the Complaint's two claims for relief rest on alleged secondary liability of Mr. Beblawi. *See*, *e.g.*, Complaint, ¶ 151. The actual allegations against Mr. Beblawi are summarized above in the Background section at pp. 7-9. They rest primarily on information and belief. The Complaint at ¶¶ 36, 38, 41, and 46 (concerning alleged attempted extrajudicial killing) does not allege Mr. Beblawi directed or participated in the shooting of Plaintiff. The Complaint at ¶¶ 121, 122, and 127-128 (concerning alleged torture) does not allege that Mr. Beblawi directed or participated in harm to Plaintiff following his arrest. Plaintiff fails to state a claim.

The TVPA provides that an "*individual* who, under actual or apparent authority, or color of law, of any foreign nation. . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual." *See* TVPA § 2(a)(1). This provision does not use the words "aid," "abet," "conspire," or "secondary liability." *Id.* There can be no dispute that the terms of § 2(a) do not expressly create a civil cause of action for secondary liability of "an individual" who is not alleged to have participated in "subjecting" the plaintiff to the proscribed conduct. TVPA, § 2(a)(1)

---

[61] Plaintiff's suit is also nonjusticiable under the second *Baker* factor because it questions the proportionality of the use of military force. *E.g*, Compl. ¶¶ 36, 41. There are no "judicially discoverable and manageable standards for resolving" such questions. As the Supreme Court has recognized, the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," outside judicial "competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Thus, courts "lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Aktepe v. USA*, 105 F.3d 1400, 1404 (11th Cir. 1997). Accordingly, Plaintiff's claims must be dismissed as a matter of law for this reason as well.

and (2).[62] As recently noted by the Supreme Court in *Bostock v. Clayton Cty., Ga.*, No. 17-1618, 2020 WL 3146686 (2020), "the meaning of 'individual' was as uncontroversial in 1964 as it is today: 'A particular being as distinguished from a class, species, or collection.' Webster's New International Dictionary, at 1267." *Id.* at *6.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court made clear that authorization for secondary liability under a statutory tort must appear on the face of the statute, and should not be inferred from legislative history. The Court refused to find a cause of action for aiding and abetting in § 10(b) of the 1934 Securities Exchange Act, observing that "Congress knew how to impose aiding and abetting liability when it chose to do so," and if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." *Id.* at 176-77 (citations omitted). Absent that, "the statutory text controls." *Id.* at 175; *accord Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1988).[63]

### B. The TVPA's Structure and Legislative History Do Not Evidence Congressional Intent to Create Secondary Liability

Despite the TVPA's statutory text and *Central Bank*'s rule, a number of courts have found secondary liability based on TVPA's legislative history. *Hilao v. Estate of Marcos,* 103 F.3d 767, 779 (9th Cir.1996); *Wiwa,* 2002 WL 319887, at *16; *see also Cabello v. Fernandez–Larios,* 402 F.3d 1148, 1158 (11th Cir.2005). The legislative history in question was an untransmitted Senate Report. S.Rep. No.102-249 ("TVPA Senate Report"), 102d Cong., 1st Sess. at 9 (1991).[64] A more

---

[62] The intransitive verb to "subject," used in the statute, connotes a causative and intended relationship to the proscribed act, not expressly applicable to a removed actor who, like Mr. Beblawi, is not alleged to have ordered or directed any of the alleged tortious acts as to the Plaintiff. *See*, Merriam Webster Dictionary, Definition Entry 3 of 3 (here).

[63] Indeed, the TVPA appears narrower than the statute at issue in *Central Bank*. As § 10(b) of the 1934 Act imposes liability on those who "directly or indirectly employ a deceptive device," *Central Bank*, 511 U.S. at 175, it is more expansive and requires less participation than § 2(a), which does not contain the words "indirect" or "indirectly."

[64] Plaintiff will likely argue that the Supreme Court noted that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing" using the example of an officer who gives the order to torture or kill. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 450 (2012). This *dicta* simply does not address the attenuated allegations in this case.

detailed inquiry, however, shows that Congress never intended for the TVPA to create secondary liability for officials such as former Prime Minister Beblawi.

