**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MOHAMED SOLTAN, | ) | Civil Action No.: 20-cv-1437 (CKK) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| HAZEM ABDEL AZIZ EL BEBLAWI | ) | |
| Defendant. | ) | |

**CONSOLIDATED OPPOSITION OF PLAINTIFF MOHAMED SOLTAN TO
DEFENDANT HAZEM ABDEL AZIZ EL BEBLAWI'S MOTIONS TO DISMISS
THE COMPLAINT AND TO QUASH SERVICE OF PROCESS**

Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan

July 21, 2020

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................1

THE COMPLAINT'S ALLEGATIONS .............................................................5

ARGUMENT .........................................................................................................14

I.      The Complaint States Valid Claims for Relief. ....................................14

        A.      The complaint sufficiently alleges that defendant planned, directed, participated in, and thereby caused the attempted extrajudicial killing and torture of Mr. Soltan. ..........................................................................................14

        B.      The text of the statute and the legislative history show that the TVPA provides for secondary liability. ....................................................................18

        C.      Attempted extrajudicial killing is proscribed under the TVPA. ...........................21

II.     This Court Has General Personal Jurisdiction Over Defendant Beblawi. .......................23

III.    Defendant Beblawi Is Not Entitled to Diplomatic Status or Foreign Official Acts Immunity. ..................................................................................................27

IV.     The Act of State Doctrine Does Preclude Accountability for Torture and Attempted Extrajudicial Killing. ...............................................................................34

V.      Resolution of Plaintiff's Claims Does Not Require This Court to Resolve Political Questions Properly Left to the Other Branches of Government. .....................................38

CONCLUSION ....................................................................................................44

## **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Al Aulaqi v. v. Obama,*
    727 F. Supp. 2d 1 (D.D.C. 2010) ...........................................................................39

*\*Baker v. Carr,*
    369 U.S. 186 (1962) ................................................................................... *passim*

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964): (1) ......................................................................................35

*Boniface v. Viliena,*
    338 F.Supp.3d 50 (D. Ma. 2018) .........................................................................22

*Butz v. Economou,*
    438 U.S. 478 (1978) .............................................................................................32

*Cabello v Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005) ...............................................................18, 19, 21

*Central Bank of Denver, N.A., v. First interstate Bank of Denver., N.A.,*
    511 U.S. 164 (1994) .............................................................................................20

*Chavez v Carranza,*
    559 F.3d 486 (6th Cir. 2009) ........................................................................16, 21

*Corrinet v. Burke,*
    946 F.Supp.2d 155 (D.D.C. 2013) ...............................................................27349

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ......................................................................................24, 25

*Doe I v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005) ......................................................................42

*Doe v. Qi,*
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) ..............................................................34

*Doğan v. Barak,*
    932 F.3d 888 (9th Circ. 2019) .............................................................................31

*El-Shifa Pharamceuticals v. United States,*
    607 F3d 836 (D.C. Cir. 2010) (en banc) ..................................................38, 39, 40

*In re Estate of Ferdinand Marcos, Human Rights Litig. (Hilao v. Marcos)*,
    25 F.3d 1467 (9th Cir. 1994) ........................................................................33

*Ford ex rel. Estate of Ford v. Garcia*,
    289 F.3d 1283 (11th Cir. 2002) ....................................................................19

*Force v. Islamic Republic of Iran*,
    No. 16-1468 (RDM), 2020 WL 2838527 (D.D.C. May 1, 2020)..........................22

*Giraldo v. Drummond Co.*,
    2012 WL 235806 (N.D. Ala. June 20, 2012)....................................................26

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) .......................................................................... 23-24, 25

*Griffin v. Oceanic Contractors*,
    458 U.S. 564 (1982)....................................................................................32

*Hafer v. Melo*,
    502 U.S. 21 (1991)......................................................................................32

*Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) .................................................................. 19-20

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015)...........................................................................37

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)....................................................................................40

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018).................................................................................39

*Kashef v. BNP Paribas S.A.*,
    925 F.3d 53 (2d Cir. 2019)............................................................................38

*Klinghoffer v S.N.C. Acchille Lauro Ed Altri-Gestione Motonave Achille Lauro in
    Amministrazione Straoedinaria*,
    937 F.2d 44 (2d. Cir. 1991)...........................................................................27

*Larson v. Domestic & Foreign Commerce Corp*,
    337 U.S. 682 (1949)....................................................................................32

*Letelier v. Republic of Chile*,
    488 F. Supp. 665 (D.D.C. 1980).....................................................................33

*Lewis v. Clarke*,
    137 S. Ct. 1285 (2017).................................................................................30

*Lewis v. Mutond,*
   918 F.3d 142 (D.C. Cir. 2019) ................................................................. *passim*

*Livnat v. Palestinian Authority,*
   82 F. Supp. 3d 19 (D.D.C. 2015) ........................................................... 23

*Matar v. Dichter,*
   563 F.3d 9 (2d Cir. 2009) ....................................................................... 31

*Matar v. Dichter,*
   500 F. Supp. 2d 284 (S.D.N.Y. 2007) ................................................... 42

*Mehinovic v. Vuckovic,*
   198 F.Supp.2d 1322 (N.D. Ga. 2002) .................................................... 20

*Mohamed v. Palestinian Authority,*
   566 U.S. 449 (2012) ................................................................................ 15

*Mujica v. Occidental Petroleum Corp.,*
   381 F. Supp. 2d 1164 (C.D. Cal 2005) ............................................... 20, 21

*Mutond v. Lewis,*
   --- S. Ct. ---, No. 19-185, 2020 WL 3492651 (June 29, 2020) ............... 30

*Nuevos Destinos, LLC v. Peck,*
   No. 15-cv-1846 (EGS), 2019 WL 78780 (D.D.C. Jan. 2, 2019) ......... 25, 26

*Rochon v. Federal Bureau of Investigation,*
   691 F. Supp. 1548 (D.D.C. 1988) ....................................................... 24, 25

*Samantar v. Yousuf,*
   560 U.S. 305 (2010) ............................................................................ 28, 29

*Saudi Arabia v. Nelson,*
   507 U.S. 349 (1993) ................................................................................ 29

*Schneider v. Kissinger,*
   310 F. Supp. 2d 251 (D.D.C.2004) ........................................................ 43

*Siderman de Blake v. Republic of Argentina,*
   965 F.2d 699 (9th Cir.1992), *cert. denied,* 507 U.S. 1017 (1993) ......... 33

*Singh v. G.k.,*
   2016 WL 3181149 (S.D.N.Y. June 2, 2016) ......................................... 26

*In re Terrorist Attacks on Sept. 11, 2001,*
   714 F.3d 659 (2d Cir. 2013) ................................................................... 25

iv

*Terry v. Dewine*,
    75 F.Supp.3d 512 (D.D.C. 2014) (Kollar-Kotelly, J.) ......................................................27694

*Underhill v. Hernandez*,
    168 U.S. 250 (1897).........................................................................................................37

*United States v. PLO*,
    695 F. Supp. 1456 (S.D.N.Y. 1988).................................................................................27

*Warfaa v. Ali*,
    33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016) ..............................33

*Wiwa v. Royal Dutch Petroleum Co.*,
    No. 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .........................18, 20

*Yousuf v. Samantar*,
    699 F.3d 763 (4th Cir. 2012) .............................................................................28, 33, 42

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012).........................................................................................................40

## **Statutes**

28 U.S.C. § 1350 (note) ...................................................................................17, 18, 31

D.C. Code §13-422 ................................................................................................2, 26

Foreign Sovereign Immunities Act,
    28 U.S.C. § 1605A ..............................................................................................22

*Torture Victim Protection Act ............................................................... *passim*

## **Rules**

F.R.C.P. 8(a) .....................................................................................................10, 18

F.R.C.P. 11(e) ........................................................................................................10

F.R.C.P. 12(b)(6) ..................................................................................................14, 18

**Legislative History**

H. Rep 102-367(I) (1991) .................................................................................20, 34

*S. REP. 102-249 (1991) ................................................................................... *passim*

**Other Authorities**

All According to Plan: the Rab'a Massacre and Mass Killings of Protestors in
    Egypt." Human Rights Watch. August 12, 2013. Accessed at
    https://www.hrw.org/report/2014/08/12/all-according-plan/raba-massacre-
    and-mass-killings-protesters-egypt ........................................................................8

Certification Pursuant to Section 7041(a)(6)(C) of the Department of State,
    Foreign Operations, and Related Programs Appropriations Act, 2015 (Div. J,
    P.L. 113-235), https://www.al-
    monitor.com/pulse/files/live/sites/almonitor/files/documents/2015/Egypt%20
    Waiver%20May%202015%20FMF-IMET-FMF.pdf...........................................36

*Egypt's Constitution of 2014,*
    https://www.constituteproject.org/constitution/Egypt_2014.pdf......................32, 35

Egypt: Critically ill  hunger-striker denied crucial medical care, Accessed at
    https://www.amnesty.org/en/latest/news/2014/09/egypt-critically-ill-hunger-
    striker-denied-crucial-medical-care/ .......................................................................6

Hawthorne, Amy. "What's Happening with Suspended Military Aid to Egypt:
    Part 1" October 16, 2014. Accessed at
    https://www.atlanticcouncil.org/blogs/menasource/what-s-happening-with-
    suspended-military-aid-for-egypt-part-i/ ...............................................................13

Journalists killed, attacked as clashes erupt in Egypt, Accessed at
    https://cpj.org/2013/08/journalists-killed-attacked-as-clashes-erupt-in-eg/ ............6

Kirpatrick, David, "Army Ousts Egypt's President; Morsi is Taken into Military
    Custoday", Accessed at
    https://www.nytimes.com/2013/07/04/world/middleeast/egypt.html......................7

Michael J. Stephan, *Persecution Restitution: Removing the Jurisdictional
    Roadblocks to Torture Victim Protection Act Claims*, 84 Brook. L. Rev. 1355-
    1385, 1369 (2019) ..................................................................................................25

Merriam-Webster, https://www.merriam-webster.com/dictionary/subject ............................17, 24

Oxford English Dictionary, https://www.oed.com/ .......................................................24

State by the State Information Services in Response to the Allegations Made in the Report Issued by Human Rights Watch, https://marsad-egypt.info/en/2014/08/12/statement-by-the--services-in-response-to-the-allegations-made-in-the-report-issued-by-human-rights-watch/ ................................................7

Statement by the Press Secretary on the Convictionand Sentencing of American Citizen Mohamed Soltan, https://obamawhitehouse.archives.gov/the-press-office/2015/04/11/statement-press-secretary-conviction-and-sentencing-american-citizen-moh ........................................................................................6, 36

Wedeman, Ben & Richard Allen Greene, "Election Day: Finally Egypt  is Born", Accessed at https://www.cnn.com/2012/05/23/world/africa/egypt-elections/index.html ...............................................................................................7

Plaintiff Mohamed Soltan, through his attorneys, hereby files this consolidated opposition to defendant Hazem Abdel Azizi El Beblawi's motions to dismiss the complaint, Dkt. 25, and to quash service of process, Dkt. 24.  On the grounds asserted in the two motions, both are without merit and should be denied.

