# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMED SOLTAN, | ) | Civil Action No.: 20-cv-1437 (CKK) |
|     Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
| HAZEM ABDEL AZIZ EL BEBLAWI | ) |  |
|     Defendant. | ) |  |
|  | ) |  |

## PLAINTIFF'S REPLY TO DEFENDANT BEBLAWI'S OPPOSITION TO PLAINTIFF'S MOTION FOR ADMINISRATIVE STAY OF PROCEEDINGS FOR THE COURT TO ASSESS THE STATUS OF <u>DEFENDANT BEBLAWI'S CLAIM OF DIPLOMATIC IMMUNITY</u>

Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan

August 10, 2020

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................... ii

I.    PLAINTIFF'S MOTION FOR STAY WAS NECECESSARY BECAUSE DEFENDANT RAISED A NEW BASIS FOR DIPLOMATIC IMMUNITY OUTSIDE THE BRIEFING SCHEDULE ON THE MOTION TO DISMISS. .................5

II.   THE COURT HAS FULL AUTHORITY TO REVIEW THE LEGAL BASIS FOR BEBLAWI'S ASSERTION OF IMMUNITY. ...................................................................7

III.  BEBLAWI IS NOT IMMUNE UNDER THE EXPLICT TERMS OF THE UN HEADQUARTERS AGREEMENT BECAUSE HE HAS PROVIDED NO EVIDENCE THAT HE HAS BEEN DESIGNATED AS A PRR IN ACCORDANCE WITH ITS TERMS. ..........................................................10

IV.   THE COURT SHOULD DENY DEFENDANT BEBLAWI'S ASSERTION OF DIPLOMATIC STATUS IMMUNITY AND DIRECT THE PARTIES TO COMPLETE BRIEFING ON REMAINING ISSUES RAISED IN THE MOTION TO DISMISS. ..............................................................20

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASE(S)**

*Ahmed v. Hoque,*
   01 CIV. 7224 (DLC), 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002) ...................................18

*Butz v. Economou,*
   438 U.S. 478 (1978)........................................................................................................11

*Carrera v. Carrera,*
   174 F.2d 496 (D.C. Cir. 1949)........................................................................................18

*United States. ex rel. Casanova v. Fitzpatrick,*
   214 F. Supp. 425 (S.D.N.Y. 1963)...............................................................................9, 16

*Central Trust Co., Rochester N.Y. v. Official Creditors' Committee of Geiger Co.*
   *Inc.,*
   454 U.S. 354 (1982)........................................................................................................11

*Firemen's Ins. Co. of Washington D.C. v. Onwualia,*
   No. 94 Civ. 0095 (PKL), 1994 WL 706994 (S.D.N.Y. Dec. 19, 1994) ................................15

*Gonzalez Pardes v. Vila,*
   479 F. Supp. 2d 187 (D.D.C. 2007) ............................................................................18, 19

*Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army,*
   201 F.3d 451 (D.C. Cir. 2000) ........................................................................................10

*Jungquist v. Nahyan,*
   940 F. Supp. 312 (D.D.C. 1996) ......................................................................................18

*Lewis v. Mutond,*
   918 F.3d 142 (D.C. Cir. 2019*), cert. denied,* No. 19-185, 2020 WL 3492651
   (U.S. June 29, 2020) .........................................................................................................7

*Medellín v. Texas,*
   552 U.S. 491 (2008)...........................................................................................................8

*Phoenix Consulting Inc. v. Republic of Angola,*
   216 F.3d 36 (D.C. Cir. 2000) .............................................................................................7

*Sabbithi v. Al Saleh,*
   605 F. Supp. 2d 122 (D.D.C. 2009) ............................................................................18, 19

*Swarna v. Al-Awadi*,
    622 F.3d 123 (2d Cir. 2010)............................................................................7

*United States v. Al-Hamdi*,
    356 F.3d 564 (4th Cir. 2004) ........................................................................9

*United States v. Coplon*,
    84 F. Supp. 472 (S.D.N.Y. 1949).................................................................16

*United States v. Coplon*,
    88 F. Supp. 915 (S.D.N.Y. 1950).................................................................9

*United States v. Egorov*,
    222 F. Supp. 106 (E.D.N.Y. 1963) ..............................................................16

*United States v. Enger*,
    472 F. Supp. 490 (D.N.J. 1978) ..................................................................16

*United States v. Melekh*,
    190 F. Supp. 67 (S.D.N.Y. 1960).............................................................12, 17

*United States v. Noriega*,
    746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) ......................9, 19

*Zdravkovich v. Consul General of Yugoslavia*,
    No. 98-7034, 1998 WL 389086 (D.C. Cir. June 23, 1998) ...............................18

**Statutes**

8 U.S.C. § 1101(a)(15)(G)(i) .............................................................................19

22 C.F.R. §41.12 ........................................................................................6, 19

**Other Authorities**

Benjamin N. Cardozo, *The Growth of the Law* (1924).................................................14

Diplomatic Relations Act of 1978 .........................................................................7

Final Report of Sub-Committee 1 of the Sixth Committee, November 15, 1947
https://digitallibrary.un.org/record/721680................................................................13

https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visa-
employees-nato.html.......................................................................................19

https://www.imf.org/external/np/sec/memdir/eds.aspx .................................................12

https://www.imf.org/external/np/sec/memdir/members.aspx ...........................................12

https://www.imf.org/external/SelectedDecisions/Description.aspx?decision=A-11780.................................................................................................................12

https://www.imf.org/external/SelectedDecisions/Description.aspx?decision=A-11780#:~:text=Article%20IX%2C%20Article%208%20of,from%20legal%20process%20with%20respect .................................................................................13

https://www.state.gov/resources-for-foreign-embassies/diplomatic-list/ ....................................12

