**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MOHAMED SOLTAN,

      Plaintiff

    v.

HAZEM ABDEL AZIZ EL BEBLAWI,

      Defendant

Civil Action No. 20-1437 (CKK)

---

**MEMORANDUM OPINION**
(September 17, 2021)

      Plaintiff Mohamed Soltan filed suit against Defendant Hazem Abdel Aziz El Beblawi, the former interim prime minister of Egypt, alleging violations of the Torture Victim Protection Act of 1991 ("TVPA").  Defendant later submitted to the Court a letter from the United States Department of State, certifying that at the time Plaintiff filed his lawsuit, Defendant was serving as Egypt's Principal Resident Representative to the International Monetary Fund ("IMF"); based on that position, Defendant claims he is entitled to diplomatic immunity pursuant to the United Nations Headquarters Agreement, the Vienna Convention on Diplomatic Relations, and the Diplomatic Relations Act.

      Before the Court are Defendant's [24] Motion to Quash Service of Process and [25] Motion to Dismiss, in which Defendant argues that this Court lacks jurisdiction because he is immune from suit by virtue of his diplomatic status.  Also before the Court are Plaintiff's [50] Motion for Leave to File a Reply to Defendant's Response to the United States' Statement of Interest and Defendant's [53] Motion to Strike Plaintiff's Motion for Leave.  Because the Court has considered Plaintiff's proposed pleading, attached to his [50] Motion, the Court shall **GRANT** Plaintiff's Motion for Leave to File a Reply and **DENY** Defendant's Motion to Strike.

Upon thorough review of the pleadings,[1] the relevant legal authority, the Statement of Interest of the United States, ECF No. 44, and the entire record, the Court concludes that Defendant is entitled to diplomatic immunity.  Accordingly, the Court shall **GRANT** Defendant's Motion to Quash Service of Process and Motion to Dismiss and shall **DISMISS** this case for lack of jurisdiction.

The Court does not take this step lightly.  Plaintiff's Complaint contains shocking allegations of grave human rights abuses.  The Court's dismissal of this case is in no way a reflection of the merits of Plaintiff's claims or Defendant's defenses.  Nor does the Court express any view as to the merits of the Complaint, as the merits cannot be reached because of the Court's conclusion that it lacks subject matter jurisdiction due to Defendant's status as immune from suit.  Basic constitutional and statutory principles prevent this Court from allowing Plaintiff's claims against Defendant to proceed at this time.

## I.    BACKGROUND

Although the Court resolves the pending motions on the narrow issue of Defendant's immunity from suit, the Court shall briefly discuss Plaintiff's allegations before addressing the procedural posture and facts underlying Defendant's claim of diplomatic immunity.

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Quash Service of Process ("Def.'s Mot. to Quash"), ECF No. 24;
- Mem. in Support of Def.'s Mot. to Dismiss ("Def.'s Mot. to Dismiss"), originally filed at ECF No. 25-1, corrected version filed at ECF No. 30-1;
- Pl.'s Mot. for Administrative Stay of Proceedings ("Pl.'s Mot. to Stay"), ECF No. 33;
- Pl.'s Consolidated Opp'n to Def.'s Mot. to Dismiss and Mot. to Quash ("Pl.'s Opp'n to Def.'s Mots."), ECF Nos. 34 & 35;
- Def.'s Opp'n to Pl.'s Mot. for Administrative Stay of Proceedings ("Def.'s Opp'n to Pl.'s Mot. to Stay"), ECF No. 37;
- Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Stay ("Pl.'s Reply"), ECF No. 38;
- Statement of Interest of the United States ("Gov.'s Stmt."), ECF No. 44;
- Pl.'s Resp. to the Stmt. of Interest of the United States ("Pl.'s Resp. to Gov.'s Stmt."), ECF No. 47;
- Def.'s Resp. to Pl.'s Resp. to the Statement of Interest filed by the United States ("Def.'s Resp. to Gov.'s Stmt."), ECF No. 49; and
- Pl.'s Reply to Def.'s Resp. to the U.S. Statement of Interest ("Pl.'s Reply to Gov.'s Stmt."), ECF No. 50-1.

A. **Plaintiff's Allegations**

Plaintiff Mohamed Soltan is a United States citizen, who previously held dual citizenship with Egypt.  Compl. ¶ 12, ECF No. 1.  He is fluent in both English and Arabic.  *Id.* ¶¶ 19, 32.  Defendant Hazem Abdel Aziz El Beblawi served as Prime Minister of Egypt from July 9, 2013 until March 1, 2014.  *Id.* ¶ 14; Def.'s Mot. to Dismiss at 9.

The following is a recitation of the facts included in the Complaint, and not findings of fact by the Court.  Plaintiff's claims stem from a period of political unrest in Egypt.  On July 3, 2013, the Egyptian military removed then-President Mohamed Morsi from office.  *See* Compl. ¶ 28.  Shortly thereafter, Defendant became the interim prime minister.  *Id.*  In response to these events, protesters and activists congregated in Rabaa Square in Cairo, seeking—according to Plaintiff—to "pressure the military to restore democracy."  *Id.* ¶ 30.  Plaintiff joined the protesters "to assist in the coverage of the protest."  *Id.* ¶ 31.  He worked as an interpreter for foreign media outlets, in an effort to "promote insight" into the protests during an alleged "military black-out of all independent media."  *Id.* ¶ 32.  He also helped media outlets coordinate witness interviews and shared videos, photographs, and "first-hand testimonials" of the protests and the government's response.  *Id.* ¶¶ 33, 34.