First, The Senate Report is not part of the TVPA's official legislative history, as Congress ultimately adopted the House Report. *See* H.R. Rep. No. 102-367, pt. 1 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 84. The relevant phrase from the Senate Report does not appear in the House Report. Even if the phrases could be read to authorize a broad concept of secondary liability, there is no indication that Congress accepted such an interpretation. Indeed, the conspicuous absence of such an intent from the House Report suggests just the opposite.

Second, the TVPA's express requirement of "custody or physical control" is inconsistent with notions of secondary liability. Section 3(b)(1) of the TVPA defines torture as an "act[ ] directed against an individual in the offender's custody or physical control." The requirement of actual custody and physical control indicates direct, primary responsibility for the torture.

Finally, with respect to Plaintiff's allegations seeking to impose liability based on conspiracy to violate the TVPA, a review of the broader statutory scheme shows that Congress expressly addressed both conspiracy to commit torture and the possibility of erroneous deportation to face torture. In both cases, Congress declined to create a civil cause of action, indicating that it did not intend to create civil liability for secondary violators. The federal criminal code expressly criminalizes both torture and, in a separate section, conspiracy to torture. *See* 18 U.S.C. § 2340A(c). The TVPA does not contain an analogous conspiracy provision, however, "thereby suggesting that its absence from [the civil code] should not be disregarded." *Dinsmore*, 135 F.3d at 842. Indeed, the criminal torture statute expressly precludes the use of its provisions criminalizing conspiracy to torture as the basis for a civil claim. *See* 18 U.S.C. § 2340B ("nor shall anything in this chapter be construed as creating any substantive or procedural right enforceable by law by any party in any civil proceeding"). This explicit limitation further evidences Congress's intent *not to* create a private right of action for conspiracy to commit torture.

Accordingly, Plaintiff's allegations premised on secondary liability as to Mr. Beblawi should be dismissed for failure to state a claim upon which relief can be granted.

### C.   An "Attempted" Extrajudicial Killing Is Not Recognized Under the TVPA

In order to be actionable under one prong of the TVPA—Plaintiff's second claim for relief—Plaintiff must allege "an extrajudicial killing."   By definition, killing requires a death.   As very recently noted by the Supreme Court in *Bostock*, 2020 WL 3146686,  at *4:

> This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President.  If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

The plain language of the TVPA does not contemplate an "attempted" extrajudicial killing. *See Desert Palace v. Costa*, 539 U.S. 90, 91 (2003) (where, as here, the words of the statute are unambiguous, the "judicial inquiry is complete.")  The word "attempted" is not used in the statute.[65] This is bolstered by the fact that the statute states that a person who does the killing will be liable to that individual's "legal representative" or other individual capable of bringing an action for "wrongful death." TVPA, § 2(a)(2).  Accordingly, Plaintiff's Second Claim for Relief for Attempted Extrajudicial Killing must be dismissed because the plain language of the TVPA does not permit the claim.

### CONCLUSION

For the above reasons, the Court should grant Defendant's motion to dismiss.

---

[65]   While some courts have permitted TVPA claims to proceed based on an "attempted" killing, Defendant here submits that such decisions ignore the plain language of the statute, usurp the role of the legislature  and should be disregarded.

Respectfully submitted,

Dated: July 1, 2020

*/s/ Timothy M. Broas*

TIMOTHY M. BROAS (D.C. Bar #391145)
RACHEL A. BECK (D.C. Bar #1029929)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW Suite 700
Washington, DC 20004
Tel.: (202) 508-6000
Email: timothy.broas@bclplaw.com
          rachel.beck@bclplaw.com

*/s/ Robert H. Bunzel*

ROBERT H. BUNZEL (*pro hac vice*)
LOUISE ANN FERNANDEZ (*pro hac vice*)
JOHN J. BARTKO (*pro hac vice*)
BARTKO, ZANKEL, BUNZEL & MILLER
A Professional Corporation
One Embarcadero Center Suite 800
San Francisco, CA 94111
Tel: (415) 956-1900
Email: rbunzel@bzbm.com
          lfernandez@bzbm.com
          jbartko@bzbm.com

*Attorneys for Hazem Abdel Azis El Beblawi*