## PRELIMINARY STATEMENT

Defendant Beblawi's motion to dismiss is fundamentally improper.  On preliminary motions, the Court is required to accept as true the complaint's well-pleaded allegations as to the merits of plaintiff's claims and to draw all inferences on those merits in plaintiff's favor.  Here, defendant Beblawi does the reverse.  Without filing an answer – the only pleading at this stage where contesting the merits allegations is permitted – he offers up what in essence is a counter-complaint, which attempts to refute plaintiff's complaint with a lengthy, false narrative of a country being somehow destroyed from within by its elected government and having to be saved by defendant Beblawi and military commanders loyal to him. (Corrected Memorandum in Support of Defendant's Motion to Dismiss ("MTD"), Dkt. 30-1, at 3-7)  According to Beblawi's version of history, those men, women, and children slaughtered in Rabaa Square were not peaceful protesters but terrorists in disguise. (MTD at 4)  In Beblawi's telling, Mr. Soltan was just another anonymous terrorist threat to the regime, not worth Beblawi's attention, much less his active participation in his wounding, arrest, and torture. (MTD at 7-9)

Beblawi stresses this false narrative in a misguided attempt to dispose this Court in his favor as a patriot and now a "respected international public servant" who should be shielded from accountability.  His false portrayal of the arrest and torture of Mr. Soltan as a part of his purportedly noble efforts to save his country has no legitimate place in deciding this motion.  The issue before this Court is whether Mr. Soltan has adequately alleged that Beblawi was complicitous in the

attempted assassination of Mr. Soltan and his subsequent torture.  Defendant Beblawi tries to interpose his importance both in 2013 and now to avoid legal liability for his conduct, but the Torture Victims Protection Act ("TVPA") was passed precisely to prevent such authoritarian justifications to excuse torture.

While plaintiff will not allow defendant's false counter-complaint to go unanswered, the first priority is to address the facts pertinent to the instant motion's laundry list of meritless preliminary defenses.  Beblawi raises multiple defenses of avoidance:

i)   He claims that he is not subject to personal jurisdiction and that service should be quashed, ignoring the fact that this forum's long-arm statute (D.C. Code §13-422) expressly confers general personal jurisdiction over an individual whose principal place of business is located here.  Beblawi has worked at a full-time job at the IMF in Washington for the past six years.  He has stated that he resides in the District of Columbia.  He has owned property here.  There is nothing remotely unfair about requiring him to answer for these claims in this forum.  Subject to the validity of the basis for his prospective reformulation of his diplomatic immunity claim, service of process was entirely proper.

ii)  When he filed the instant motion, Beblawi asserted that his G-1 Visa gives him diplomatic immunity, notwithstanding that he produced no evidence that he is an accredited Egyptian diplomat to the United States.  While his visa is labeled as "diplomatic," it simply allows him to work for the IMF as an international civil servant, representing a geographic area that comprises 11 countries of which Egypt is but one.  IMF officials only have immunity for official acts undertaken on behalf of the IMF.  Beblawi's G-1 Visa does not confer diplomatic status immunity.

iii) In his motion, Beblawi announced his hope that the State Department will decide that it should support granting common law immunity to the torturer of an American citizen and file a Statement of Immunity in this case stating that he has official acts immunity for torture.  Tellingly, Beblawi banished to a footnote the direct authority of the D.C. Circuit Court of Appeals that there is no common law immunity for violation of *jus cogens* norms such as torture.   In a highly suspicious maneuver, however, days before plaintiff's opposition is due, Beblawi filed no such Statement and no claim of official acts immunity, instead filing a bizarre letter from the State Department stating that Beblawi has a status that he never claimed – as a Principal Resident Representative for Egypt to the IMF ("PRR") and that this status is "effective" from November 2, 2014.  As set forth in plaintiff's motion for administrative stay (Dkt. 33), the Court should not accept this last-minute bombshell without a full explanation as to its provenance and what actual legal arguments Beblawi is now making.

iv) He asserts that torture can be a legitimate Act of State, ignoring that both the text and the legislative history of the TVPA establish precisely the opposite.  In fact, torture is actionable under the TVPA *only* when committed under official color of law.  Thus, as a matter of statutory construction, the Act of State doctrine cannot provide a shield from claims under the TVPA.

v) Beblawi also insists that addressing claims of the torture of an American citizen is a non-justiciable political question, arguing that the Court should not hear this case because it necessarily implicates the foreign policy of the executive branch with respect to relationships with other countries.  It does not, and Beblawi offers no factual support for his contention that it does here.  Moreover, by passing the TVPA, the two political branches

of our government have resolved any political question that the statute may cause in foreign relations. This Court can readily resolve the factual questions under the TVPA of whether Mr. Soltan was tortured and whether defendant Beblawi was responsible for it without implicating the *Baker v. Carr* factors.

Defendant's brief saves until last his only argument on the merits, contending that at most his liability is secondary. He gets this contention wrong on both the facts and the law. On the facts, he ignores the well-pleaded allegations of the complaint that establish his personal, primary liability, which, on a motion to dismiss, he is not permitted to contest. Beblawi did not have to fire the gun, or administer the cigarette burns, or torture Mr. Soltan's father in his son's presence to be liable for TVPA violations. By his conduct, Beblawi directly caused the TVPA injuries Mr. Soltan suffered, and his assertion that his involvement was too "attenuated" (MTD at 34, n.64) is not only belied by the facts alleged, but cannot properly be decided on a preliminary motion. Furthermore, his contention that the TVPA does not reach what he labels as "secondary liability" is simply wrong; it ignores the text of the statute, its legislative history, and numerous court decisions that hold the contrary.

These then are the facts – absent the full facts surrounding Beblawi's belated basis for asserting immunity on some newly discovered, never-before-mentioned status – that are pertinent to Beblawi's motion to dismiss. The complaint's allegations on the merits are summarized for background purposes in the next section, along with a rebuttal of the key assertions in defendant's improper and wholly false counter-complaint, designed to provide an Orwellian rationalization for the intolerable brutality of which Mr. Soltan was one victim. Now, Beblawi seeks to find some way to prevent his impunity from the scrutiny that the Torture Victim Protection Act requires.

4

## THE COMPLAINT'S ALLEGATIONS

Plaintiff's complaint alleges in detail the gruesome facts of his near two-year ordeal.  He was targeted for assassination, shot, his wounds left untreated, and then imprisoned and tortured physically and psychologically by the Government of Egypt.  This occurred while defendant Beblawi was the Egyptian Prime Minister, from the time when Mr. Soltan was shot, to his arrest, and during the first seven months of his torture. (Compl. ¶¶ 1-8, 122-126)  Beblawi worked closely with those who had conducted the military coup that brought him to power, including current President el-Sisi, who is an un-sued defendant and was Beblawi's Deputy Prime Minister for Security.  (*Id*. at ¶ 15)  Beblawi also worked closely with and had supervisory authority over un-sued defendant Abbas Kamel, who was Chief of Staff to el-Sisi, and is now head of the General Intelligence Directorate, known in Arabic as the Mukhabarat.  (*Id.* at ¶ 16)  Un-sued defendant Mohamed Ibrahim was Minister of the Interior and, in conjunction and consultation with Beblawi, ordered the massacre of over 1,000 peaceful protesters at Rabaa Square.  (*Id.* at ¶¶ 17, 46) Later, working with un-sued defendant Al-Fergany, Ibrahim had direct oversight of the Prison Authority's widespread and well-known torture of political prisoners, including Mr. Soltan. (*Id.* at ¶ 17)

Working with global journalists to counter an attempted media blackout, Mr. Soltan chose to show the world the reality of the post-coup regime headed by defendant, a regime that was massacring peaceful protesters, including a thousand unarmed civilians on a single day.  Beblawi's regime was desperate to shut down truthful reporting of its ruthless suppression of dissent through mass murder and to provide a single – and utterly false – narrative, reiterated to this Court, of a universally popular coup besieged by a rump group of violent terrorists.  Mr. Soltan was a thorn in the side of defendant Beblawi and his regime because he exposed the brutal reality of the new

5

Egyptian power structure.  And for his interference with the false propaganda being spread as the regime consolidated power, Mr. Soltan was targeted for extrajudicial killing and, for nearly two years, brutally tortured. (*Id.* ¶¶ 1, 7)

Mr. Soltan's human rights activism and his assistance of the Western media in accurate reporting from Egypt, where the domestic press was muzzled, were well known to the Egyptian security state and its Prime Minister Beblawi. (*Id.* ¶¶ 35, 41, 51, 64)  That is why he was targeted by government snipers and narrowly avoided assassination as other journalists were killed.[1]  After his arrest, Mr. Soltan's imprisonment, torture, and hunger strike became the subject of extensive reporting and advocacy around the world.[2]  Because Mr. Soltan was fortunate enough to be an American citizen, calls for his release and requests for humane treatment were the subject of continuous diplomatic intervention by the Government of the United States at the highest levels, including numerous Senators and Congressmen, the Secretary of State, and the President of the United States.[3]  Beblawi's  regime, including Prime Minister Beblawi personally, knew just who Mohamed Soltan was; they knew just where he was; and they directed just how he was to be treated.[4]

Defendant asserts in his bowdlerized history that Egypt went through "three revolutions," culminating, in his view, in the "inclusivity and integration" of the so-called third revolution in

---

[1] "Journalists killed, attacked as clashes erupt in Egypt." Committee to Protect Journalists. August 14, 2013. Accessed at https://cpj.org/2013/08/journalists-killed-attacked-as-clashes-erupt-in-eg/.

[2] *See, e.g.,* "Egypt: Critically ill hunger-striker denied crucial medical care." September 19, 2014. Accessed  at  https://www.amnesty.org/en/latest/news/2014/09/egypt-critically-ill-hunger-striker-denied-crucial-medical-care/.

[3] *See,  e.g.,*  https://obamawhitehouse.archives.gov/the-press-office/2015/04/11/statement-press-secretary-conviction-and-sentencing-american-citizen-moh.