Restatement (Third) of Foreign Relations Law § 464 (1987).........................................................9

Restatement (Third) of Foreign Relations Law § 470 (1987).......................................................14

United Nations Headquarters Agreement, Article V, Section 15 (61 Stat. § 3461) .......................1

*United Nations Headquarters Agreement, Article V. Section 15(2) ................................. *passim*

*United Nations Headquarters Agreement, Article V, Section 15(4) ................................. *passim*

Vienna Convention on Diplomatic Relations, Article 31 ............................................................10

Defendant Beblawi's vitriolic opposition to plaintiff Soltan's motion for administrative stay appears designed to obscure the fact that he cannot satisfy his burden to support his claim for diplomatic immunity under the explicit terms of the treaty provision that he now acknowledges – for the first time – governs the inquiry.  Beblawi asserts that he has been designated as Egypt's Principal Resident Representative ("PRR") at the International Monetary Fund ("IMF").  In support, he has provided a letter from the State Department stating that the "official records" of the Department's Office of Foreign Missions "indicate that" Beblawi "is notified to the Department as assuming his duties" as the PRR of Egypt to the IMF "pursuant to 'Article V, Section 15(4)'" of the United Nations Headquarters Agreement.  As it turns out, this awkward phrasing reflects the awkward fact that, by the express terms of Article V, Section 15(4), the State Department has *not* certified and *cannot* certify that Beblawi is actually Egypt's PRR to the IMF, but can only report that State's internal records show that Egypt informed the Department six years ago that Egypt wished to name him as a PRR.  The State Department cannot, however, speak to whether Beblawi has complied with the provisions of Article V, Section 15(4); that is for this Court to determine.

Beblawi is not entitled to assert PRR status under Section 15(4) as he has not shown – as is his burden – an essential requirement for obtaining such status and consequent immunity under the relevant treaty, (the Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations ("UN Headquarters Agreement"),[1] namely, that *the IMF through its principal officer has agreed* to confer that status on Beblawi.  In the absence of proof of a tripartite agreement[2] to his PRR status – and the evidence all suggests the IMF has not granted

---

[1] Art. V, Section 15, November 21, 1947, 61 Stat. §3416.

[2] It is also unclear from the peculiar wording of the State Department letter whether the United States, another of the three parties along with Egypt and the IMF, agreed to his status as a PRR, or

and, as a matter of institutional policy and practice, does not grant such status – Beblawi does *not* have diplomatic status immunity.

Before addressing the substance of his assertion of PRR immunity, Beblawi's attacks on Mr. Soltan and his counsel cannot go unanswered.  Beblawi is obviously displeased that Mr. Soltan has the temerity to try to hold his torturer accountable and to prevent him from trying to evade that accountability through unsupported assertions of immunity.   Beblawi therefore denigrates plaintiff's motion variously as "meandering," "histrionic," "littered with unsupported suspicion," calculated "to feed plaintiff's paranoia," "desperate," "unalleged and unsupported propaganda," and "a smoke screen to hide a failed case" that "borders on Rule 11 sanctions."  He protests that the allegations of torture against him are based on "information and belief" and hearsay, blaming the victim, Mr. Soltan, for somehow not having direct access from his dungeon to Beblawi's internal deliberations, but only to his public statements and his legal authority as Prime Minister over a massive and notorious system of torture of political dissenters.

Beblawi also complains repeatedly that plaintiff did not have the courtesy to agree to extend his time to respond to the complaint, but he never acknowledges that Mr. Soltan made clear that he only declined to agree to a delay because the Egyptian government at that very moment was terrorizing his family in Egypt in a crude attempt to coerce him to drop this case.  Mr. Soltan did not want to agree to a briefing schedule that would extend for months, unless the issue of retaliation for the suit was addressed, but Beblawi declined to agree to any hearing on the matter. Defendant's assertion that Mr. Soltan's request for an emergency status conference to explore the circumstances surrounding the retaliatory raids, arrests, and disappearance of his family members,

---

whether State was simply attesting that it had been informed of that status under Section 15(4) "effective" 2014.

and Beblawi's knowledge and communications in that regard, was some sort of publicity stunt is truly beyond the pale.

Despite his gratuitous vitriol and his attempts at misdirection, Beblawi has the audacity to accuse Mr. Soltan of "disrespect" for "the rule of law." From the former Egyptian leader whose orders caused the slaughter of more than a thousand innocent protesters and Mr. Soltan's brutal torture for reporting it, this faux outrage is ironic and, indeed, appalling. Mr. Soltan has every right and obligation to get to the bottom of the immunity issue and to fight against letting a torturer walk free.

Illustrative of his attempt to avoid the merits of the immunity issue by launching unfounded attacks, including against arguments that were never made, Beblawi further asserts that plaintiff contends that the State Department's letter "is somehow ineffective" because State did not file it alongside a formal "Suggestion of Immunity." Opp. at 11. Plaintiff's motion for stay makes no such argument. It simply pointed out that the letter Beblawi submitted was not the Suggestion of Immunity that he said he had been in the process of trying to obtain.[3] Yet Beblawi spends over a page rebutting this never-made contention. To the contrary, plaintiff was highlighting that the promised Suggestion of Immunity never emerged, presumably because the State Department declined to provide it. Plaintiff also was underscoring (i) that defendant proffered to the Court, without explanation, an ambiguous letter stating that six years ago, Egypt asked for Beblawi to be designated as Egypt's PRR to the IMF and (ii) that the request was noted on the official records of the State Department, but without stating its explicit acceptance of the status or any statement

---

[3] Contrary to Beblawi's assertion, plaintiff's stay motion simply stated the State Department letter "is not in the usual form of a Suggestion of Immunity filed directly with the Court by the State Department that he told the Court he was in the process of attempting to obtain" and thus it was unclear what Beblawi intended to argue is the letter's force and effect. Dkt. 33-1, Motion to Stay at 2, 5.

suggesting the agreement by the IMF to such status, as required under Article V, Section 15(4) of the UN Headquarters Agreement, had also been obtained.