Plaintiff alleges that the Egyptian government—including Defendant—authorized security forces to "violently disperse the protests" on July 31, 2013.  *Id.* ¶ 36.  The security forces fired tear gas and then "fired ammunition into the crowds from rooftops and helicopters" and blocked the protesters from exiting the square.  *Id.* ¶¶ 37–38.  Plaintiff posted images and reports of these events on his Twitter account.  *Id.* ¶¶ 41–42.  He alleges that the Egyptian government was monitoring his social media accounts and "deliberately targeted" him "for assassination" based on his reporting.  *Id.* ¶ 43.  According to Plaintiff, security forces shot at him twice, and one bullet

lodged itself in his upper arm. *Id.* Plaintiff alleges that Defendant "personally authorized and launched the operation" to clear protesters from Rabaa Square, resulting in Plaintiff's injury and 1,000 civilian deaths. *Id.* ¶ 46.

On August 25, 2013, Plaintiff was arrested at his parents' home in a suburb of Cairo. *Id.* ¶¶ 52–53. Plaintiff was detained at several police stations and prisons over the course of approximately 20 months. *See id.* ¶¶ 58, 59, 67, 72, 74, 80, 118. Plaintiff alleges that he suffered brutal treatment at the hands of police and security forces during each stage of his detention; among other things, Plaintiff indicates that he was repeatedly beaten, intentionally deprived of food, water, and sleep, and denied medical assistance for the gunshot wound in his arm. *Id.* ¶¶ 75–77, 79, 95, 100, 103, 106, 112. Plaintiff also describes being confined in small, hot cells—often chained together with other prisoners—being forced to sleep on the ground, and being placed in a cell "infested with cockroaches and spiders" without a mattress, toilet, or other basic hygiene supplies. *Id.* ¶¶ 62, 68, 78, 88–91. Plaintiff further alleges that prison guards forced him to listen to his father being beaten, threatened to kill him, beat another prisoner to death in front of him, and encouraged Plaintiff to commit suicide. *Id.* ¶¶ 68, 72, 86, 104.

After several months of confinement, Plaintiff was "found guilty as part of a mass trial of the bogus charges presented against him and sentenced to life in prison." *Id.* ¶ 115. Plaintiff, however, was released from prison on May 30, 2015 "after condemnations by the United States government" on the condition that he relinquish his Egyptian citizenship. *Id.* ¶¶ 117, 118. He returned to the United States. *Id.* ¶ 118. Plaintiff continues to suffer from physical, mental, and emotional health complications related to his period of incarceration. *Id.* ¶ 119.

Defendant's tenure as Egypt's prime minister ended on March 1, 2014, more than one year before Plaintiff's release from prison. *See id.* ¶ 14; Def.'s Mot. to Dismiss at 2. Plaintiff alleges

that Defendant exercised command and control over the security forces responsible for the "Rabaa Square massacre and the subsequent crackdown in Egypt[.]" Compl. ¶ 124. He further alleges that Defendant "authorized, directed and permitted persons or groups acting in coordination with the [security forces], or under their control, to commit human rights abuses[,]" *id.* ¶¶ 122, 124, including those Plaintiff alleges were perpetrated against him, *id.* ¶ 126.

At the time Plaintiff filed his Complaint in this action, Defendant served as an executive director of the IMF. Def.'s Mot. to Dismiss at 2. In that position, Defendant held a G-1 diplomatic visa. *See* Def.'s Opp'n to Pl.'s Mot. for Hr'g Ex. A, ECF No. 19-1. A "G-1" visa designation applies to "Principal Resident Representative of Recognized Foreign Government to International Organization," among others. 22 C.F.R. § 41.12.

In addition to Defendant, Plaintiff names in his Complaint several other current and former Egyptian government officials as "un-sued Defendants":

- Abdel Fattah el-Sisi, President of Egypt, Compl. ¶ 15;

- Abbas Kamel, head of the General Intelligence Directorate, *id.* ¶ 16;

- Mohamed Ibrahim, former Minister of the Interior, *id.* ¶ 17;

- Mahmoud Sayed Abdel Hamid Sha'rawi, former Deputy Director of the National Security Agency, *id.* ¶ 18; and

- Tamar Al-Fergany, current Head of the Anti-Corruption Authority and former Attorney General of State Security Prosecution, *id.*

There is no indication on the public docket that Plaintiff has served or attempted to serve process on these "Un-sued Defendants." Rather, Plaintiff concedes that the Court lacks jurisdiction over these "Un-sued Defendants," but suggests that they "will be named" in the event "personal jurisdiction against [these individuals] can be obtained." *See id.* ¶¶ 15–18. Accordingly, the Court proceeds in this Opinion with respect to Plaintiff's claims against Defendant Beblawi only.