[4] As recent events show, the current regime knows just who and where his family is, and it is directing how they are being treated in retaliation for the truths that Mr. Soltan has told in this complaint.

which the military purportedly saved the country from its own elected government.  (MTD at 3)
In fact, there was only one revolution, in 2011, that overthrew the 30-year, military-backed regime
of Hosni Mubarak.  (Compl. ¶ 19)  Plaintiff left the United States for Cairo to join tens of thousands
of peaceful, joyful  protesters who spent 18 days in Tahrir Square.  There he facilitated translation
for foreign media of the protests.  On January 25, 2011, mass, peaceful protests around the country
coalesced into a broad coalition protesting corruption, police brutality, and torture. (*Id.* ¶ 20)
Eight-hundred and fifty people were killed during the 18-day protests, largely at the hands of
Mubarak's police firing live ammunition into crowds.  Similar to the rationale offered by Beblawi
in his motion to dismiss, then too, the response from the authoritarian government was that the
butchering of hundreds of civilians was justified because they were "terrorists."[5]

On February 11, 2011, Mubarak stepped down under pressure, replaced by an interim
military government, which set elections for June 2012.  These were the first open presidential
elections in Egyptian history.[6]  Mohamed Morsi, the candidate of the Muslim Brotherhood party,
was elected President.  (*Id.* ¶ 24)  Presumably this is what defendant Beblawi considers the second
revolution, but it was not – it was the evolution of Egypt into a state that actually elected its
President.  To be sure, it was a tumultuous and difficult presidency after thirty years of military
autocracy causing protests to begin again followed by the intervention of the military, which
launched a military coup to remove Morsi.[7]  This, too, was not a revolution; it was the restoration

---

[5] *See, e.g.,*  https://marsad-egypt.info/en/2014/08/12/statement-by-the-state-information-services-in-response-to-the-allegations-made-in-the-report-issued-by-human-rights-watch/.

[6] Wedeman, Ben and Richard Allen Greene. "Election Day: Finally Egypt is Born." CNN. May 23, 2012. Accessed at https://www.cnn.com/2012/05/23/world/africa/egypt-elections/index.html.

[7] Kirpatrick, David. "Army Ousts Egypt's President; Morsi is Taken into Military Custody." New York Times. July 3,2013. Accessed at https://www.nytimes.com/2013/07/04/world/middleeast/egypt.html.

of a military government even more autocratic and brutal than its predecessors.  Defendant goes to great lengths to try to demonstrate how wonderful and justified the coup was to save the country, largely relying on official, government-controlled media sources.  (MTD at 3-7)  He also suggests that the coup-plotters tried to unify the country.  Yet, Beblawi conveniently ignores that this new post-coup government that he headed (i) suspended the Constitution, (ii) rounded up thousands of political prisoners, and (iii) closed down all broadcast outlets unwilling to parrot the coup-plotters' line.  (Compl. ¶¶ 28-29)  It was a unity of enforced fear effected through mass brutality.

### The Rabaa Square Massacre

Tens of thousands of anti-military rule activists gathered in Rabaa square to oppose the coup and suspension of democracy.  (Compl. ¶¶ 30-31)  Defendant again cites false state propaganda to suggest that there was violence on the part of the protesters.  (MTD at 4-7)  Mr. Soltan was there, as were the Western media,  who reported along with human rights organizations that the vast majority of the crowd was peaceful and that it was the Egyptian security officials who were shooting and killing protesters.[8]  In any event, there is no need for this Court to decide this issue; in considering this motion to dismiss, plaintiff's allegations not bearing on the preliminary issues, rather than defendant's propaganda, must be taken as true.  This case does not concern whether "security forces would need to enter the camps to secure clearance and restore order and peace to the city of Cairo" (MTD at 6), as Beblawi asserts.  Rather, what is at issue here is that Beblawi ordered a massacre of civilians followed by mass incarceration and torture of those individuals.

---

[8] "All According to Plan: the Rab'a Massacre and Mass Killings of Protestors in Egypt." Human Rights Watch.  August 12, 2013.  Accessed at https://www.hrw.org/report/2014/08/12/all-according-plan/raba-massacre-and-mass-killings-protesters-egypt.

Plaintiff and defendant agree that on August 14, 2013, at 6:30 am, a warning was issued demanding that everyone leave the square.  But defendant fails to mention that only ten minutes later, the government that he led, implementing the plan that he had approved, blocked all exits from the square, fired tear gas which blinded the protesters, and began firing live ammunition into the mass of humanity trapped in the square. (Compl. ¶¶ 36-38)  He also fails to mention that when protestors, including the injured protestors, attempted to escape, security forces continued to fire upon them.  (*Id.*)  Defendant states, again relying on state media accounts, that "gunfire is reported to have broken out from within the camp."  (MTD at 6)  This is a contemptible and implausible lie: the gunfire came from the police, and a thousand people were killed, not by each other, but by Egyptian security firing on trapped protesters.  (Compl. ¶¶ 37-39)  Thousands more were wounded, including plaintiff.  (*Id.*)  At the time, Beblawi was quoted in the local news that he had expected far more deaths from his plan, presumably not because he thought the protesters would be killing each other. (*Id.* at ¶ 46)  While Beblawi blames the victims, (MTD at 13-14) Human Rights Watch did an extensive independent report, which called the Rabaa massacre the "worst mass unlawful killings in [Egypt's] modern history."  (Compl.  ¶ 39)

Plaintiff was with the journalists and observed the line of fire by snipers around the square. He saw that journalists were specifically targeted with "kill shots" and encountered the corpses of over a dozen journalists.  (Compl. ¶ 40)  Plaintiff,  who was continuously fielding calls and sending video, was shot at twice by snipers, the second shot hitting him in the arm.  (Compl. ¶ 43)  Beblawi notes in his motion that two police officers were shot, and one died, which is tragically unfortunate, but he seems able to ignore the over 1,000 dead, noting that "casualties are inevitable."  (MTD at 7)  In the words of un-sued defendant Mohamed Ibrahim, who reported directly to Beblawi, the plan approved by Beblawi and implemented by Ibrahim was designed to "purify" the square.

(Compl. ¶ 44)  Some government leaders initially devised a plan that would have spared bloodshed, but Beblawi instead opted for a plan of "maximum force to get it over with quickly."  (Comp. ¶¶ 45-46)

Massacring unarmed civilians with automatic weapons fire does tend to "get it over with quickly."  Although here he asserts "no responsibility" for these deaths and injuries, at the time he was quoted as acknowledging that the death toll was "close to 1,000" but "that we expected much more than what actually happened on the ground."  (Compl. ¶ 46)  In short, Beblawi has admitted that his plan was designed to and did result in mass murder and that he thought there would be even more dead.

### Mohamed Soltan's Arrest and Torture

Beblawi tries to sidestep responsibility for Mr. Soltan's fate by asserting that the facts "are relatively spare with respect to the alleged conduct of the Defendant *as an individual*."  (MTD at 7-8, emphasis in original)  He complains that the allegations as to his own knowledge and actions as Prime Minister, as well as other allegations, are based on *"information and belief."*  (*Id.* at 8)

First, this is not a Rule 9(b) motion; plaintiff is entitled to plead on information and belief pursuant to Rules 8(a) and 11(e), especially where, as here, it is a virtual certainty that the Prime Minister would have had knowledge and involvement in these high-profile events, where he had command responsibility and was in regular communication with his subordinates carrying out his orders.  Mr. Soltan's shooting, arrest, torture and hunger strike to protest his treatment were all the subject of extensive news coverage and intervention by the Secretary of State and the President of the United States.  Any assertion that Beblawi did not know what was happening to Mr. Soltan is therefore not credible.  Indeed, while Beblawi makes many factual assertions in his motion to dismiss, he does not assert that he did not know who Mr. Soltan was or what was done to him or

that he had no role in it; he just claims the facts are "relatively spare" and alleged on information and belief.

Mr. Soltan was not an unidentified victim of random violence; he was a well-known citizen journalist and human rights activist targeted for torture based on deliberate decisions made by defendant Beblawi. With respect to the Rabaa massacre, plaintiff Soltan is not pleading facts on information and belief. Beblawi conceded publicly that he planned the Rabaa massacre and was willing to tolerate "much more" killing. (Compl. ¶ 46) Beblawi shut down all domestic broadcast outlets that did not broadcast the party line. (Compl. ¶ 29) Beblawi also publicly stated that the killings were "needed to move the country forward." (Compl. ¶ 48) The allegation that Beblawi complains of as based on information and belief is that he ordered the massacre as part of an illusory "war on terror" (Compl. ¶ 36), because he was frustrated that the protests being beamed worldwide did not fit his authoritarian narrative of being besieged by terrorists. Plaintiff submits that, in the circumstances detailed by the complaint, this is an entirely fair inference as to Beblawi's motive.

With respect to Mr. Soltan's arrest and torture, defendant appears to concede that plaintiff "provides a great deal of factual detail." (MTD at 7) Nowhere does he suggest that Mr. Soltan did not accurately allege the ceaseless beatings with whips, belts, batons, fists and feet, the burning with cigarettes, the appallingly infested conditions of confinement, the lack of food and drink, the failure to render medical treatment, the torture of his father in close proximity to ensure that he can hear it, the death threats, the dying man thrown in his cell and left there, and the encouragement to commit suicide. Defendant does not dare suggest that these facts are not properly pleaded or that he is surprised to hear them.

11

He takes issue instead with plaintiff's pleading on information and belief that, as Prime Minister with authority over the armed and security forces as well as over the Interior Ministry which controlled the prisons, he had the power to order torture and did so. Yet that he had precisely such power is not some wild guess on plaintiff's part; Beblawi indisputably was at the top of the command structure that carried out this torture. Beblawi further complains that it should not be pled on information and belief that, as Prime Minister, he would have knowledge of and approve the torture of a high-profile prisoner who is the subject of media attention and Presidential intervention by Egypt's purported great ally and friend, the United States. (MTD at 8-9) Yet on a motion to dismiss, Plaintiff is entitled to the plausible inference that Beblawi followed and discussed his case and knew and approved what was happening in the notorious system of torture prisons that Beblawi supervised. Plaintiff's pleading that Beblawi was responsible is entirely proper.

### Egypt As America's Ally

Defendant's motion spends five pages discussing how important it is for the United States (and doubtless its courts) to be solicitous of Egypt. Presumably, that is part of defendant's full-court-press to persuade the United States that he should have immunity from torture. Yet, whatever other protections defendant Beblawi may be entitled to, he is not now a high official of the Government of Egypt; he is an international civil servant at the IMF, representing regional and not individual country interests. Thus, if Beblawi was complicitous in the torture of Mr. Soltan in 2013, he cannot plausibly argue that his culpability for those actions implicates any "sensitive relationship" (MTD at 10) that the United States may currently have with Egypt seven years later or that this lawsuit threatens legitimate bilateral policy interests.

To be sure, Egypt is located in a strategic part of the world.  It has received tens of billions of dollars of United States aid over the years and billions more in IMF aid.  Presumably, such massive assistance should have prevented the twenty-two months of torture of an American human rights activist like Mr. Soltan, but it did not.  Yet, Beblawi audaciously now makes the extortionate argument that it is somehow incumbent upon the United States to intervene to excuse this 2013 torture in order to protect the relationship of the two countries today. Beblawi ignores the important fact that Egypt's conduct in the 2013 Rabaa massacre and subsequent violent crackdowns was the very reason for the United States government's historic suspension of longstanding military funding for Egypt, with some lawmakers strongly condemning the military regime's human rights abuses.[9] Nevertheless, the United States' strategic relationship with Egypt remains strong and the two countries continue to work towards their shared interests in the region, which presumably do not include Egypt torturing American prisoners or the United States excusing such actions.