Beblawi's diatribe appears designed to obscure that Mr. Soltan's motion has exposed the fact that Beblawi has failed to satisfy his burden to establish his claim of immunity as laid out in the terms of the UN Headquarters Agreement that he asserts confers the basis for the PRR status he now claims. That treaty could not be clearer that to have status as a PRR to a UN specialized agency there must be a ***tripartite agreement*** among the home government of the proposed PRR (here, Egypt), the government of the country that houses the United Nation specialized agency in which the proposed PRR is resident (here, the United States), and the United Nations specialized agency to which he is seconded (here, the IMF).

On the record before this Court, this required tripartite agreement was never reached. As shown below, there is not a shred of evidence that the IMF agreed, or was ever even asked to agree, that Beblawi could have PRR status at the IMF. The plain language of the Headquarters Agreement, the relevant case law, expression in the IMF Articles, and the Restatement of Foreign Affairs all support the conclusion that, Beblawi has *not* met the requirements for PRR status immunity. As an institutional matter, the IMF does *not* award blanket immunity to its Executive Directors, of which Beblawi is one, and it has not done so here. Whatever position the State Department may have taken with respect to its own leg of the tripartite requirement – and even that is not clear – it is not its role to declare, nor is it its assertion, that that all three conditions of the Headquarters Agreement have been fulfilled; that is for the Court to determine. On this record, Beblawi has failed to show that he has PRR immunity.

I.   **PLAINTIFF'S MOTION FOR STAY WAS NECECESSARY BECAUSE DEFENDANT RAISED A NEW BASIS FOR DIPLOMATIC IMMUNITY OUTSIDE THE BRIEFING SCHEDULE ON THE MOTION TO DISMISS.**

Since Beblawi falsely accuses plaintiff of "ignor[ing] and distort[ing the record" in order to "sidestep the Court's Orders and rearrange the docket" (Opp. 1-2), a brief look at why plaintiff filed the instant motion for administrative stay is in order.  On July 17, 2020, while plaintiff was drafting his opposition to the pending motion to dismiss, Beblawi filed an attorney declaration signaling ***for the very first time*** that his basis for diplomatic immunity was pursuant to a specific treaty provision – Article V, Section 15(4) of the UN Headquarters Agreement – and attaching a July 7 letter from the State Department.  Dkt. 32 at ¶5.  Oddly, Beblawi did not file the declaration in support of an affirmative new motion or even as a proper addition to or replacement of his pending motion to dismiss.  Nor did he bother to explain what legal arguments he intended to advance in reliance on the July 7 letter.[4]

Defendant now would have this Court believe that the mere invocation of his G-1 visa status or his reference to the incorrect proposition that a G-1 designation "reflects status as 'designated principal resident representative of a foreign government'" (Opp. at 4) – an argument buried in a parenthetical at the end of a string-citation – was sufficient to put plaintiff and the Court on notice of the materially different immunity argument he now advances.  That contention is baseless.  As of the date of defendant's July 17 submission, this was the record on diplomatic immunity:

- Defendant had filed 5 substantive pleadings raising every imaginable basis for immunity, but he never claimed diplomatic immunity as a PRR under the UN Headquarters Agreement Article V, Section 15(4) (Dkts.13, 19, 22, 24, 30-1);

---

[4] Beblawi does not explain why it took ten days for the July 7 letter to be submitted to the Court; presumably, he and Egypt were trying to obtain a letter that actually provided for immunity.

- He never once cited the relevant treaty provision (Section 15(4)) in any of his pleadings;

- In his prior pleadings, the only mention of the UN Headquarters Agreement was contained in a footnote wherein he stated that "Section 15(2) of the [UN] Headquarters Agreement is not presently at issue" and again, when the same footnote was copied verbatim into a subsequent pleading (Dkt. 22 at 4 fn.3, Dkt. 30-1 at 18 fn.50); and

- The only reference in the 5 substantive pleadings to the designation of a PRR is in a parenthetical copied verbatim into two different pleadings that merely characterizes (wrongly) the text of 22 C.F.R. §41.12 (Dkt. 24 at ¶11, Dkt. 30-1 at 17).

In these circumstances, plaintiff was left in the dark as to both the legal basis and evidentiary support for Beblawi's new claim of diplomatic status immunity.  It was precisely for this reason that plaintiff filed his motion for administrative stay to get to the bottom of the defendant's position, requiring Beblawi to detail the legal arguments and supporting evidence he intends to advance in reliance on the July 7 letter.  Indeed, in the response to the stay motion, defendant submitted a 22-page opposition laying out the basis for his reliance on the UN Headquarters Agreement provision and citing new (but irrelevant) caselaw in support, thereby demonstrating that he had not previously advanced this new argument for diplomatic status immunity.

The instant memorandum is plaintiff's response to the Beblawi's opposition in which at last he states the legal basis for his diplomatic immunity claim and his  evidentiary support for it. In fact, his opposition demonstrates its fatal flaw in meeting the requirements for status immunity. As detailed below, UN Headquarters Agreement Section 15(4) on which Beblawi now relies is specific and exacting in what it requires for PRR status, and the State Department's July 7 letter, standing alone, does not fulfill those requirements.  Thus, far from a "meandering and histrionic

motion," plaintiff's motion for stay properly sought to put Beblawi to the test as to the legal and evidentiary basis for his immunity claim.  He has failed that test.