**B.  Procedural Posture**

Plaintiff filed his Complaint on June 1, 2020.  *See* Compl.  Defendant was personally served with the Summons and Complaint on June 3, 2020.  *See* Aff. of Service, ECF No. 9.  One week later, Plaintiff filed a "Notice," alleging that after Defendant had been served, Plaintiff's family members in Egypt had been "subject to raids in the middle of the night," "held at gunpoint," and "were asked specifically about Plaintiff Soltan."  Notice ¶ 5, ECF No. 11.  Because of these alleged events, Plaintiff moved the Court for an emergency status conference to inquire about Defendant's involvement, *see* Pl.'s Mot. for Emergency Conf., ECF No. 12, which the Court denied, *see* Order, ECF No. 25.  Plaintiff also cited these events in opposing Defendant's request for an extension of time to respond to the Complaint.  *See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Extension at 2, ECF No. 21 (noting "the serious concern about the retaliatory and intimidating actions taken by the Egyptian government").

On June 24, 2020, Defendant filed his [24] Motion to Quash Service of Process and [25] Motion to Dismiss.  With Plaintiff's consent and leave of the Court, *see* Order, ECF No. 31, Defendant subsequently filed his [30] Corrected Motion to Dismiss on July 1, 2020.[2]  In these motions, Defendant argues that his diplomatic status based on his IMF position made him immune from service of process and from suit.  *See* Def.'s Mot. to Quash ¶¶ 1, 7, 14; Def.'s Mot. to Dismiss at 15–18.[3]  In his Motion to Dismiss, Defendant indicates that the Egyptian government had requested a suggestion of immunity from the State Department.  Def.'s Mot. to Dismiss at 13–14.  The record confirms that the Egyptian Embassy in Washington, D.C. sent two Diplomatic Notes

---

[2] Except where specifically noted, citations to "Def.'s Mot. to Dismiss" refer to Defendant's Corrected Motion to Dismiss, ECF No. 30-1.

[3] Defendant also argues that the Complaint should be dismissed for lack of personal jurisdiction and failure to state a claim under Rules 12(b)(2) and 12(b)(6).  *See* Def.'s Mot. to Dismiss at 19–21; 33–36.  Defendant further contends that Plaintiff's claims are barred by the Act of State and Political Question doctrines.  *See id.* at 27–30.

to the United States Department of State.  The first, dated June 22, 2020, advises the State Department that a "detailed diplomatic note will soon be dispatched respectfully requesting the United States of America to recognize the immunities from suit in respect to Mr. El Beblawi." *See* Broas Decl. Ex. A, ECF No. 22-1.  The second, dated June 24, 2020, requests that the State Department submit a Suggestion of Immunity on behalf of Defendant because Defendant "is inviolable and immune from civil suit on account of his current diplomatic status."  Broas Decl. Ex. B, ECF No. 22-1.  Defendant did not file any State Department records at the time he filed his motions to quash and to dismiss.

On July 17, 2020, however, Defendant filed a [32] Declaration of Timothy M. Broas, attaching to it a State Department document describing itself as a "certification of Mr. Elbelblawi's immunity."  *See* Broas Decl. Ex. A, ECF No. 32.  The certification is under cover of U.S. State Department Diplomatic Note 20-959, dated July 7, 2020.  The certification appears in the form of a letter on State Department letterhead, signed by Clifton C. Seagroves, Principal Deputy Director, Office of Foreign Missions.  It states, in pertinent part:

> The official records of the Department of State, Office of Foreign Missions, indicate that Mr. Hazem Abdelaziz Mohamed ELBEBLAWI . . . is notified to the Department as assuming his duties as the Principal Resident Representative of the Arab Republic to the International Monetary Fund, effective November 2, 2014 and that he continues to serve in such capacity.

Broas Decl. Ex. A, ECF No. 32.  The certification then provides that pursuant to Article V, Section 15(4) of the Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, 61 Stat. 3416, 11 U.N.T.S. 11 (entered into force Oct. 21, 1947) ("UN Headquarters Agreement"), "principal resident representatives" of a "special agency" of the United Nations enjoy the  "privileges and immunities" provided by the Vienna Convention

on Diplomatic Relations, 23 U.S.T. 3227, 500 U.N.T.S. 95 ("Vienna Convention").  *Id.*  The Vienna Convention, in turn, states that "[a] diplomatic agent . . . shall enjoy immunity from [the receiving State's] civil and administrative jurisdiction."  Vienna Convention Art. 31(1).

In response to Defendant's filing of the State Department's certification, Plaintiff filed on July 20, 2020 a [33] Motion for Administrative Stay of Proceedings for the Court to Assess the Status of Defendant Beblawi's Claim of Diplomatic Immunity.  In his Motion to Stay, Plaintiff argues that Defendant failed to raise his status as a "Principal Resident Representative" in earlier pleadings or to identify this position as the basis for his claim of diplomatic immunity.  Pl.'s Mot. to Stay at 2, 3–5.  Plaintiff also labels the State Department's certification a "highly questionable document," raising questions about its timing, source, and effect.  *Id.* at 3, 6.  For example, Plaintiff notes that the certification is not "in the usual form of a Suggestion of Immunity filed directly with the Court by the State Department," that it is unclear when Defendant became the Principal Resident Representative to the IMF, and that there were no "official records" attached to it.  *Id.* at 6.  Plaintiff also notes that the correspondence from the Egyptian Embassy made no reference to Defendant's Principal Resident Representative status.  *Id.*  Based on these "questions," Plaintiff asks the Court to infer that Defendant "was not previously a Principal Resident Representative," but that his "status was changed for purposes of this case."  *Id.* at 6–7.  Plaintiff also requested that the Court stay consideration of Defendant's motions, require Defendant to provide additional information about the timing of the document's production, to identify "his precise legal arguments on diplomatic immunity," and to "submit any materials from the IMF showing its agreement to his status as a Principal Resident Representative." *Id.*