Defendant Beblawi also talks about Egypt as working with the United States "on issues impacting regional stability," and, of course, he plays the inevitable card that this country is "working with Egypt to combat terrorism."  (MTD at 10-11)  Those actions are certainly commendable, if they are happening, but they should not be dangled as bait for immunity.  Egypt and the United States have a mutual interest in regional stability and fighting terrorism.  They do not have a mutual interest in protecting torturers from liability.  Giving a free pass to Beblawi should not be the price of maintaining that relationship.  Indeed, accountability and transparency should strengthen any such relationship.

---

[9] Hawthorne, Amy. "What's Happening with Suspended Military Aid to Egypt: Part 1" October 16, 2014. Accessed at https://www.atlanticcouncil.org/blogs/menasource/what-s-happening-with-suspended-military-aid-for-egypt-part-i/.

This case should be decided on its merits.  While defendant jumps at the first opportunity to spin his propaganda narrative before this Court, it is highly improper on a motion to dismiss, and the Court should disregard it.

## ARGUMENT

Defendant's arguments for dismissal are ones of avoidance.  Understandably, he does not want an examination of the merits of plaintiff's TVPA claims in open court, and thus he buries at the end of his brief his contention that those claims are invalid.  But Beblawi's avoidance defenses should be considered in the context of the substantive merits of this case.   Plaintiff therefore examines those merits first.

## I.      The Complaint States Valid Claims for Relief.

Defendant raises three arguments in support of his motion to dismiss pursuant to Rule 12(b)(6).  Beblawi begins by challenging the sufficiency of the complaint's allegations, contending that it does not allege *any* facts that he "directed or participated" – or elsewhere in his formulation: "participated in 'subjecting'" the attempted extrajudicial killing and torture of Mr. Soltan.  (MTD at 33) In fact, the complaint is replete with precisely those allegations.  Next, he contends that, in all events, Congress never intended for the TVPA to create "secondary" liability.  Yet, however labeled, the statute does prohibit the very conduct alleged.  Lastly, he mistakenly argues that the TVPA does not cover "attempted" extrajudicial killings.  Each of these arguments relies on a misreading of the complaint and applicable law.

### A.      The complaint sufficiently alleges that defendant planned, directed, participated in, and thereby caused the attempted extrajudicial killing and torture of Mr. Soltan.

Citing to one paragraph of the complaint, defendant asserts that plaintiff's claims rest on his so-called "secondary liability." (MTD at 33)  Cherry-picking eight of the more than 160 complaint paragraphs, Beblawi asserts that there are no allegations that he "directed or

participated" in the attempt to murder Mr. Soltan or in his subsequent torture.  (*Id.*)  This assertion

willfully ignores the numerous paragraphs of the complaint that allege exactly such conduct.  For

example, the complaint alleges:

- "Immediately upon becoming Prime Minister," Beblawi "orchestrated and executed a brutal program to suppress dissent" and "planned and executed a campaign of indiscriminate killing, mass incarceration, and brutal torture of those who played any role in publicizing the Rabaa Square protests."  (Compl. at ¶14)

- Beblawi "directed" that the police commence an assault on the Rabaa protesters only ten minutes after announcing they must withdraw from the Square, firing tear gas and then live ammunition into the captive, non-violent crowd.  (*Id.* at ¶ 37)

- "This was Defendant Beblawi's plan, formulated and carefully orchestrated while communicating directly by phone with" his subordinate staff and "executed with utmost brutality." (*Id.* at ¶ 38)

- Beblawi "personally authorized and launched the operation anticipating even more than the 1,000 deaths that actually occurred." He subsequently confirmed that "he was part of the 'we' who planned the massacre and that he had approved a plan that called for far more than 1000 civilian deaths." (*Id.* at ¶ 46)

- Beblawi "directed" the conditions of Mr. Soltan's confinement, during which he "suffered a pulmonary embolism and over twelve hypoglycemic comas in prison." (*Id.* at ¶ 99)

- "Plaintiff's mistreatment was a matter of deliberate government policy set by Defendant Beblawi" and "was not the random brutality of sadistic prison guards." (*Id.* at ¶ 137)

By any measure – whether labeled primary or secondary – Beblawi's "direction and

participation" in Mr. Soltan's treatment caused him, in the words of the statute, to be "subjected"

to injury and torture compensable under the TVPA.  Those who administer a brutal police state

and preside over a network of notorious torture prisons, like Beblawi, direct others to do the dirty

work.  They are no less liable for the harm they cause than had they pulled the trigger or personally

inflicted the torture.  *See Mohamed v. Palestinian Authority*, 566 U.S. 449, 458 (2012) ("TVPA

contemplates liability against officers who do not personally execute the torture or extrajudicial killing") (*citing Chavez v Carranza*, 559 F.3d 486 (6th Cir. 2009)).

As defendant concedes, liability is sufficiently alleged where the person charged "directed" or "participated" in the torture or extrajudicial killing.  (MTD at 33)   Where Beblawi gets it wrong, however, is in his false assertion that the complaint contains no such allegations.[10]   The gist of Beblawi's argument against his individual liability is buried in a footnote wherein he contends that the statute is not applicable "to a removed actor who, like Mr. Beblawi, is not alleged to have ordered or directed any of the alleged tortious acts as to the Plaintiff."  *Id.* at 34, n. 62.  Here, again, defendant chooses to ignore the well-pleaded allegations, or he seeks to challenge them.  Either strategy is impermissible at this stage.

Beblawi was no "removed actor."  The complaint does not just allege that these crimes occurred on Beblawi's watch but that he *personally* participated in the planning and execution of "a campaign of indiscriminate killing, mass incarceration, and brutal torture of those who played any role in publicizing the Rabaa Square protests"; that he "communicat[ed] directly by phone" with his subordinates as they carefully executed his plan, which he fully "intended, anticipated and planned" would result in the deaths of more than one thousand peaceful protesters; that he targeted Mr. Soltan directly for assassination; and that he directed that Mr. Soltan be imprisoned and "deliberate[ly]" set government policy authorizing his brutal mistreatment.  (*See* Compl. ¶¶ 2, 14, 37-38, 43, 46, 99, 131, 137).  He was Prime Minister at the time that Mr. Soltan was shot,

---

[10] Defendant cites to a single paragraph (Compl. ¶151) alleging that the defendant "exercised command responsibility over, conspired with, or aided and abetted subordinates in the prison authorities" in torturing plaintiff.  The addition of conspiracy and aiding and abetting allegations, however, do not negate the multiple other allegations throughout the complaint of direct, primary liability.

tortured, and began his hunger strike to protest his treatment; all of these were the subject of massive international media coverage, pleas from human rights organizations, and intervention at the highest levels of the U.S. government to the Egyptian government, of which he was serving as Prime Minister.  It defies credulity that Beblawi was "removed" from personal knowledge and direct involvement in Mr. Soltan's mistreatment and communications regarding such mistreatment.

In any event, Beblawi will have his chance to try to convince a jury how, as Prime Minister, he was far too high up to pay attention to the torture of an American-citizen human rights activist whose treatment was the subject of international outrage.  For purposes of this motion to dismiss, however, it is more than sufficient to allege that Beblawi's individual actions, as well as those committed by his subordinates over whom he had direct command responsibility, "caused the attempted extrajudicial killing" and "caused the torture" of Mr. Soltan in violation of the TVPA.[11] (Compl. at ¶¶154, 162)  Simply put, these are not "attenuated" allegations, as defendant has the temerity to argue to the Court.  (*See* MTD at 34, n. 64)

Contrary to defendant's assertions, the complaint alleges facts sufficient to support a finding that defendant "caused" plaintiff to undergo an attempted extrajudicial killing and torture and, accordingly, it sufficiently alleges that he participated in "subjecting" Mr. Soltan to the proscribed conduct.  Nothing more is required at the pleading stage.[12]

---

[11] As defendant acknowledges, the TVPA expressly provides liability if an individual "subjects" another to torture or extrajudicial killing.  28 U.S.C. § 1350 (note).  The verb "subjects" is defined as "to cause or force to undergo or endure."  *See* "Subject." Merriam-Webster.com. 2020 https://www.merriam-webster.com/dictionary/subject.

[12] Defendant complains that "the actual allegations" against him "rest primarily on information and belief."  (MTD at 33)  Here, again, this assertion is demonstrably false.  Plaintiff has personal knowledge of many of the complaint's allegations, and others are based on defendant's own statements.  (Compl. ¶¶ 36, 46, and 48)  While *some* facts are alleged on information and belief, pleading on this basis is permissible under the liberal pleading standard applicable here.  *See*

**B.      The text of the statute and the legislative history show that the TVPA provides for secondary liability.**

As shown above, the complaint alleges that Beblawi's conduct in directing and participating in the torture and attempted murder of Mr. Soltan constitutes primary violations of the TVPA.  In his second argument against application of the statute, Beblawi suggests that secondary liability, which he incorrectly asserts is plaintiff's sole basis for liability in this case, does not exist because the statute's "[s]tructure and [l]egislative history [d]o [n]ot [e]vidence [c]ongressional [i]ntent to [c]reate [s]econdary [l]iability."  (MTD at 34-35)  In making this argument, defendant asks this Court to ignore the plain text of the statute, its complete legislative history, and the holding of numerous federal courts that have concluded that the TVPA does encompass secondary liability.  In essence, he tries to strip the TVPA of its purpose of holding cruel authoritarians accountable and instead only holds the guards following orders to be at risk.  Such a "reverse-Nuremberg" construction is wholly at odds with the text and intent of the statute.

First, the plain text of the statute provides for indirect or secondary liability in its use of the verb "subjects."  *See* 28 U.S.C. § 1350 (note).  The use of the word "subjects," as noted by one court considering the scope of liability under the TVPA,  "expands rather than narrows the reach of the statute." *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 WL 319887, *1, *15 (S.D.N.Y. Feb. 28, 2002).  As the court in *Wiwa* held "individuals who 'cause someone to undergo' torture of extrajudicial killing, as well as those who actually carry out the deed, could be held liable under the TVPA." *Id.*; *see also Cabello v Fernandez-Larios*, 402 F.3d 1148, 1157 (11th

---

F.R.C.P. 8(a).  Plaintiff was not in the room when US officials were communicating their outrage to the highest levels of the Egyptian government; he was being tortured, as Beblawi well knew. And on a Rule12(b)(6) motion, it is axiomatic that plaintiff is entitled to the benefit of all reasonable inferences, including fair inferences as to defendant's motives.