## II.     THE COURT HAS FULL AUTHORITY TO REVIEW THE LEGAL BASIS FOR BEBLAWI'S ASSERTION OF IMMUNITY.

Under the well-settled decisions of the D.C. Circuit Court of Appeals, it is axiomatic that Beblawi "bears the burden of proving foreign official immunity."  *Lewis v. Mutond,* 918 F.3d 142, 145 (D.C. Cir. 2019)*, cert. denied,* No. 19-185, 2020 WL 3492651 (U.S. June 29, 2020); *cf. Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C. Cir. 2000).  It is, accordingly, entirely within the role of the judiciary to determine whether the evidence submitted by the defendant claiming immunity meets that burden and satisfies the legal basis for the status claimed.

In his briefs on the issue, Beblawi completely misapprehends, indeed, denies any role for the Court, asserting that this Court is merely to rubber stamp the Executive Branch's letter and then dismiss the case.  In support, Beblawi cites to Article 31 of the Vienna Convention on Diplomatic Relations ("VCDR) and the Diplomatic Relations Act of 1978 ("DRA") to claim that "the Court must…dismiss the Complaint without leave to amend."  Opp. at 8.  Yet these treaty provisions apply only *if* the Court determines, in the first instance, that the governing law under which immunity is claimed – here, the UN Headquarters Agreement Article V, Section 15(4) – supports the proposition that Beblawi had met its requirements and is indeed immune.  *See, e.g., Swarna v. Al-Awadi,* 622 F.3d 123, 133-140 (2d Cir. 2010) (court first analyzed whether defendant properly entitled to immunity before applying VCDR provisions, ultimately finding no immunity and so VCDR inapplicable); *Sabbithi v. Al Saleh,* 605 F. Supp. 2d 122, 126 (D.D.C. 2009) (noting that only when "the Court concludes that defendants are immune, it must dismiss the action" under the VCDR and DRA).  Only once such a finding of diplomatic immunity is made does the VCDR or the DRA prescribe the consequence that the Court dismiss the complaint, not before the finding,

as Beblawi suggests.  As discussed herein, no such finding is warranted in this case; therefore, the terms of the VCDR and the DRA do not apply.

Beblawi contends that "the Court must accept the State Department's certification as conclusive evidence of Mr. Beblawi's diplomatic status." Opp. at 8.  This contention is demonstrably incorrect.  While it is not within the Court's province to question whether a valid grant of status immunity under applicable law is *justified*, it is entirely an appropriate and necessary juridical function for it to examine a defendant's contention that he has, in fact, been *granted* the status he claims.  Here, Beblawi claims that he has been granted PRR status under Section 15(4). It is the Court's role to examine the legal basis for this claim of PRR status under the operative treaty provision and to determine whether, under the plain terms of that provision, Beblawi has provided sufficient evidence that he qualifies as a PRR.  *See Medellín v. Texas,* 552 U.S. 491, 506 (2008) ("the interpretation of a treaty, like the interpretation of a statute, begins with its text").

In his opposition to the instant motion, Beblawi's seeks to sideline the Court from this most basic judicial function – the interpretation of the plain text of the treaty provision at issue and the examination of whether the evidence supports its application.  He asserts, mistakenly, that this most basic of juridical inquiries involves some sort of a complex political dispute that is foreclosed to judicial consideration.  Opp. at 6, fn.5.  Whether the United States should consider Beblawi as an appropriate recipient of immunity given his egregious breach of *jus cogens* norms against torture and extrajudicial killing may well be a political issue, but whether he has, in fact, met the requirements under the relevant treaty for PRR status is quintessentially an issue for the courts. Consequently, when immunity is invoked under the UN Headquarters Agreement, courts time and again properly undertake the traditional judicial function of examining whether the explicit terms of the treaty have been satisfied.

In *United States. ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425, 433 (S.D.N.Y. 1963),[5] for example, the court held specifically with respect to the construction of Section 15(2) of the Headquarters treaty, which *also* requires tri-partite agreement:

> Accordingly, whether or not a particular individual is entitled to immunity is to be decided within the framework of the applicable document. The Headquarters Agreement simply provides that the **three designated parties are to agree** upon those entitled to immunity. It contains no provision, nor is there any supplementary agreement, which defines how such agreement is to be manifested. **The determination of a claim upon a disputed state of facts that one is entitled to immunity pursuant to that agreement is not a political judgment to be made by one of the parties thereto, but a judicial determination**.

*Id.* (emphasis added). The court then went on to reject the very contention that Beblawi makes here – that due to the political nature of the case, the court should not perform its normal duty of analyzing immunity under the language of the relevant treaty. Stating in plain terms, Judge Weinfeld ruled:

> Whether, upon the facts presented by both the Government and the individual involved or his government, immunity exists by reason of the agreement, is **not a**

---

[5] In previous iterations of Beblawi's now amended argument, he advanced the unsupported contention that his mere holding of a G-1 Diplomatic Visa confers upon him diplomatic immunity, a proposition directly rejected by *Casanova*. The mere possession of a diplomatic visa does not confer diplomatic status immunity upon the holder. *See* Restatement (Third) of Foreign Relations Law § 464 (1987) ("Generally, a sending state issues a diplomatic passport to its diplomatic agent and the receiving state gives him a diplomatic visa, but such passports and visas are sometimes issued as a courtesy also to persons other than diplomats, and they do not prove that the holder enjoys diplomatic status or is entitled to diplomatic privileges and immunities in the receiving state.") Diplomatic visas and other administrative diplomatic documents such as passports have little bearing on the diplomatic status immunity inquiry. Indeed, in *Casanova*, the sole case addressing the precise G-1 Visa at issue here, the court rejected diplomatic immunity based on visa status, holding that the administrative grant of the diplomatic visa was "entirely separate" from "the question of the agreement of the United States Government to diplomatic immunity." 214 F. Supp. at 440. The courts uniformly reject the notion advanced by Beblawi that a G-1 Visa by itself confers diplomatic immunity. *See United States v. Noriega,* 746 F. Supp. 1506, 1524 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004);); *United States v. Coplon*, 88 F. Supp. 915, 920 (S.D.N.Y. 1950).