On the following day, Plaintiff filed a consolidated opposition to Defendant's motions to quash and dismiss.  In his Opposition, Plaintiff recognizes Defendant's claims of diplomatic

immunity based on the State Department certification—raising many of the same "suspicious issues" noted in his Motion to Stay.  *See* Pl.'s Opp'n to Def.'s Mots. at 27.  Plaintiff claims, however that he "could not responsibly respond" to Defendant's motions based on Defendant's "late-breaking" reliance on his status as a Principal Resident Representative.  Plaintiff also argues that Defendant "has no legitimate argument for immunity unless he obtains an official Suggestion of Immunity from the State Department."  *Id.* at 28.

Defendant filed on August 4, 2020 an Opposition to Plaintiff's Motion to Stay, presenting his legal arguments for diplomatic immunity based on the State Department's certification. Defendant argues that the State Department's formal certification of Defendant's status as a Principal Resident Representative conclusively establishes his immunity from suit.  Def.'s Opp'n to Mot. to Stay at 8–12.  Plaintiff then replied to Defendant's diplomatic immunity arguments in his [38] Reply to Defendant's Opposition to Plaintiff's Motion for Administrative Stay.  Plaintiff argues that the State Department certification is not dispositive as to Defendant's diplomatic immunity because the relevant provision of the UN Headquarters Agreement requires evidence of a "tripartite agreement" as to Defendant's status as a "Principal Resident Representative" among the United States, Egypt, and the IMF.  *See* Pl.'s Reply at 10–11.  Plaintiff contends that Defendant has failed to produce such evidence, and therefore the State Department's certification is insufficient.  *Id.*

Because each party has had the opportunity to address the legal question of Defendant's immunity from suit based on his diplomatic status, the Court considers that issue fully briefed for the purpose of resolving the dispositive issue of Defendant's diplomatic immunity.[4]

---

[4] Although the Court previously indicated that it would set a date for Defendant to file a Reply in support of his Motions to Quash Service and to Dismiss, *see* July 21, 2020 Minute Order, the Court now finds that the parties have fully briefed the legal question of Defendant's diplomatic immunity in their briefing on Plaintiff's Motion to Stay and in response to the Statement of Interest of the United States.  Accordingly, the Court finds that a Reply brief from

### C.  Participation of the United States and Responsive Pleadings

On December 19, 2020, the Court issued an [39] Order pursuant to 28 U.S.C. § 517, inviting the United States to provide its views on the question of Defendant's immunity.  *See* Order at 2–3, ECF No. 39.  The Court noted that based on its review of the relevant caselaw, it would be the first court to determine whether Section 15(4) of the UN Headquarters Agreement requires a "Principal Resident Representative" of a specialized agency of the United Nations (here, the IMF), to demonstrate the agency's consent to Principal Resident Representative status and diplomatic immunity.  *Id.* at 2.  Accordingly, the Court solicited the position of the United States as to the following questions:

> a.  Does the State Department's certification of Defendant's immunity rely on the IMF's agreement to Defendant's status; and if so, would the State Department produce to the Court documentation of the IMF's agreement; *or*
>
> b.  If the State Department's certification is not based on the IMF's agreement to Defendant's status, would the State Department be able to consult with the IMF and obtain such documentation— without the State Department needing to express a legal position on whether such agreement is required pursuant to the UN Headquarters Agreement; *or*
>
> c.  If it is the State Department's position that the UN Headquarters Agreement does not require the IMF's agreement to Defendant's status as "principal resident representative" or immunity, what is the State Department's legal analysis for such conclusion.

*Id.* at 2–3.  After filing two notices requesting additional time to respond to the Court's inquiry, *see* ECF Nos. 41, 43, the United States filed a Statement of Interest on April 1, 2021, ECF No. 44.

In its Statement of Interest, the United States indicates that the State Department's "certification of El Beblawi's diplomatic status is conclusive with respect to that issue."  Gov.'s

---

Defendant is not necessary to resolve the dispositive issue of whether Defendant is immune from suit based on the State Department certification.

Stmt. at 2.  According to the United States, "[c]onsistent with standard accreditation practice," the IMF "notified [the U.S. Department of State] that El Beblawi assumed the position as Egypt's Principal Resident Representative to the IMF, effective November 2, 2014." *Id.*; Gov.'s Stmt. Ex. 1, Seagroves Decl. ¶ 2, ECF No. 44-1. The State Department, "following [its] standard practice for the accreditation of foreign representative to international organizations," then "accepted the IMF's notification." Gov.'s Stmt. at 3; Seagroves Decl. ¶ 3.  According to the United States, the State Department's certification reflects agreement between the IMF, Egypt, and the United States as to Defendant's diplomatic status.  Gov.'s Stmt. at 7; *see also id.* at 8 ("In this case, all three entities referred to in Section 15(4) of the UN Headquarters Agreement—the IMF, Egypt, and the United States—agreed as to El Beblawi's diplomatic status.").