Cir. 2005) (". . . by their terms, the ATCA and the TVPA are not limited to claims of direct liability"). Thus, the plain text of the statute contradicts defendant's position and makes clear that higher-ups who order torture are equally liable as those who inflict it.[13]

Second, the legislative history unequivocally provides that the act was intended to encompass secondary liability. The Senate Judicial Committee Report states:

> E. Scope of Liability . . .
>
> The legislation is limited to lawsuits against **persons who ordered, abetted, or assisted in the torture**. It will not permit a lawsuit against a former leader of a country merely because an isolated act of torture occurred somewhere in that country. However, **a higher official need not have personally performed or ordered the abuses in order to be held liable**. Under international law, responsibility for torture, summary execution, or disappearances **extends beyond the person or persons who actually committed those acts-anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them**.

S. REP. 102-249, at 8-9 (1991) (emphasis added).[14] In short, defendant's contention that the more important your position, the further insulated you are from TVPA liability is supported in the factual context of this case by neither the statute, its legislative history, nor common sense.

Virtually every federal court that has considered this issue has held that the TVPA provides for secondary liability of the sort at issue here. *See Cabello*, 402 F.3d at 1158; *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002) (recognizing command responsibility liability); *Hilao v. Estate of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996) (being aware of and failing

---

[13] Defendant also argues that the "TVPA's express requirement of 'custody or physical control' is inconsistent with notions of secondary liability," citing the TVPA's definition of torture as an "act[] directed against an individual in the offender's custody or physical control." (MTD at 35) This is mere word play. Custody or physical control over a prisoner is not limited to the guard who holds the key but includes the warden and his superiors. Indeed, a federal prisoner is properly said to be under the custody of the United States.

[14] While the House Report is silent on the issue, it certainly did not disagree in any way with the Senate Report on secondary liability.

to prevent acts of torture); *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1355 (N.D. Ga. 2002) (aiding and abetting torture); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal 2005) (same); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 WL 319887, *1, *15-16 (S.D.N.Y. 2002) (same). Beblawi concedes that "a number of courts have found secondary liability based on TVPA's legislative history" (MTD at 34), but he urges the Court to follow inapposite caselaw instead.[15]

Beblawi tries to avoid the significance of the unambiguous language contained in the act's legislative history by making the bewildering argument that the statements approving secondary liability are contained in an "untransmitted" Senate Report that is not part of the "official legislative history." (MTD at 34-35)  Defendant's argument is without merit. A review of the TVPA's extensive legislative history reveals that there were two virtual identical bills introduced for a vote at approximately the same time in both the House and the Senate.  *Compare* H.R. Rep 102-367(I) § 2(a) (1991) to S. Rep. 102-249, § 2(a) (1991).  Although the House version was ultimately adopted, the record is clear that both bills passed with a voice vote and the two versions did not differ with respect to the framing of liability standards.  *See* Torture Victim Protection Act of 1991, 1991 WL 255964, *6 (November 25, 1991); Torture Victim Protection Act of 1991, 1991 WL 258662, *2-3 (November 26, 1991).  The fact that the House version was adopted does not

---

[15] His argument is that the holdings of these courts are contrary to the Supreme Court's ruling in *Central Bank of Denver, N.A., v. First Interstate Bank of Denver., N.A.* 511 U.S. 164 (1994). However, *Central Bank* did not assess the TVPA but the SEC's Rule10(b)(5).  As the court in *Mujica* explained in rejecting a similar argument, "*Central Bank* stands for the proposition that when Congress enacts a statue under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, *there is a no general presumption* that the plaintiff may also sue for aiders and abettors." 381 F. Supp. 2d 1164 (C.D. Cal. 2005) (internal quotation and citation omitted) (emphasis in original).

diminish the significance of the record on the Senate bill containing substantively identical language to the House version, and Beblawi provides no support for his contrary position.

As a number of federal courts have held, the Senate Report *is* part of the TVPA's legislative history. *See, e.g.*, *Hilao*, 103 F.3d at 779; *Cabello*, 402 F.3d at 1158; *Chavez*, 559 F.3d at 499. Simply put, there is nothing "unofficial" about the Senate Report and it is entitled to whatever weight this Court attaches to directly relevant legislative history. In any event, the plain text of the statute is entirely consistent with the clear statement in the legislative history that "a higher official need not have personally performed or ordered the abuses in order to be held liable."

Finally, citing to the federal criminal code that criminalizes torture and conspiracy to commit torture, defendant makes the irrelevant observation that "[t]he TVPA does not contain an analogous conspiracy provision." (MTD at 35) What Congress decided to incorporate in the criminal code, however, does not dictate by its silence that it declined to create a civil cause of action for conspiracy to commit torture under the TVPA. Defendant strains to equate the two statutes, but his thesis is incoherent. It is unsurprising then that he cites to not a single decision dismissing a TVPA claim seeking to impose liability based on a conspiracy. Indeed, at least one court has allowed precisely such claim to proceed. *Mujica*, 381 F. Supp. 2d at 1172 (C.D. Cal. 2005). Thus, defendant's strained inference that Congress declined to create a private right of action for conspiracy to commit torture is without legal basis.

### C.   Attempted extrajudicial killing is proscribed under the TVPA.

While offering a hollow acknowledgment of contrary holdings from "some courts," which ostensibly includes recent decisions from this district, and indeed this Court, defendant argues that plaintiff's claim for relief for attempted extrajudicial killing "must be dismissed" because "a death" has not occurred. (MTD at 36) Defendant's argument is wholly without merit.

A recent decision from this district addressed this precise question defendant raises here –

"whether the TVPA's definition of extrajudicial killings reaches attacks in which no one died" or,

stated differently, "does the statute cover attempts" – and it firmly held that "[d]ecisions from this

district and from other jurisdictions have held that it does." *Force v. Islamic Republic of Iran*, No.

16-1468 (RDM), 2020 WL 2838527, *22 (D.D.C. May 1, 2020) (*citing  Karcher v. Islamic

Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *Gill v. Islamic Republic of Iran*, 249 F.

Supp. 3d 88, 99 (D.D.C. 2017)).  Examining claims brought under the terrorism exception to the

Foreign Sovereign Immunities Act ("FSIA", 28 U.S.C. § 1605A), which "looks to the Torture

Victims Protection Act of 1991 ('TVPA') to define 'extrajudicial killing,'" the court reasoned:

> Several decisions from this district have held that individuals who are injured but
> not killed in an attack that results in the death of others may recover for their injuries
> under § 1605A. . . . . Those injuries were, in the ordinary sense, "caused by" the:
> "act of ... extrajudicial killing" – a bombing, for example, might kill some of the
> victims and maim others. In that scenario, both sets of victims would suffer
> "personal injury or death ... caused by an act of ... extrajudicial killing" . . . that is,
> to continue the example, the bombing was, in fact, an act of extrajudicial killing
> and that act caused both the deaths and the injuries.

*Force*, 2020 WL 2838527, *22 (internal citations omitted).  This reasoning fully applies here.

Snipers deployed on Egyptian government buildings, who were firing at targets designated by

Beblawi, deliberated targeted Mr. Soltan for assassination.  It was purely by chance that Mr. Soltan

was not among the approximately 1000 fatalities on the day of the Rabaa Square massacre; he was

just one of the thousands more wounded.  As held in *Force*, it was "an act of extrajudicial killing"

that caused Mr. Soltan's injuries.

Defendant stresses that the word "attempted" is not used in the statute, but he is at a loss to

distinguish the multiple cases that have permitted claims for attempted killings to proceed.  *See

Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-68  (D. Ma. 2018) (collecting cases).  He acknowledges

these decisions undermine his argument but relegates to a footnote his views that they "should be

disregarded" because they "ignore the plain language of the statute" and "usurp the role of the legislature" (MTD at 36, n. 65) and otherwise offers no support for this position. His baseless opposition to plaintiff's "attempt" claim should be rejected. It is the intent to kill without judicial sanction that is the breach of the *jus cogens* norm that the TVPA addresses, not the aim of the sniper.

Accepting the allegations as true and drawing all reasonable inferences in plaintiff's favor, the complaint sufficiently alleges valid claims under the TVPA for which relief can be granted.

## II.   This Court Has General Personal Jurisdiction Over Defendant Beblawi.

The basis for personal jurisdiction over defendant Beblawi is uncontroversial, and irrefutable. His contacts with this forum make it eminently fair for him to be held to account in this Court under the TVPA for his egregious torture and persecution of plaintiff Soltan. Defendant's contention that he is not subject to personal jurisdiction here is grounded on two demonstrably false premises.

First, his arguments against specific jurisdiction are irrelevant. Plaintiff does not assert that defendant is subject to transaction-specific personal jurisdiction here. *See* Compl. ¶ 10. While perhaps no forum has a greater interest in enforcement of the TVPA than this nation's capital, plaintiff has not asserted that his claim arises out of an attempted extrajudicial killing and subsequent torture that took place in this forum. Those multiple breaches of *jus cogens* norms took place in Egypt, but the TVPA makes them cognizable here.

Second, defendant's arguments against general jurisdiction – the actual basis for jurisdiction here – rest on the erroneous assumption that "domicile" is the sole basis for general personal jurisdiction over an individual defendant. It is not, and none of the cases, whether cited by plaintiff or otherwise, state that it is. Defendant tries to stretch *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915 (2011), *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and this Court's decision in *Livnat v. Palestinian Authority*, 82 F. Supp. 3d 19 (D.D.C. 2015), well beyond their holdings.  He argues that because they state that domicile is the "paradigm" for assertion of general jurisdiction over an individual, it is the *only* way such jurisdiction can be obtained.  That is not what these cases hold, and it is not consistent with the statutory or constitutional law of personal jurisdiction.

The plain meaning of the word "paradigm" is "example."  The Oxford English Dictionary defines it as "a pattern or model, an exemplar," or in the context here, as "a typical instance of something, an example." As Merriam-Webster notes, it means "especially: an outstandingly clear or typical example."  It does not mean the "sole" or "only" instance.  *Daimler* itself so recognized (571 U.S. at 137) when it qualified its holding that the "paradigm" for corporate defendants is their "place of incorporation and principal place of business":

> *Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums.

Neither *Goodyear*, *Daimler*, nor *Livnat* had occasion to expound on the paradigmatic status of "domicile" since none of these decisions deal with establishing jurisdiction through contacts over individual defendants.  The two Supreme Court decisions concerned jurisdiction over corporate entities, not individuals; this Court's decision in *Livnat* concerned a non-sovereign government organization.  But cases that have considered the bases for general jurisdiction over an individual have *not* limited such jurisdiction to domicile.  In *Rochon v. Federal Bureau of Investigation*, 691 F. Supp. 1548, 1559 (D.D.C. 1988), for example, the court recognized "continuous and systematic" contact with the District as a basis for general personal jurisdiction because this creates "an inference of actual 'presence' within the District of Columbia," citing

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16 (1984).  The court held

that defendants' employment in the forum was sufficient under this standard to satisfy general

jurisdiction.  *Rochon*, 691 F. Supp. at 1560 & n. 14.    Notably, none of the agents in *Rochon*

*resided* in the District, yet the *Rochon* court still found sufficient contacts through employment.