> **political question, but a justiciable controversy** involving the interpretation of
> the agreement and its application to the particular facts.

*Id.* (emphasis added).

As the foregoing makes clear, it is for this Court to examine whether under the operative

UN Headquarters Agreement – as a judicial matter, not a political one – Beblawi has satisfied his

burden by proffering the requisite facts showing that he meets the treaty's requirements.  On this

issue of treaty interpretation and whether the evidence supports its application here, the Court is

not to defer to the State Department, which, as shown below, is only one of the three parties under

the treaty whose assent is required to grant PRR status to an IMF official.  The State Department

can only speak for its own assigned role in the process specified under the treaty.

**III.   BEBLAWI IS NOT IMMUNE UNDER THE EXPLICT TERMS OF THE UN
       HEADQUARTERS AGREEMENT BECAUSE HE HAS PROVIDED NO
       EVIDENCE THAT HE HAS BEEN DESIGNATED AS A PRR IN ACCORDANCE
       WITH ITS TERMS.**

When interpreting a treaty, courts are "guided by principles similar to those governing

statutory interpretation."  *Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army*, 201 F.3d 451, 458 (D.C.

Cir. 2000).  Courts "'must, of course, begin with the language of the Treaty itself.'"  *Id.* (*quoting*

*Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 180 (1982)).  Here, Beblawi bases his claim

for diplomatic immunity on Section 15(4) of the UN Headquarters Agreement; that is also the only

treaty provision referenced in the State Department letter.  Dkt. 32-1 at 3.  That provision could

not be clearer.  To be granted PRR status at the IMF, a UN subagency, there must be a ***tripartite***

***agreement*** among the claimant's home government (Egypt), the government of the country that

houses the specialized agency (the United States), and the affected UN specialized agency (the

IMF).  Section 15(4) states:

> [P]rincipal resident representatives of members of a [U.S.-based] specialized
> agency and such resident members of the staffs of representatives of a specialized
> agency **as may be agreed upon between the principal executive officer of the**

10

**specialized agency, the Government of the United States and the Government of the Member concerned**, shall whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it.

UN Headquarters Agreement, Art. V, Section 15(4) (emphasis added).  The government of Egypt apparently has manifested its agreement to his designation – indeed, it has shown it will take any and all aggressive measures (including holding Mr. Soltan's family members hostage on bogus charges) to avoid having Beblawi answer for his conduct and those who acted in concert with him in torture and killing.  The United States, through the State Department, reports that its records "indicate" that its records have been "notified," presumably by the government of Egypt, that he has "assum[ed]" the PRR status.  Beblawi, however, has submitted no evidence of agreement by the "principal executive officer of the specialized agency" (the IMF) that he has this status.

As a matter of treaty interpretation, it is inarguable that the agreement of, at best, only two of the three necessary parties is legally insufficient to confer the claimed status.  To rule otherwise would render the plain text of Section 15(4) meaningless.  *See Butz v. Economou*, 438 U.S. 478, 501 (1978).  Where, as here, the language is clear, the Court need not look beyond its plain meaning.  *See Central Trust Co., Rochester N.Y. v. Official Creditors' Committee of Geiger Co. Inc.,* 454 U.S. 354, 359-60 (1982).

Beblawi's failure to provide the necessary evidence of an agreement from the "principal executive officer" of the IMF is not surprising.  His status as an Executive Director of the IMF does not in any way suggest that the IMF has agreed or would agree to PRR status as required under Section 15(4) of the Treaty.  The IMF's own practices and procedures are to the contrary.  As an Executive Director, Beblawi's position at the IMF is fundamentally and functionally distinct from the accredited ambassadors, ministers, and other senior diplomats working on a foreign

country's behalf, and in no manner does it reflect agreement on the part of the IMF that he is a PRR for Egypt.  Beblawi does not contend that he has "the rank of ambassador or minister plenipotentiary" for  immunity under Section 15(1), which does not require a tripartite agreement. Rather, he explicitly acknowledges that Section 15(4) is the basis for his purported status, and the State Department letter discusses PRR status solely under Section 15(4), a provision, like Section 15(2), that manifestly requires tripartite agreement.  *See* Dkt. 32 at ¶5; Dkt. 32-1 at 3.

Moreover, the IMF website makes clear that, as an Executive Director, Beblawi does not even represent Egypt's singular national interest before the IMF.  He is appointed by and has responsibility for macroeconomic policy decisions with respect to a regional bloc of Middle Eastern countries including Bahrain, Egypt, Iraq, Jordan, Kuwait, Lebanon, Maldives, Oman, Qatar, United Arab Emirates, and the Republic of Yemen.[6]  Egypt alone did not appoint him, and he does not serve Egypt's national interests.[7]  He is an international civil servant who happens to hold Egyptian nationality, not an Egyptian ambassador or minister.  In a similar case where diplomatic status was rejected under Section 15, *United States v. Melekh,* 190 F. Supp. 67, 88 (S.D.N.Y. 1960), the court specifically noted that the defendant in that case, an international civil servant at the United Nations, did not represent "any particular state."  So, too, here.