The United States also noted that the "official records of the Office of Foreign Missions indicate that the IMF notified State of El Beblawi's termination as the Principal Resident Representative of Egypt to the IMF, effective October 31, 2020." Gov.'s Stmt. at 4; Seagroves Decl. ¶ 4.  The United States argues that Defendant's change in status has "no effect on the instant case" because Defendant held diplomatic status at the time Plaintiff filed his Complaint and served Defendant with process.  Gov.'s Stmt. at 9–10.

On April 19, 2021, with the Court's leave, *see* ECF Nos. 45, 46, Plaintiff filed a [47] Response to the Statement of Interest.  In his Response, Plaintiff contends that the State Department failed to offer "documentary proof" of the IMF's consent to Defendant's "PRR status." Pl.'s Resp. to Gov.'s Stmt. at 2–3, 9.  Defendant, with the Court's leave, Minute Order (Apr. 19, 2021), responded to Plaintiff's Response to the Statement of Interest, contending that the United States' certification and Statement of Interest provide "conclusive evidence of diplomatic status." Def.'s Resp. to Gov.'s Stmt. at 4.

Plaintiff then filed a [50] Motion for Leave to File a Reply to Defendant's Response to the United States' Statement of Interest, attaching to the motion his proposed reply.  Defendant subsequently moved to strike Plaintiff's motion for leave and proposed reply, contending that Plaintiff has had ample opportunity to address the question of Defendant's diplomatic immunity in earlier pleadings, and that permitting further briefing undermines the purpose of diplomatic immunity, which is "*immunity from suit*, rather than a mere defense to liability."  Def.'s Mot. to Strike at 1 (quoting *Mitchell v. Forsynth*, 472 U.S. 511, 526 (1985)).

As noted above, the Court grants Plaintiff's motion for leave to file its reply to Defendant's response to the United States Statement of Interest.  The Court reviewed Plaintiff's proposed reply, but does not consider the reasoning presented therein dispositive in ruling on the pending motions to dismiss and to quash.  The Court also denies Defendant's motion to strike Plaintiff's motion for leave to file a reply, and denies Defendant's request to file an additional responsive pleading.  The Court considers the question of Defendant's diplomatic immunity based on his Principal Resident Representative status to be fully briefed, and proceeds to the merits of the parties' arguments with respect to that issue.

## II.   LEGAL STANDARD

"Federal courts are tribunals of 'limited jurisdiction,' possessing 'only that power authorized by Constitution and statute[.]" *Zuza v. Office of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Where a defendant official is immune from suit, "the district court must dismiss the complaint for lack of subject-matter jurisdiction." *Zuza v. Office of High Representative*, 107 F. Supp. 3d 90, 93 (D.D.C. 2015), *aff'd* 857 F.3d 935 (D.C. Cir. 2017).

To determine whether there is subject matter jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharms, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction[.]").

### III.   DISCUSSION

Defendant argues that dismissal of this action is mandated pursuant to the Vienna Convention on Diplomatic Relations and the Diplomatic Relations Act. Specifically, Defendant contends that because he was a Principal Resident Representative to the IMF at the time he was served with process, he is entitled to diplomatic immunity pursuant to Article V of the UN Headquarters Agreement—the basis for the State Department's certification. Plaintiff, however, argues that the State Department's certification of Defendant's immunity does not conclusively establish Defendant's immunity absent evidence of the IMF's consent to Defendant's diplomatic status and immunity. Simply put, the question the Court confronts is whether diplomatic immunity shields Defendant from suit. The answer requires an examination of the underlying statutory and treaty framework.

### A.  Vienna Convention and Diplomatic Relations Act

The Vienna Convention provides that a "diplomatic agent shall . . . enjoy immunity from [the receiving state's] civil and administrative jurisdiction[.]"[5] Vienna Convention Art. 31(1). In accordance with the Vienna Convention, Congress enacted the Diplomatic Relations Act, which

---

[5] Article 31 provides three exceptions to this diplomatic immunity. *See Montuya v. Chedid*, 779 F. Supp. 2d 60, 62 (D.D.C. 2011). None of those exceptions is at issue here.

provides that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed." 22 U.S.C. § 254d.  Accordingly, if the Court concludes that Defendant is entitled to diplomatic immunity, it must dismiss the action.  *See Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187, 191 (D.D.C. 2007); *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 130 (D.D.C. 2009).

Under the Diplomatic Relations Act, immunity "may be established upon motion or suggestion by or on behalf of the individual." 22 U.S.C. § 254d.  Here, Defendant filed a "certification of [Defendant's] immunity" in the form of a letter from the State Department dated July 7, 2020.  *See* Broas Decl. Ex. A, ECF No. 32.  The certification confirms that the State Department "was notified" of Defendant's position as a "Principal Resident Representative" to the IMF "effective November 2014" and that, as of the date of the certification, "he continues to serve in that position." *Id.*  The certification also provided the basis for the State Department's conclusion, relying on Section 15(4) of the UN Headquarters Agreement (discussed in greater detail *infra* Section III(B)).