*Id*.  Said the court:

> From these principles, it should be obvious that the long-arm statute reaches those
> defendants who work in the District of Columbia. Through their affirmative
> association with an enterprise located in the District of Columbia, they have
> "purposefully avail[ed themselves] of the privilege of conducting activities within
> the [District of Columbia], thus invoking the benefits and protections of its laws" .
> . . and creating the reasonable anticipation of being haled into court here because
> of their activities.

*Id.*  (internal citations omitted)

Indeed, a case cited by Beblawi, *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659,

674 (2d Cir. 2013), acknowledged a similar basis for general jurisdiction: "the defendant's

'continuous and systematic business contacts' with the forum."[16]  Beblawi has lived and worked

in the District for the past six years, fully establishing a continuous and systematic presence here.

His jurisdictional contacts vastly exceed those of the defendants in the case Beblawi cites, *Nuevos*

*Destinos, LLC v. Peck*, No. 15-cv-1846 (EGS), 2019 WL 78780, *6 (D.D.C. Jan. 2, 2019), where

the court denied jurisdiction over non-resident foreign defendants whose "various connections" to

---

[16] Historically, a defendant's physical presence in the forum when served with process was the
paradigm for general personal jurisdiction.  Michael J. Stephan, *Persecution Restitution: Removing
the Jurisdictional Roadblocks to Torture Victim Protection Act Claims*, 84 Brook. L. Rev. 1355-
1385, 1369 (2019).  Defendant asserts (MTD at 20, n.52) that *Goodyear, Daimler,* and *Bristol-
Meyers Squibb* have "narrowed personal jurisdiction substantially," but these decisions say
nothing that rejects so-called "tag" jurisdiction.  In fact, this basis for general personal jurisdiction
over individual defendants has never been overturned or even questioned by the Supreme Court
and remains valid to the present day.

the forum were insufficient for the exercise of general jurisdiction.[17]  Beblawi conveniently ignores the key point in *Nuevos Destinos*: unlike Beblawi, none of those defendants *resided* here.[18]  Nor did any of those defendants, unlike Beblawi, have continuous employment here.

Whether Beblawi is subject to jurisdiction before this Court is answered in unmistakable terms by the District of Columbia's long-arm statute on general personal jurisdiction (D.C. Code § 13-422):

> **§ 13-422.  Personal jurisdiction based upon enduring relationship.**
>
> A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief.

It is undisputed that  Beblawi has "maintain[ed] his . . . principal place of business in[] the District of Columbia" since 2014.  His motion to dismiss acknowledges that he works as an Executive Director of the IMF at its headquarters on Pennsylvania Ave., N.W.  (MTD at 2)  While this alone is sufficient under the statute, Beblawi's jurisdictional contacts are not limited to his IMF employment.  He further acknowledges that he "maintains a residence in this district for the purpose of engaging in IMF-related work."  (*Id.* at 20)[19]  Furthermore, he has owned property in the District at the Watergate Apartments.   Notably, the district court here has declined to exercise general personal jurisdiction under this statute only with respect to defendants who do not reside,

---

[17] The "various connections" in *Nuevos Destinos* consisted of random visits to the United States, having U.S. based clients, and marketing in the U.S., and these "limited connections" did not "render them essentially at home in the forum."  *Nuevos Destinos*, 2019 WL 78780, at *6.

[18] Two other decisions cited by Beblawi, *Singh v. G.k.*, 2016 WL 3181149 (S.D.N.Y. June 2, 2016) and *Giraldo v. Drummond Co.*, 2012 WL 235806 (N.D. Ala. June 20, 2012), are distinguishable on the same grounds.

[19] His comment that the household of an ambassador is deemed to be within the territory of his sovereign (MTD at 20) is irrelevant.  He is not an ambassador.  According to his motion, he is an international civil servant representing multiple countries.  Due to his Egyptian nationality, he necessarily obtained his visa to travel here under an Egyptian passport.

work or maintain a principal place of business, or own property in the District when the of Columbia. *See*, *e.g.*, *Terry v. Dewine*, 75 F.Supp.3d 512, 521 (D.D.C. 2014) (Kollar-Kotelly, J.); *Corrinet v. Burke*, 946 F.Supp.2d 155, 158-159 (D.D.C. 2013).

Beblawi's living in the District of Columbia while working at the IMF has allowed him to fully enjoy the rights, privileges, and protections of D.C. law for the past six years, and he continues to do so to this day. He has every reason to expect to be called upon to defend himself against judicial actions filed here. The fact that he lives and works here because he works for the IMF does not somehow erase these contacts for jurisdictional analysis. By any measure, he qualifies under the applicable long-arm statute for general personal jurisdiction here.[20] His motion to dismiss for lack of personal jurisdiction should therefore be denied.[21]

## III. Defendant Beblawi Is Not Entitled to Diplomatic Status or Foreign Official Acts Immunity.

As set forth in plaintiff's pending motion for administrative stay, Beblawi's belated assertion of diplomatic status immunity on grounds he did not claim or in any manner disclose in his motion to dismiss has injected a new and highly suspicious issue into this case. On July 17, 2020, Beblawi filed with the Court a letter dated ten days earlier from the State Department representing that Beblawi has "Principal Resident Representative" immunity and has had this

---

[20]  *Klinghoffer v S.N.C. Acchile Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straoedinaria*, 937 F.2d 44 (2d. Cir. 1991), cited by Beblawi, has no application to his circumstances. It addressed the unrelated question of whether the contacts of the PLO as a quasi-governmental organization with Permanent Observer status at the United Nations should be considered in a contacts analysis. Suffice it to say that Beblawi is an individual and is sued here as such. He also ignores *United States v. PLO*, 695 F. Supp. 1456 (S.D.N.Y. 1988), cited in turn by *Achille Lauro*, 937 F.2d at 51, which made clear that the contacts of PLO *employees* should be considered for purposes of general jurisdiction, noting that there is nothing that immunizes such contacts.

[21]  Since jurisdiction over him is proper, Beblawi's related motion to quash service of process should also be denied. Since, as shown *infra* at 27-34, he is not entitled to immunity from suit, he is equally not immune from service of process.

status "*effective* November 2, 2014."  (Dkt. No. 32-1)  Plaintiff obviously had not anticipated this late-breaking disclosure and cannot responsibly respond to it in this opposition brief until defendant discloses its provenance and briefs the legal basis on which he contends that it establishes diplomatic status immunity.  Presumably, if defendant had such status at the time of the motion, he would have, and certainly should have, said so.  Hence the pending motion for administrative stay requests the Court to defer the time for plaintiff's substantive response on the issue of diplomatic status immunity until after the position is clarified as to the origin and meaning of this claim.   The actual claims that Beblawi made in his motion for such immunity are and remain without merit, as made clear in the original draft of this opposition which is attached for the Court's review to the motion for administrative stay.  (*See* Dkt. 33)

Recognizing that he has no legitimate argument for immunity unless he obtains an official Suggestion of Immunity from the State Department, Beblawi is pulling out all the stops to persuade State to issue a Suggestion on his behalf.  No Suggestion has been filed.  And even in the unlikely event that the State Department were to decide to provide a free pass from accountability from torture and issue a Suggestion, it would not necessarily defeat jurisdiction, but may be simply entitled to "substantial weight" by the court.  *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012).[22]

Defendant's alternative ground for immunity – foreign official acts immunity – remains ripe for opposition, however, and is addressed below.

---

[22] Beblawi ignores the subsequent Fourth Circuit decision in *Samantar* in favor of the absolute deference that he suggests.  While the D.C. Circuit has not explicitly accepted nor rejected the "substantial weight" standard of the Fourth Circuit for conduct immunity, it remains an open question whether it would do so if confronted with the issue.

Beblawi is plainly not entitled to "official acts immunity."  That status is reserved to foreign officials for legitimate matters of government or in circumstances where an action, although nominally against an individual, is really against the foreign state.  That is not the case here, as defendant has been sued in his individual capacity for damages out of his own funds for the illegitimate acts of torture and attempted extra-judicial assassination under a statute that explicitly provides a cause of action against him for such conduct. The D.C. Circuit has unequivocally held that where an action is against an official and does not seek to "enforce a rule" against a state, official acts immunity is not triggered.  Moreover, both the plain text and legislative history of the TVPA make clear that this statute has the explicit purpose of holding ex-officials accountable for acts taken under "color of law."   Torture and attempted extra-judicial assassination can never qualify as "official acts" for purposes of immunity.

Plaintiff has sued defendant Beblawi in his personal capacity under the TVPA; accordingly, the Court must look to the common law in deciding whether he enjoys official acts immunity.[23] *See Samantar v. Yousuf,* 560 U.S. 305, 325 (2010).  In his motion to dismiss, Beblawi appears to concede that under clearly established D.C. Circuit law as set forth in *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), he is not entitled to official acts immunity.  (MTD at 32–33)  But he invites this Court to cast *Mutond* aside, citing to what was then a pending petition for a writ of certiorari before the Supreme Court and language from an amicus brief submitted by the Justice Department in support of the writ.  (MTD at 26)  This creative attempt to sidestep binding precedent – resting upon a hope that the Supreme Court would overturn *Mutond* – may now be easily disposed of.

---

[23] Beblawi cites to the inapposite *Saudi Arabia v. Nelson,* 507 U.S. 349, 361 (1993), in support of his position that he is entitled to official acts immunity; that case was not brought under the TVPA and was brought against a State, among other parties.  The *Nelson* court ruled that the immunity issue was governed by the Foreign Sovereign Immunities Act, not common law.

Days after Beblawi filed his motion to dismiss here, the Supreme Court denied certiorari. *Mutond v. Lewis*, --- S. Ct. ---, No. 19-185, 2020 WL 3492651, at *1 (June 29, 2020). *Mutond* governs this dispute, and it is fatal to Beblawi's argument.

In *Mutond*, the D.C. Circuit unequivocally rejected, on two independent bases, the contention that an action under the TVPA for conduct "exclusively taken in Defendant's official capacity" are barred by official acts immunity. 918 F.3d at 145-147. There, the court analyzed whether the defendants, who were still sitting high ranking officials in the Democratic Republic of the Congo were entitled to common law conduct-based foreign official immunity. *Id.* The D.C. Circuit held that the immunity does not apply when "the plaintiff pursues an individual capacity claim seeking relief against an official in a personal capacity." *Id.* at 147. The court also provided "the alternative holding that the TVPA displaces conduct-based immunity in this context." *Id.* at 144.