Further supporting the conclusion that the IMF never agreed to PRR status, the IMF itself does not as a matter of practice and procedure provide for the sweeping immunity that Beblawi

---

[6] *See* https://www.imf.org/external/np/sec/memdir/eds.aspx.

[7] Each country, Egypt included, appoints a Governor and an Assistant Governor to the IMF to represent that country's national interests. https://www.imf.org/external/np/sec/memdir/members.aspx.  Yet even these appointees are not included on the State Department's list of accredited diplomats nor considered by the IMF as accredited. *Compare id*. *with* https://www.state.gov/resources-for-foreign-embassies/diplomatic-list/ (Egypt's Governor and Assistant Governor not so listed); https://www.imf.org/external/SelectedDecisions/Description.aspx?decision=A-11780.

here claims, instead taking the official position that its senior employees who are accredited even as diplomats are only entitled to a limited purpose immunity "with respect to acts performed by them in their official capacity."[8]   Beblawi's breaches of the TVPA happened long before he became an international civil servant and had nothing to do with acts in an official capacity with the IMF.  The IMF's institutional approach to limited immunity comports with the United Nations' own view as to the type of immunity to be afforded to IMF Executive Directors.  In its final report to the UN General Assembly, the subcommittee drafting and proposing the UN General Assembly's adoption of the "Convention on Privileges and Immunities of the Specialized Agencies" stated:

> …**executive directors of the Bank and the Fund**, partly as representatives of Governments but predominantly as representing the interests of all Members…It was considered that these officers **should be regarded, for the purposes of this Convention, rather as officials than as representatives of Members**.

Final Report of Sub-Committee 1 of the Sixth Committee, November 15, 1947, at 8 at ¶ 21 (emphasis added).[9]  In the absence of evidence of IMF agreement, and there is none, special credit should be given to the opinion of the UN itself regarding Executive Directors at the IMF as officials rather than "representatives of Members," much less as a Member's "principal resident representative."

The Restatement of Foreign Relations Law concurs on this critical point.  In its discussion of PRR status as respects Executive Directors at the IMF, it explicitly notes that these officials do *not* have that type of wide-ranging immunity:

> In the United States, member representatives to international organizations enjoy immunities by international agreement as well as under the International

---

[8]  *See* https://www.imf.org/external/SelectedDecisions/Description.aspx?decision=A-11780#:_~:text=Article%20IX%2C%20Article%208%20of,from%20legal%20process%20with%20respect.

[9]  *See* https://digitallibrary.un.org/record/721680.

> Organizations Immunities Act.  Member representatives to the United Nations and
> to the Organization of American States enjoy immunities similar to those of
> diplomatic agents. **The Executive Directors of the World Bank and of the**
> **International Monetary Fund, many of whom represent more than one state,**
> **are accorded diplomatic immunities in many respects, but they**
> **enjoy immunity from legal process only in respect of their official acts**.

Restatement (Third) of Foreign Relations Law § 470 (1987) (citing World Bank Article VII and

IMF Article IX) (emphasis added).[10]   Moreover, the Restatement goes on to state that the IMF

does not even have "Resident Representatives":

> The Headquarters Agreement with the United Nations also provides
> such immunities for principal resident representatives (and members of their
> staffs) of Specialized Agencies at their headquarters in the United States, **but the**
> **only such Specialized Agencies—the World Bank and the International**
> **Monetary Fund—do not have "resident representatives" of members**.

*Id.* at § 470 (emphasis added).

As the Court will be aware, the American Law Institute convenes leading scholars,

practitioners and judges in the relevant fields to study comprehensively the state of the law on the

specific subject at issue.   As then-Judge Cardozo stated with respect to the authority of

Restatements:

> When, finally, it goes out under the name and with the sanction of the Institute,
> after all this testing and retesting, it will be something less than a code and
> something more than a treatise. It will be invested with unique authority, not to
> command, but to persuade. It will embody a composite thought and speak a
> composite voice. Universities and bench and bar will have had a part in its creation.
> I have great faith in the power of such a restatement to unify our law.

Benjamin N. Cardozo, *The Growth of the Law*  9 (1924).   In arcane areas such as this one, the

Restatement's clear explanation that the IMF only gives official acts immunity to Executive

---

[10] This limited immunity for IMF officials is supported by the caselaw.  Notably, all of the cases
where PRR status has been invoked, *without exception,* involve UN officials, not officials from
the IMF.  This not only includes Executive Directors, like Beblawi, representing regional interests
but even high IMF officials and actual Member appointees/representatives.

Directors and does not give out the Permanent Resident Representative status to its employees at all should be highly persuasive, and nothing offered by Beblawi contradicts these provisions of the Restatement.

Perhaps recognizing that he has not supported his claim as a PRR with a shred of evidence that the IMF had agreed to such status, Beblawi instead cites to a number of inapposite decisions where the claim of immunity analysis was based on some alternative status, including Section 15(1) of the Headquarters Agreement, which does not require IMF agreement, and has no bearing here.  As noted above, Section 15(1) expressly pertains only to *ambassadors* and *ministers plenipotentiary*, a status which Beblawi does not claim (and has not claimed in any of his five earlier filings in this matter), as a basis for PRR status; instead he simply string cites to these inapposite Section 15(1) cases without informing the Court of the differing requirements of Section 15(1).  *See, e.g.,* Opp. at 9, 10, 13-14, 16.  Unlike PRR status at a UN sub-agency under Section 15(4), some alternative bases of immunity may be unilaterally satisfied by agreement by the United States.  Section 15(4) is not one of them.  In his opposition, Beblawi goes to great lengths seeking to distinguish the basis for his claim to PRR status under Section 15(4) as opposed to Section 15(2).  But there is no distinction between the two sections on the controlling issue.  Section 15(4) also requires the same tri-partite agreement among the two governments and "the principal executive officer of the specialized agency," an agreement which he has not suggested exists.