Although Plaintiff raised "questions" about the certification from the State Department, *see* Pl.'s Mot. to Stay at 5–6, other courts have accepted similar documents as an appropriate method to confirm the State Department's view on immunity.  *See, e.g.*, *Sabbithi*, F. Supp. 2d at 126 (relying on a "letter from the State Department" filed "as an exhibit" to the motion to dismiss); *Montuya*, 779 F. Supp. 2d at 62 (relying on letter from the State Department as basis for diplomat's immunity).  As the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has explained, "[i]t is enough that [the diplomat] has requested immunity, that the State Department has recognized that the person for whom it was requested is entitled to it, and that the

Department's recognition has been communicated to the court." *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) (internal quotation and citation omitted); *see also Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) ("In litigation implicating the status of diplomats, the courts and the Executive have developed a practice in which the Executive submits a certification of a diplomat's status to the court.").  That is precisely what happened here: the State Department provided its recognition of Defendant's immunity after correspondence from the Egyptian embassy, and that recognition was presented to the Court.[6]  The United States also indicated in its Statement of Interest that the "State Department's Certification is consistent with [the UN Headquarters Agreement] . . . and the process followed is in keeping with the Department's standard practice." Gov.'s Stmt. at 8.

The Court concludes that the certification filed by Defendant confirms the State Department's position that Defendant's status as a Principal Resident Representative to the IMF entitles him to diplomatic immunity.  The State Department's confirmation of diplomatic status and immunity ordinarily ends the Court's inquiry.[7]  *See Carrera*, 174 F.2d at 497 ("The courts are disposed to accept as conclusive of the fact of the diplomatic status of an individual claiming an exemption, the views thereon of the political department of their government." (internal citations

---

[6] Plaintiff suggests that it is a "fair inference" to conclude that Defendant's status was "changed for the purpose of this case" or "reverse-engineered." Pl.'s Mot. to Stay at 6–7.  Defendant disputes Plaintiff's suggestion, contending that Defendant is immune from suit by virtue of his position with the IMF, as evidenced by the State Department's confirmation of his status "effective 2014."  *See* Def.'s Opp'n to Pl.'s Mot. to Stay at 6 n.4.  Even assuming Plaintiff is correct, "[t]he weight of relevant caselaw favors finding that if international officers acquire immunity during the pendency of a suit, the suit must be dismissed." *Zuza v. Office of High Representative*, 14-01099 (RC), 2016 WL 447442, at *5 (D.D.C. Feb. 4, 2016) (citing *Abdulaziz v. Metro. Dade Cnty.*, 741 F.2d 1328, 1329-30 (11th Cir. 1984) (holding that diplomatic immunity "serves as a defense to suits already commenced")) (additional citations omitted).

[7] Plaintiff argues that the State Department's position on Defendant's immunity is merely entitled to "substantial weight," based on *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012).  In that case, the Fourth Circuit concluded that it was appropriate to "give absolute deference to the State Department's position on status-based immunity doctrines," but its determination "regarding conduct-based, by contrast, is not controlling, but it carries substantial weight in our analysis of the issue."  *Id.* at 773.  Here, Defendant's immunity hinges on his status as a Principal Resident Representative to the IMF, not based on his conduct.

and quotation marks omitted)); *see also Zdravkovich v. Consul General of Yugoslavia*, No. 98-7034, 1998 WL 389086, at *1 (D.C. Cir. June 23, 1998) (per curiam) ("The courts are required to accept the State Department's determination that a foreign official possesses diplomatic immunity from suit.") (internal citations and quotation marks omitted); *Abdulaziz*, 741 F.2d 1328, 1331 (11th Cir. 1984) ("Although defendant argue that the State Department certificate is reviewable in court, the courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status."); *Jungquist v. Nahyan*, 940 F. Supp. 312, 321–22 (D.D.C. 1996) ("[T]he determination of a diplomat's status . . . is made by the State Department, not the Court."), *rev'd in part on other grounds*, 115 F.3d 1020 (D.C. Cir. 2017); *Montuya*, 779 F. Supp. at 62 ("The Court must accept the State Department's determination that Defendants have diplomatic status."). Courts afford such "conclusive weight to the Executive's determination of an individual's diplomatic status" in recognition of the Constitution's "vesting" of "diplomatic powers with the President." *Muthana*, 985 F.3d at 907. "The Constitution vests the President with the sole power to 'receive Ambassadors and other public Ministers.'" *Id.* (quoting U.S. Const. art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."), § 3 ("[H]e shall receive Ambassadors and other public Ministers.")). And the "Reception Clause recognizes the President's authority to determine the status of diplomats, a fact long confirmed by all three branches." *Id.* (citing Crimes Act of 1790 ch. IX § 25, 1 Stat. 112, 117–18; Presidential Power to Expel Diplomatic Personnel from the United States, 4A Op. O.L.C. 207, 208–09 (Apr. 4, 1980); *In re Baiz*, 135 U.S. 403, 432 (1890)).