In conducting its foreign official immunity analysis, *Mutond* looked to a variety of factors, including "whether exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Id. at* 146. In other words, a foreign official would be immune from suit over an official act that imposed a sovereign obligation, such as a contract, but a TVPA claim against that same official would not enforce any rule or obligation *against the foreign state. Id*. at 147; *accord*, *Lewis v. Clarke*, 137 S. Ct. 1285 (2017) ("[o]fficers sued in their personal capacity come to court as individuals, and the real party in interest is the individual, not the sovereign.") (internal citations omitted). Just as in *Mutond*, Beblawi has been sued here in his personal capacity, and any damages would be sought from his personal funds. Under *Mutond*, common law foreign official immunity does not apply.

30

Beblawi invites this Court to ignore *Mutond's* binding precedent, citing two inapposite opinions from other circuits.  (MTD at 24-26) (citing *Doğan v. Barak*, 932 F.3d 888 (9th Circ. 2019); and *Matar v. Dichte*r, 563 F.3d 9 (2d Cir. 2009)).  Even if these cases were in conflict, *Mutond* would control.  But neither decision has any bearing here.  In *Doğan v. Barak*, decided after this Circuit's decision in *Mutond,* the Ninth Circuit did not take issue with *Mutond,* but instead pointed to the distinction that the defendant in *Doğan* had obtained the State Department's Suggestion of Immunity under the unique facts of an international military confrontation on the high seas.  *Doğan*, 932 F.3d at 893-894.

Similarly, in *Matar*, the Second Circuit was confronted with a case where the State Department and the Department of Justice had filed a statement of interest recognizing defendant's immunity in a similar factual context of a military confrontation where there was a resulting collateral death.  *Matar*, 563 F.3d at 14.  In both cases, the courts upheld an immunity defense to avoid having to examine the propriety of foreign military operations.  No comparable circumstances are present here.  The deliberate massacre of innocent civilians followed by torture cannot masquerade as a foreign military operation.

Beblawi claims that because plaintiff alleges "executive, prosecutorial and police power decisions that are 'peculiarly sovereign in nature,'" he is entitled to official act immunity.  (MTD at 24)  This argument seeks to turn the TVPA on its head as, by its terms, the statute provides the very converse.  It targets such decisions for liability – not immunize them – when they result in acts prohibited under the statute.  The TVPA expressly imposes civil liability on any "individual who, under actual or apparent authority, or under color of law, of any foreign nation . . . subjects an individual to torture . . . or . . . extrajudicial killing[.]"  28 U.S.C. § 1350 (note).  The statutory

language is clear, and the legislative history duly confirms it.[24]   The Supreme Court in *Hafer v. Melo*, 502 U.S. 21, 27–28 (1991), rejected the precise argument that Beblawi makes here. Beblawi's argument for official act immunity on the very grounds that are required by the TVPA seeks effectively to nullify the statute.   *See Hafer*, 502 U.S. at 27–28 (rejecting claim of official immunity and dismissing the "novel proposition" that color of state law requirement "insulates" defendant from a personal capacity suit).   This argument would produce an "absurd result" of statutory interpretation that this Court should avoid.   *See Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *see also Butz v. Economou,* 438 U.S. 478, 501 (1978) (statutes should not be interpreted in a way that would render them meaningless).

Beblawi's argument for official acts immunity also fails because his direction of torture and attempted extra-judicial assassination of plaintiff were inherently beyond the scope of his lawful authority[25] and thereby cannot qualify as "official acts" for purposes of immunity.   *See* S. Rep. No. 102–249, at 7 ("because no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's

---

[24] *See* S. Rep. No. 102-249, at 8-9 (1991) ("anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them" . . . Congress did not "intend these immunities to provide *former* officials with a defense to a lawsuit brought under this legislation").  *See also* H.R. Rep. No. 102–367(I), at 4-5.

[25] Notably, torture and extrajudicial killing are unconstitutional under Egypt's own laws.  *See Constituteproject.org, Egypt's Constitution of 2014*, Chp. 3, Chp. 3, Art. 52 ("All forms of torture are a crime with no statute of limitations."); *see also id*. at Art. 55 ("All those who are apprehended, detained or have their freedom restricted shall be treated in a way that preserves their dignity. They may not be tortured, terrorized, or coerced. They may not be physically or mentally harmed, or arrested and confined in designated locations that are appropriate according to humanitarian and health standards… Any violation of the above is a crime and the perpetrator shall be punished under the law."); *see also id.* at Art. 59 https://www.constituteproject.org/constitution/Egypt_2014.pdf.

duties"); *Larson v. Domestic & Foreign Commerce Corp*, 337 U.S. 682, 689 (1949) ("where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.."); *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir.1992), *cert. denied,* 507 U.S. 1017 (1993), ("[t]hat states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens"); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) (assassination cannot be within an official's "discretionary" authority). Beblawi conveniently ignores the Fourth Circuit's holding on remand from the Supreme Court in *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), holding that "officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." 699 F.3d at 777.  Torture and deliberate extrajudicial killing of domestic dissenters are cardinal examples of breaches of *jus cogens* norms and cannot support a defense of immunity.  Similarly, the Ninth Circuit held in *In re Estate of Ferdinand Marcos, Human Rights Litig. (Hilao v. Marcos)*, 25 F.3d 1467, 1472 (9th Cir. 1994), that "acts of torture, execution, and disappearance were clearly acts outside of [the defendant's] authority as President… were not taken within any official mandate and were therefore not the acts of… a foreign state."

Finally, Defendant Beblawi claims that "ratification from the foreign state that the alleged conduct was official in nature is central to the immunity analysis" and "may be sufficient for immunity and dismissal."  (MTD at 24-25)  This point, too, is easily disposed of under *Mutond*, as there the DRC Ambassador to the United States sent similar letters to the United States Department of State ratifying defendants' conduct.  *Mutond*, 918 F.3d at 146.  The D.C. Circuit found such requests irrelevant to its analysis.  *See also, Warfaa v. Ali*, 33 F. Supp. 3d 653, 663 (E.D. Va.

2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016) (finding no official acts immunity despite Somalia's ratification of defendant's actions); *Doe v. Qi,* 349 F. Supp. 2d 1258, 1286 (N.D. Cal. 2004) (finding no official acts immunity over alleged human rights violations committed against members of Falun Gong, despite evidence that the acts were part of China's national policy).

Incumbent governments that torture nearly always have their own reasons for trying to hide such conduct from public scrutiny, both domestically and certainly in a United States court.  The TVPA was enacted precisely to provide a remedy and to exclude immunity through ratification. Egypt's efforts here represent a continued conspiracy by officials in Egypt to cover up torture, which is unworthy of consideration, morally or legally.  The Court should reject Beblawi's attempt to escape TVPA liability on the baseless ground of foreign official acts immunity.

## IV.   The Act of State Doctrine Does Not Preclude Accountability for Torture and Attempted Extrajudicial Killing.

Defendant Beblawi also seeks to avoid this Court's scrutiny of his conduct by arguing that the torture and attempted extrajudicial killing of plaintiff were sovereign acts of the state of Egypt committed in Egyptian territory and therefore not subject to challenge in United States Court.  The "act of state" doctrine, however, does not apply to this case.

Torture and extrajudicial killing are inarguably violations of *jus cogens* norms of international law and can *never* be legitimate acts of state entitled to respect from a U.S., or any other, foreign court.  Recognizing such violations as legitimate sovereign acts worthy of international deference would undermine the irreducible, enforceable limits of human decency that is at the heart of public international law and embodied in binding treaties, including the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment, to which 169 countries, including the United States and Egypt, are parties.  *See e.g,* H.Rep. 102-367 at 3.  The

TVPA was passed to enact the principles of the Convention into domestic law.  *See id.; see also* S. Rep. 102-249 at 3.

Additionally, there is dispositive evidence that Mr. Soltan's torture was not a legitimate exercise of Egyptian sovereignty entitled to deference is that torture is explicitly forbidden by the Egyptian Constitution.  Article 52 of that constitution provides that "[a]ll forms of torture are a crime with no statute of limitations."  *Egypt's Constitution of 2014*, Chp. 3, Art. 52. Egypt, like the international community as a whole, recognizes that the state may never torture; therefore, torture may *never* be an act of state.  It is grotesque that defendant would argue otherwise and that Egypt would attempt to ratify such conduct.

In evaluating whether an action is an act of state entitled to deference, courts have employed the three part test set forth in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427-28 (1964): (1) the degree to which consensus has been reached regarding a particular area of international law; (2) the potential significance of any implications that the issue may have on the foreign relations of the United States; and (3) whether there has been a regime change removing from power the government that perpetrated the act of state.  While the regime responsible for plaintiff's torture remains in place, the other two *Sabbatino* factors overwhelmingly support refusal of defendant's invitation to apply the act of state doctrine here.

International law is clear: torture and extrajudicial killing are prohibited. Defendant ignores that indisputable fact and instead argues that "there is no international consensus surrounding the turbulent period of political and social change occurring in Egypt as it endured three revolutions from 2011 to 2015." (MTD at 27-28)  Whether or not there is any consensus as to the political history of Egypt during this period – although the propaganda that Beblawi wishes to pass off in this case is unlikely to prevail – is irrelevant to the issue of act of state.  The *Sabbatino* test does

not ask whether there is a consensus about historical interpretation, it asks whether there is a consensus about the law—whether torture is or is not a legitimate act. Beblawi tries to redefine the allegations of the complaint to spin a tale about the complexities of Egyptian politics, but that is not what matters in this case. What matters is whether there is a consensus that torture and extrajudicial killing are illegal. That consensus exists.[26]

The second *Sabbatino* factor also strongly points against applying the act of state doctrine here. Beblawi details at length the amicable relations between Egypt and the United States that might be adversely impacted by examination of the claims asserted by plaintiff. Yet his arguments ignore the fact that the United States government and various officials of the Executive and Legislative branches have already, repeatedly, criticized the Egyptian government for torturing and trying to kill Mr. Soltan as well as for massacring peaceful protesters. The United States worked to secure his release from imprisonment and to stop his mistreatment.[27] Our government publicly criticized the failure of Egypt to hold anyone to account for the actions in Rabaa Square in August of 2013.[28] In effect, Beblawi and the Egyptian government are making extortionate threats through this motion that unless this TVPA case goes away, the bilateral relationship will be harmed. Such threats do not implicate the act of state doctrine and are not something that this Court should properly consider. The bilateral relationship is based on mutual interests and massive

---

[26] The TVPA legislative history reinforces this point. As the Senate report recites: "[t]he committee does not intend the 'act of state' doctrine to provide a shield from lawsuit for former officials. … Since the doctrine applies only to 'public' acts, and no state commits torture as a matter of public policy, this doctrine cannot shield former officials from liability under this legislation. S. Rep. No. 102 -249, at 8.

[27]  *See, e.g.*, https://obamawhitehouse.archives.gov/the-press-office/2015/04/11/statement-press-secretary-conviction-and-sentencing-american-citizen-moh.