A review of all of the immunity cases where PRR status under any of Section 15's subparts other than Section 15(1),[11] shows that courts *without exception* require evidence that there is

---

[11] *Firemen's Ins. Co. of Washington D.C. v. Onwualia,* No. 94 Civ. 0095 (PKL), 1994 WL 706994, at \*3 (S.D.N.Y. Dec. 19, 1994), is the sole case where a non-ambassador or minister was granted immunity as a PRR under Section 15 simply based on U.S. recognition of that status, but it does so without the Court examining the issue.  There, the plaintiff did *not* dispute diplomatic immunity,

agreement among all three necessary parties under the treaty, rather than simply rely on evidence of agreement by (arguably) two of the three necessary parties, as Beblawi asks the Court to do here. *See, e.g., United States v. Coplon*, 84 F. Supp. 472, 476 (S.D.N.Y. 1949); *United States v. Enger*, 472 F. Supp. 490, 500 (D.N.J. 1978); *United States ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425, 432 (S.D.N.Y. 1963); *United States v. Egorov*, 222 F. Supp. 106, 107 (E.D.N.Y. 1963).

In *Coplon*, the court considered whether the evidence showed that the UN Secretary General had agreed to PRR status. The court ruled that because the defendant's name had never been submitted for inclusion in the diplomatic list, and absent UN agreement that defendant was a PRR, immunity was denied. 84 F. Supp. at 476. Similarly, in *Casanova*, the court confronted whether a tri-partite agreement was effected between the three necessary parties, finding that, while Cuba and the United Nations had agreed to the defendant's PRR status, the third necessary party, the United States, had not. Notably, there, the court described the robust process at the United Nations for agreement that a diplomat is entitled to PRR immunity:

> Following the effective date of the Headquarters Agreement, a procedure was established to implement the required ***tri-partite consent*** under section 15(2) with respect to those qualified thereunder. The mission involved, in the instance of an individual other than a permanent representative of the rank of ambassador or minister, notifies the Secretary-General of its request that the staff member be granted the benefits of section 15(2) and asks that the necessary arrangements therefor be made. The Secretary-General forwards the request to the United States Mission, which sends it on to the State Department. If the State Department gives its agreement, it notifies the United States Mission which, in turn, advises the United Nations, as well as the individual, in a formal communication which, in part, reads:
>
> 'Under the terms of the Headquarters Agreement between the United States and the United Nations, brought into force on November 21, 1947, and on the basis of certification submitted by your mission, ***with the concurrence of the Secretary General of the United Nations***, you are entitled in the territory of the United States

---

nor was the question of whether the UN agreed to his PRR status was ever put at issue. *Id.* So, this case is not only distinguishable, it does not even deal with the issue.

> to the privileges and immunities of a diplomatic envoy under section15 of the Headquarters Agreement.'
>
> In addition, the individual's name is published in a list issued by the United States Mission to the United Nations as 'recognized by the Department of State as entitled to diplomatic privileges and immunities * * * under the provisions of Section 15 of the Headquarters Agreement * * *.'

214 F. Supp. at 439 (citation omitted; emphasis added).  This statement of what is required for granting PRR status – a tripartite agreement reflected by clear, affirmative evidence – is squarely at odds with what Beblawi has presented.  There is no evidence that such application by the IMF was made on Beblawi's behalf; nor has Beblawi offered in evidence anything approximating such an affirmative IMF agreement.  And all other evidence strongly supports the conclusion that the IMF did not and would not give such an agreement.

In *Melekh,* too, there was "not the slightest intimation that the defendant as a diplomat was 'received as such' by the United Nations Organization." 190 F. Supp. at 88.  There, a U.S.S.R. former Second Secretary of the Ministry of Foreign Affairs arrived in the United States with a Soviet diplomatic passport to work in a role as an international civil servant for the U.N. and not as a "minister" or an "emissary" from the U.S.S.R. to the United States. *Id.* at 77.  After noting that there was "no legal significance" to the "purely incidental circumstance" of Melekh's former high role in the U.S.S.R., the court focused instead on whether a tri-partite agreement was effected by the requisite parties under Section 15 of the Headquarters Agreement, examining the "nondiplomatic capacity" with which he worked at the UN and the absence of evidence showing UN agreement to his status as a PRR. *Id.* at 77, 88-89.

The parallel here is inescapable.  Beblawi's role as the former Prime Minister of Egypt is similarly of "no legal significance" to the inquiry before this Court.  The court's analysis of Section 15(4) in *Melekh* applies with equal force in the instant case.  There, the court noted that "as an

employee of the United Nations, the defendant was not the representative of any particular state. He performed his official 'duties by authority of an international organization; (he was) . . . neither accredited to any particular government, nor (was he). . . sent on a temporary mission on behalf of any sovereign independent state.'" *Id.* at 88. Beblawi's circumstances are identical.

Finding no support in the caselaw addressing the Section 15 provisions that explicitly require a tri-partite agreement, Beblawi instead relies upon cherry-picked language from a smattering of cases adjudicating the matter of diplomatic immunity on bases *other than* PRR status under the UN Headquarters Agreement. Beblawi thus cites to *Carrera v. Carrera*, 174 F.2d 496 (D.C. Cir. 1949); *Zdravkovich v. Consul General of Yugoslavia*, No. 98-7034, 1998 WL 389086, *1 (D.C. Cir. June 23, 1998); *Jungquist v. Nahyan*, 940 F. Supp. 312 (D.D.C. 1996); *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122 (D.D.C. 2009) ("*Sabbithi*"); *Gonzalez Pardes v. Vila,* 479 F. Supp. 2d 187 (D.D.C. 2007) ("*Gonzalez*"). Opp. at 9. But the Court does not need to linger long on those cases as they are entirely irrelevant to the current inquiry under Section 15(4), which, unlike these cases, explicitly requires agreement of all three necessary parties to PRR status.

Beblawi trumpets the irrelevant fact that the "certificate of immunity" purportedly issued by the State Department here, "is comparable to those cited in *Sabbithi, Gonzalez, Devi, and Ahmed.*" Opp. at 10.[12] But this, too, misses the point, as the issue before this Court is not to compare certificates issued in support of alternative bases for immunity, where a tri-partite agreement was not necessary, but to determine whether the evidence shows that the explicit terms that mandate IMF agreement have been met. For instance, *Ahmed* concerned the application of Section 15(1), discussed above, which governs ambassadors and ministers plenipotentiary and

---

[12] *Citing Sabbithi, Gonzalez, Devi v. Silva*, 861 F. Supp. 2d 135 (S.D.N.Y. 2012), and *Ahmed v. Hoque*, 01 CIV. 7224 (DLC), 2002 WL 1964806 (S.D.N.Y. Aug. 23, 2002).

expressly does not require tri-partite agreement.[13]   In addition, Plaintiff in that case conceded immunity under Section 15, which is not the case here.  In *Devi*, too, the analysis was under Section 15(1), which is why the U.S. certificate of immunity was credited in that case but is insufficient in this one.  Lastly, as discussed above, *Sabbithi* and *Gonzalez* did not involve PRR status at all.

One further point regarding evidence of status must be addressed.  In his Opposition, Beblawi also asserts that his possession of a G-1 visa was necessarily proof of his status as a PRR. Opp. at 5.  But his reliance upon 22 C.F.R. § 41.12 is misplaced, as the regulation provides that non-PRRs *also* be given a G-1 visa.  *See* 22 C.F.R. § 41.12.  In fact, defendant himself quotes from 8 U.S.C. § 1101(a)(15)(G)(i) acknowledging the same.  Opp. at 5.  Moreover, State Department publications also confirm that non-PRRs may receive a G-1 visa.  *See, e.g.,* https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visa-employees-nato.html.

Beblawi makes a similar argument based on the State Department's issuance of a "Diplomatic Identification Card" listing him as a PRR, which he attaches for the first time to the Opposition.  *See* Opp. at 17 fn.12; *see also* Dkt. 36-1.[14]   Like his visa card, this card, too, is irrelevant to the real issue before this Court.  Neither speaks to whether the IMF has agreed to Beblawi's status as a PRR in order to establish compliance under the Headquarters Agreement. Diplomatic visas and related administrative documents issued by the Department of State, such as these cards, do not establish entitlement to diplomatic status immunity.  *See, e.g., United States v. Noriega,* 746 F. Supp. 1506, 1524 (S.D. Fla. 1990), *aff'd,* 117 F.3d 1206 (11th Cir. 1997).  Rather,

---

[13] Section 15(1) recognizes immunity for "Every person designated by a Member as the principal resident representative to the United Nations of such Member or as a resident representative with the rank of ambassador or minister plenipotentiary."

[14] Beblawi offers no explanation as to why he provides the card for the first time in his August 3 filing.

that determination turns on analysis of the relevant treaties and statutes that govern the status being asserted.

In sum, Beblawi's claim to PRR status as Egypt's representative to the IMF fails for lack of any evidence that he meets the tri-partite agreement criteria for recognition of this status as required under the UN Headquarters Agreement.  The State Department's letter – itself vague as to whether State has agreed to that status or only is confirming that it has been instructed and recorded that Egypt has sought it – cannot substitute for clear agreement by the IMF that he is entitled to PRR immunity.  Beblawi has failed to satisfy his evidentiary burden as to IMF agreement, and his request for immunity on this ground should be denied.

## IV.  THE COURT SHOULD DENY DEFENDANT BEBLAWI'S ASSERTION OF DIPLOMATIC STATUS IMMUNITY AND DIRECT THE PARTIES TO COMPLETE BRIEFING ON REMAINING ISSUES RAISED IN THE MOTION TO DISMISS.

Given defendant Beblawi's failure, after the now-comprehensive briefing on this issue, to provide the requisite evidentiary support for his assertion of PRR immunity, the Court should deny his claim of immunity based on his diplomatic status.[15]  There will, of course, remain the completion of briefing on the other issues raised in his motion to dismiss, including the issue of foreign official acts immunity.  Plaintiff filed his opposition to these issues on July 21, 2020.  The Court should therefore direct defendant to file his reply, if any, to plaintiff's opposition with respect to those issues on or before August 20, 2020, or on such other date as the Court may determine.  A revised Proposed Order is attached.

---

[15] Given the evidentiary record that refutes the PRR basis for Beblawi's immunity claim,  plaintiff withdraws his request for jurisdictional discovery and will reinstitute it only if it becomes necessary to further explore this or other jurisdictional issues.

DATED:  August 10, 2020                    Respectfully submitted,


/s/ Eric L. Lewis
Eric L. Lewis (D.C. Bar #394643)
Waleed Nassar (D.C. Bar #992659)
Jeffrey D. Robinson (D.C. Bar #376037)
Aisha E. Bembry (D.C. Bar #4889500)
LEWIS BAACH KAUFMANN MIDDLEMISS
PLLC
1101 New York Ave., N.W, Suite 1000
Washington, D.C. 20005
(202) 833- 8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Plaintiff Mohamed Soltan