Here, however, Plaintiff argues that the State Department's position is not dispositive because the State Department "cannot . . . speak to whether [Defendant] has complied with the provisions of Article V, Section 15(4) of the UN Headquarters Agreement," which is the basis for

the State Department's conclusion that Defendant is a diplomatic agent, immune from suit.  *See* Pl.'s Reply at 1, 10–11.  Accordingly, the Court shall next address the relevant sections of the UN Headquarters Agreement underlying the Defendant's claim of diplomatic immunity based on the State Department's certification.

### B.  UN Headquarters Agreement

The UN Headquarters Agreement affords certain United Nations officials "the same diplomatic immunity as diplomats accredited to the United States." *Devi v. Silva*, 861 F. Supp. 2d 135, 141 (S.D.N.Y. 2012).  In its certification of Defendant's immunity, the State Department relies on Article 5, Section 15 of the UN Headquarters Agreement, which provides:

> (1) Every person designated by a Member as the principal resident representative to the United Nations of such Member or as a resident representative with the rank of ambassador or minister plenipotentiary,
>
> (2) such resident members of their staffs as may be agreed upon between the Secretary–General, the Government of the United States and the Government of the Member concerned,
>
> (3) every person designated by a member of a specialized agency, as defined in Article 57, paragraph 2 of the Charter, as its principal resident representative, with the rank of ambassador or minister plenipotentiary at the headquarters of such agency in the United States, and
>
> (4) such other principal resident representatives of members to a specialized agency and such resident members of the staffs of representatives to a specialized agency as may be agreed upon between the principal executive officer of the specialized agency, the Government of the United States and the Government of the Member concerned,
>
> shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it.

UN Headquarters Agreement § 15.  Specifically, the State Department (and Defendant) relies on Section 15(4) as the basis for Defendant's diplomatic immunity, indicating that the IMF is a "specialized agency" of the United Nations, so as a "principal resident representative" of the IMF, Defendant is "entitled . . . to the same privileges and immunities . . . as [the United States] accords diplomatic envoys accredited to it."  *See* Broas Decl. Ex. A, ECF No. 32.

Plaintiff argues, however, that Section 15(4) of the UN Headquarters Agreement requires Defendant to provide evidence of a "tripartite agreement" among the United States, Egypt, *and* the IMF to demonstrate that he was a "Principal Resident Representative," entitled to diplomatic immunity.  Pl.'s Reply at 10–12.  Defendant, citing the State Department's certification, argues that Principal Resident Representatives of the IMF are entitled to diplomatic immunity pursuant to the "plain language" of Section 15.  Def.'s Opp'n to Mot. to Stay at 12–13.  The issue, therefore, is whether the final clause of Section 15(4)—"as may be agreed upon between" the agency, the United States, and Egypt—compels Defendant to demonstrate  the IMF's consent to his status as a Principal Resident Representative.

Neither party cites—and the Court has not identified—any caselaw considering whether the final clause of Section 15(4) applies *both* to "principal resident representatives" *and* "such resident members of the staffs of residents" or only to the latter category (which immediately precedes the phrase).  Rather, the parties each discuss cases applying Sections 15(1) and 15(2). Section 15(1) entitles all "principal resident representatives" designated by a member country to the United Nations to immunity, without any requirement of a "tripartite agreement."  Defendant cites two cases applying Section 15(1) to support his argument that the State Department's certification of Defendant's diplomatic status alone is sufficient and dispositive. *See* Def.'s Opp'n to Mot. to Stay at 13–15; *Devi*, 861 F. Supp. 2d at 140–41 (concluding that "Deputy Permanent

Resident of Sri Lanka to the United Nations," as "formally recognized by the United States" was entitled to diplomatic immunity); *Ahmed v. Hoque*, No. 01 Civ. 7224(DLC), 2002 WL 1964806, at *1, *5 (S.D.N.Y. Aug. 23, 2002) (finding that defendant's status as "Economics Minister" for the Permanent Mission of Bangladesh "accords him full diplomatic immunity under the Headquarters Agreement").

Plaintiff, in contrast, relies on cases applying Section 15(2), which provides immunity to "resident members of their staffs *as may be agreed upon*" by the member state, the United States, and the Secretary General of the United Nations.  UN Headquarters Agreement § 15(2) (emphasis added).  Plaintiff argues that cases applying Section 15(2) require "evidence that there is agreement among all three necessary parties under the treaty."  Pl.'s Reply at 15–16.  But the cases cited by Plaintiff deal with members of the "staff" of United Nations members' representatives—not with individuals designated as "principal resident representatives" to the UN or to a UN agency.  *See, e.g.*, *United States. ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425, 427, 433 (S.D.N.Y. 1963) (concluding that "Resident Member of the Staff of the Permanent Mission of Cuba to the United Nations" did not have diplomatic immunity because the State Department certified that the United States had not agreed to grant diplomatic immunity); *United States v. Coplon*, 84 F. Supp. 472, 476 (S.D.N.Y. 1949) (concluding that "member of the staff of the Headquarters Planning Office" who was "not the principal resident representative" and whom the State Department declared "[did] not enjoy diplomatic status" did not qualify for diplomatic immunity); *United States v. Egorov*, 222 F. Supp. 106, 108–09 (E.D.N.Y. 1963) (concluding that defendant was not entitled to diplomatic immunity as an "employee" of the UN).  And in several of the cases cited by Plaintiff, the courts have distinguished between "United Nations representatives or ministers" and "United Nations staff members or employees, noting that only representatives and ministers are accorded

full diplomatic immunity, while staff members and employees are accorded only functional immunity." *Ahmed*, 2002 WL 1964806, at *5 (citing *United States v. Enger*, 472 F. Supp. 490, 502 (D.N.J. 1978); *Egorov*, 222 F. Supp. at 108; *Fitzpatrick*, 214 F. Supp. at 436).

The Court sees no reason to depart from the same distinction with respect to "specialized agencies" of the United Nations.[8]   That is, there is no reason to read Section 15(4) as requiring "principal resident representatives of members to a specialized [UN] agency" to demonstrate the agency's assent, when there is no such requirement for a "principal resident representative to the United Nations" under Section 15(1).  The familiar "rule of the last antecedent" counsels the same result.  *See, e.g.*, *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) ("[A] limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows.") (internal citations and quotation marks omitted). So too does the State Department's reliance on Section 15(4) for its conclusion that Defendant is immune from suit based on his diplomatic status.  *See United States v. Stuart*, 489 U.S. 353, 369 (1989) ("[A]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *see also Gonzalez Paredes*, 479 F. Supp. 2d at 194 (deferring to the State Department's interpretation of "commercial activity" exception to Article 31 of the Vienna Convention).  In its Statement of Interest, the United States explicitly confirms its position that "per Section 15(4), only the immunity accorded other 'resident members of the staffs or representatives' must be agreed between the specialized agency, the United States, and the government of the state concerned."  Gov.'s Stmt. at 8 n.4.

---

[8] The IMF is classified as a "specialized agency" of the United Nations pursuant to the Agreement Between the United Nations and the IMF, Art. 1, Nov. 15, 1947, 16 UNTS 325.

Even if the Court adopted Plaintiff's interpretation of Section 15(4) as requiring "tripartite agreement" as to Defendant's Principal Resident Representative status, *see* Pl.'s Resp. to Gov.'s Stmt. at 7–8,  the State Department indicates that the "*all three entities* referred to in Section 15(4) of the UN Headquarters Agreement—the IMF, Egypt, and the United States—*agreed* as to [Defendant's] diplomatic status[.]"  *Id.* at 8 (emphases added).   The State Department explains that "the IMF notified [Defendant] to the State Department as assuming his duties as Egypt's Principal Resident Representative to the IMF, which would have been based on a notification of the appointment by the Egyptian government to the IMF."  *Id.*; *see also* Gov.'s Stmt. Ex. 1, Seagroves Decl. ¶ 2, ECF No. 44-1.  The State Department's certification, supplemented by its Statement of Interest and supporting affidavit, belies Plaintiff's assertion that Defendant's "PRR status is unsubstantiated."  Pl.'s Resp. to Gov.'s Stmt. at 1.   The Court credits the State Department's certification and representations (under oath) that its records of Defendant's position and diplomatic status derive from notification by the IMF and Egypt.  Gov.'s Stmt. at 8; Seagroves Decl.  ¶ 2; *see, e.g.*, *Muthana*, 985 F.3d at 908 ("When a diplomat has been recognized by the Executive, "the evidence of those facts is not only sufficient, but in our opinion, conclusive upon the subject of his privileges as a minister." (internal citations and quotation marks omitted)).

Based on the State Department's certification that Defendant was a Principal Resident Representative to the IMF at the time Plaintiff filed his Complaint and attempted to serve Defendant with process, the Court concludes that Defendant is entitled to "the same privileges and immunities subject to corresponding conditions and obligations, as [the United States] accords to diplomatic envoys."  UN Headquarters Agreement § 15; *see also United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014) ("Courts in civil cases have dismissed claims against individuals who had diplomatic immunity at an earlier stage of the proceedings, even if they no

longer possessed immunity at the time dismissal was sought."). Those "privileges and immunities" are defined by the Vienna Convention. *See Devi*, 861 F. Supp. 2d at 141. Under the Diplomatic Relations Act, the Court lacks jurisdiction to consider Plaintiff's Complaint. *See supra* Section III(A). The Court, therefore, does not consider Defendant's other grounds for dismissal.

In upholding Defendant's claim of diplomatic immunity from suit, the Court recognizes that it is "leaving Plaintiff without recourse—at least within the United States and at this time." *Gonzalez Paredes*, 479 F. Supp. 2d at 194. Nonetheless, the Court is bound by the requirement that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . *shall be dismissed*." 22 U.S.C. § 254d (emphasis added). The Court further grants Defendant's Motion to Quash, based on the "rather obvious point that if a diplomat is immune from suit, he or she is equally immune from service of process." *Aidi v. Yaron*, 672 F. Supp. 516, 518 (D.D.C. 1987); *see also Gonzalez Paredes*, 479 F. Supp. 2d at 195 (granting motions to quash service of process and to dismiss action against defendants entitled to diplomatic immunity under the Vienna Convention). Accordingly, Defendant's motions to quash service of process and to dismiss the Complaint shall be granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court shall **GRANT** Defendant's Motion to Quash and Motion to Dismiss and shall dismiss this case without prejudice. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

Date: September 17, 2021