[28] *See, e.g.*, https://www.al-monitor.com/pulse/files/live/sites/almonitor/files/_documents/2015/Egypt%20Waiver%20May%202015%20FMF-IMET-FMF.pdf.

aid by the United States.  Indeed, it is also based upon maintaining standards of decent conduct and not torturing American nationals, or anyone else.  Beblawi offers no evidence that the relationship between these two countries is in any jeopardy.

Defendant seeks to avoid the result required by the law and facts by relying on the decision in *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005).  That reliance is misplaced. The facts in *Doe I* were substantially different than those here.  Plaintiffs in *Doe I* sued "the State of Israel," not an individual.  The far-reaching allegations in that complaint concerned the propriety of Israel's occupation and settlement of the West Bank and a range of conduct as to which there was no international legal consensus. Unlike the instant case, the Israeli expansion was legal under Israeli law, and there were no allegations that Israel departed from traditional military norms to engage in torture or other *jus cogens* atrocities.  Moreover, the United States government had taken positions supporting the Israeli actions at issue.  In those circumstances, the court, having already concluded that it lacked jurisdiction, went on to declare, as dicta, that the act of state doctrine was applicable.  In short, *Doe I* is practically the converse of the instant case, and it provides Beblawi with no support.

Beblawi cites two other inapposite cases.  *Underhill v. Hernandez*, 168 U.S. 250 (1897), involved no violation of *jus cogens* norms and instead concerned the Venezuelan government's delay in issuing a passport, a period of house arrest, and some undescribed "assaults and affronts" against the plaintiff in the course of a legitimate military operation in that country.  It was not, as here, the use of military force to violate *jus cogens* standards.  *Sabbatino* cites *Underhill* when it applied the doctrine in similar circumstances, where Cuba, under domestic law, expropriated the proceeds of that country's sugar industry operations, again, not a *jus cogens* offense.  *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015), also cited by Beblawi, was a defamation claim against the

Kazakh government, for a "distinctly sovereign" act of speech and clearly did not involve a *jus cogens* offense.

Beblawi fails to mention, however, a recent Second Circuit case that is squarely on point. *Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019) is an action alleging that BNP Paribas conspired with and aided and abetted the governing regime in the Sudan in carrying out genocide, mass rape, and ethnic cleansing. The court rejected out of hand the defendant's act of state defense. As the *Kashef* court ruled, "the act of state doctrine cannot shield this genocide from scrutiny by the courts of the United States because . . . both Sudan's own laws and a universal international consensus prohibit us from deeming genocide an 'official act' of Sudan, or for that matter, of any state." *Id.* at 60.

The same holds true for torture and extrajudicial killing. The act of state doctrine is no defense.

## V.    Resolution of Plaintiff's Claims Does Not Require This Court to Resolve Political Questions Properly Left to the Other Branches of Government.

Defendant argues that resolution of plaintiff's claims would require the Court to decide "political questions" properly left to the executive and legislative branches of government. This too is without basis. Political questions are those that require a court to consider a discretionary "policy choice and value determination constitutionally committed for resolution" to the political branches to decide whether such choices or determinations were wise or unwise, justified or unjustified. *El-Shifa Pharamceuticals v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (internal quotation and citation omitted). This case is not about any political question as to the wisdom of U.S. executive or legislative political choices. It is about the wanton torture of an American citizen under official color of Egyptian law in violation of the TVPA, a matter that requires no inquiry into the wisdom of any U.S. political judgment.

There is no occasion for this Court to question whether it was good policy for Beblawi as the Prime Minister of the Government of Egypt to order the torture of a U.S. national.  The TVPA – the product of a decision by Congress and the President – has already made that decision.  The political question doctrine, moreover, is fundamentally a *domestic* doctrine which, as the Court of Appeals noted in *Al Aulaqi v. Obama*, "is 'essentially a function of the separation of powers.'" 727 F. Supp. 2d 1, 44 (quoting *El-Shifa,* 607 F.3d at 840  (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  This Court is not asked to decide a discretionary policy issue committed to another branch of the U.S. government.  Neither through its legislative nor its executive branch did the *United States* make any discretionary policy choices – and this Court has no occasion to question them – when Beblawi under official color of law as Prime Minister of Egypt tortured Mr. Soltan. It is Beblawi's conduct and not any discretionary policy choices by the U.S. government that Mr. Soltan is challenging.

As the Supreme Court has noted, "Congress drafted the TVPA to 'establish an unambiguous and modern basis for a cause of action.'"  *Jesner v. Arab Bank*, *PLC*, 138 S. Ct. 1386, 1391 (2018) (quoting H.R. Rep. No. 102–367 at 3).  Congress took care to delineate the TVPA's boundaries. In doing so, it weighed the foreign-policy implications of its rule.  "Among other things, Congress specified who may be liable, created an exhaustion requirement, and established a limitations period." *Id.* at 1403.

Defendant suggests that the United States may *now* take the view that bringing the TVPA claim itself challenging Beblawi's conduct six years ago may somehow have political consequences that implicate Egypt-U.S. relations, but that is quite different from a claim asking a court to decide a political question properly committed to another branch.  In essence, Beblawi makes another back-door immunity argument, suggesting that this case could cause Egypt some

*ex post facto* political discomfort.  This argument fundamentally ignores the distinction made in

*Baker v. Carr* between a "political case" and a "political question."  369 U.S. at 217. Beblawi

invites this Court to make the same basic error recognize by the D.C. Circuit Court in *El-Shifa*,

which Beblawi cites:

> Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Even in the context of military action, the courts may sometimes have a role. See *Gilligan v. Morgan*, 413 U.S. 1, 11-12 (1973). Therefore, we must conduct "a discriminating analysis of the particular question posed" in the "specific case" before the court to determine whether the political question doctrine prevents a claim from going forward. *Baker*, 369 U.S. at 211; *see, e.g., Wilson v. Libby*, 535 F.3d 697, 703-04 (D.C. Cir.2008) (holding the political question doctrine did not bar a challenge to disclosures "identifying a previously covert agent" and therefore "implicat [ing] national security" because the plaintiffs' claims did "not challenge [ ] any foreign policy or national security decisions entrusted to the Executive Branch").

607 F.3d at 842.  Beblawi also asks this Court to ignore the Supreme Court's instructions in *Japan*

*Whaling Association*, 478 U.S. at 230 (1986):

> [I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.... [U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.

To similar effect, the construction and application of a statute is an important factor in the political

question analysis.   As the Supreme Court held in resolving the application of a statute involving

the status of Jerusalem as Israel's capital (*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189,

196 (2012)):

> The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.

Just so here.  The Court is being asked to apply the language of the TVPA to the conduct of an Egyptian government official.  Egypt clearly is politically embarrassed by the airing in a U.S. courtroom the brutal torture and attempted assassination of Mr. Soltan as it decides this TVPA claim.  But that embarrassment does not turn a statutory claim into a political question.

Beblawi's fatuous analysis of the *Baker v. Carr* factors attempts to distract this Court from conducting the "discriminating analysis of the particular question posed" to determine whether it necessarily requires the Court to review and opine on "discretionary foreign policy decisions" properly committed to the political branches of the U.S. government.  Properly analyzed, the factors set out in *Baker*, 369 U.S. at 211, make clear that no political question is involved in this case.  The six familiar factors are:

(1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

(2)    a lack of judicially discoverable and manageable standards for resolving it; or

(3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

(4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

(5)    an unusual need for unquestioning adherence to a political decision already made; or

(6)    the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. Not a single factor here should direct the Court away from fulfilling its duty here.

As to the first *Baker* factor, the "issue" before this Court is not the wisdom of the TVPA. That is committed and has been decided by those branches in passing this statute.  The issue before

the Court, however, is whether Beblawi's conduct violates the TVPA, and that issue is indisputably committed to the judicial branch for decision.

The non-applicability of the second *Baker* factor is equally clear.  Torture and extrajudicial killing are well-recognized concepts – *jus cogens* norms – which courts are accustomed to applying. *See, e.g., Yousuf,* 699 F.3d at 775-776.  Accordingly, there are judicially discoverable and manageable standards.  Defendant nowhere even attempts to explain why this Court would be unable to apply these statutorily-defined terms, which reflect not only American precedent but extensive international jurisprudence and are incorporated into treaties to which both the United States and Egypt are parties.

Skipping this second *Bake*r factor, Beblawi moves directly to the third, fourth and sixth factors to suggest that they point toward non-justiciability because an adverse decision would somehow be "in conflict with the positions adopted by political branches" that would give foreign powers the impression that the U.S. "speaks with multiple voices," and would "potentially impede the Executive Branch's diplomatic efforts," causing "intragovernmental dissonance and embarrassment."  (MTD at 31)  This is patent nonsense. The United States speaks with a single voice on torture.  In adopting the TVPA, its political branches have condemned it as against the policy of the United States.  Its judicial branch is charged with adjudicating claims under the statute, not questioning its wisdom.  Far from expressing a lack of respect for coordinate branches, the Court would be implementing a duly-enacted statute according to its terms.  Denunciation of torture has been a consistent policy of the United States.  Enforcement of the TVPA against defendant Beblawi does not embarrass anyone, except perhaps Egypt, as it should.

Defendant's reliance on *Doe I v. State of Israel,* 400 F. Supp.2d 86  (D.D.C 2005), and *Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y.), is misplaced.  Litigation of those cases would

have inevitably challenged U.S. policies concerning Israel's ongoing dispute with Palestine. Deciding plaintiffs' claims in these cases would have necessarily required the court to take sides in highly charged political and diplomatic disputes about the relative rights of Israelis and Palestinians and the official conduct of the Israeli government in disputed territories.

No such choosing of sides or broad pronouncements about policy matters are required of the Court here.  The Court here only is asked to decide the important, but narrow, question of whether defendant's conduct violated standards that are universally recognized, including by Egypt, by word if not by deed.  Deciding that question will not impinge on the role of the political branches or implicate clearly delineated policy interests of the United States government.

Similarly, defendant's reliance on *Schneider v. Kissinger,* 310 F. Supp. 2d 251, 260 (D.D.C.2004), is misplaced, as that case required the Court to make a decision as to the propriety of the United States' covert support of the coup in Chile.  In sharp contrast to the instant case, the "discriminating analysis" that the *Schneider* court was improperly asked to make in resolving the political question issue could not be in more stark contrast to the narrow question here of whether Beblawi could order Mr. Soltan tortured.

In short, the case against Beblawi presents no political question for judicial determination.  The political questions were resolved by the passage of the TVPA into law. Whatever speculative consequences that Beblawi hypothesizes may flow from an adverse decision enforcing that statute does not turn the issue before this Court into a political question.

## CONCLUSION

For the foregoing reasons, defendant Beblawi's motions to dismiss and to quash service of process should be denied.

Dated: July 21, 2020

Respectfully submitted,

      /s/ Eric L. Lewis
Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan